ROB BONTA
Attorney General of California
IVETA OVSEPYAN
Supervising Deputy Attorney General
JULIO A. HERNANDEZ
Deputy Attorney General
State Bar No. 260508
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-6238
  Fax: (916) 322-8288
  E-mail: Julio.Hernandez@doj.ca.gov
*Attorneys for Defendants*
*Christopher Bates and Jeffrey O'Brien*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Jeff Macy, as an individual,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**California Highway Patrol, a State Agency; Officer Christopher Bates; Supervisor Officer Sergeant Jeffrey O'Brien, and Does 1 - 10, inclusive,**<br><br>Defendants. | Case No. 5:23-CV-02245-RGK-BFM<br><br>**DECLARATION OF JULIO A. HERNANDEZ IN SUPPORT OF OPPOSITION TO PLAINTIFF JEFF MACY'S MOTION FOR SANCTIONS**<br><br>Judge: Hon. Brianna Fuller Mircheff<br>Trial Date:    Not Set<br>Action Filed: 5/06/2024 |

I, JULIO A. HERNANDEZ, declare:

1.    I am an attorney licensed to practice before all the courts of the State of California, a Deputy Attorney General with the California Department of Justice, and counsel of record for Defendants Christopher Bates and Jeffrey O'Brien in the above-entitled action. The following facts are within my personal knowledge and, if called as a witness herein, I can and will competently testify thereto.

/ / /

/ / /

1

2.     On October 1, 2024, the deposition of plaintiff Jeff Macy was conducted and completed. The deposition took place in a conference room in San Bernardino, California. The conference room is approximately 20 by 30 feet and comfortably accommodated all six individuals present. The conference room table used to conduct the deposition is approximately 6 by 10 feet in dimension. In attendance were plaintiff Jeff Macy, Julie Macy, plaintiff's wife, Stacy M. Wilson, court reporter, Saxon Christin, videographer, and myself.

3.     Prior to the deposition commencing, Plaintiff Macy objected to the deposition and video recording of the deposition. Plaintiff did not previously serve written objections to the deposition notice. However, only the objection to the video recording was placed on the record. On October 8, 2024, I sent a meet and confer letter to Plaintiff Macy regarding his objection to the video recording before seeking the Court's intervention. Consequently, Defendants have not taken possession of the video recording of the deposition.

4.     From the outset of the deposition, plaintiff Macy objected to questions about relevant background information. During the deposition, Plaintiff Macy continually interrupted my questioning and provided unresponsive testimony requiring me to re-ask the question or seek clarification. Attached as Exhibit A is a true and correct condensed copy of the transcript of the deposition of plaintiff Jeff Macy for the Court's review.

5.     At no time did I ask any on-the-record questions to Mrs. Macy.  I exchanged pleasantries prior and after the deposition with Mrs. Macy.

6.     About a little over an hour into the deposition, I was attempting to establish the evidentiary foundation and scope of a video that was posted on YouTube purporting to demonstrate the traffic stop that is the subject of this litigation.[1] After repeated interruptions and unresponsive replies to the line of questioning and in a moment of frustration, I raised my voice to stop Plaintiff Macy

---

[1] The YouTube video is referenced in Plaintiff's operative complaint.

1  from continuing while reaching out my hand in open palm in a "stop" gesture.

2  However, I did not get off my seat, stand up, lunge at the deponent, "reach across

3  the table in Plaintiff's face" or otherwise act in an aggressive or threating manner. I

4  immediately attempted to go off the record, however, Plaintiff Macy initially

5  refused. Once the parties were off the record, I apologized to Plaintiff Macy and the

6  others present. Upon return on the record I again apologized to Plaintiff Macy. I did

7  not again raise my voice during the deposition, even though plaintiff's Macy's

8  interruptions and non-responsive answers continued, prolonging the deposition.  I

9  never used profanity, insulted the deponent, or in any other way attempt to impede

10  the deposition. Attached as Exhibit B is a true and correct reproduction of the line

11  of questioning that led up to raising of my voice out of frustration with the

12  deponent's non-responsiveness.

13      7.   I sincerely apologize to the Court for any conduct it may consider

14  unbecoming.

15      I declare under penalty of perjury under the law of the United States and State

16  of California that the foregoing is true and correct. Executed this 22nd day of

17  October, 2024, Sacramento, California.

18

19                                          /s/ Julio A. Hernandez
                                           JULIO A. HERNANDEZ

20

21

22

23

24  SA2024302219
    38492517.docx

25

26

27

28

## DECLARATION OF SERVICE BY E-MAIL AND U.S. MAIL

**Case Name:**    *Macy, Jeff, et al. v. California Highway Patrol, et al.*
**Case No.:**     **5:23-CV-02245-RGK-BFM**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

On **October 22, 2024**, I served the attached **DECLARATION OF JULIO A. HERNANDEZ IN SUPPORT OF OPPOSITION TO PLAINTIFF JEFF MACY'S MOTION FOR SANCTIONS** by transmitting a true copy via electronic mail. In addition, I placed a true copy thereof enclosed in a sealed envelope, in the internal mail system of the Office of the Attorney General, addressed as follows:

Jeff Macy
P.O. Box #103
Twin Peaks, CA 92391
**E-mail:  macybuilders@yahoo.com**

*In Pro Per*

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on **October 22, 2024**, at Sacramento, California.

Donna Kulczyk                          */s/ Donna Kulczyk*
            Declarant                                        Signature

# EXHIBIT A

```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3                              --oOo--

 4

 5    Jeff Macy, as an individual, Jerusha Macy,)CASE NO.
      as an individual, Josiah Macy, as an      )5:23-CV-02245-
 6    individual, and Jodiah Macy, as an        )RGK-BFM
      individual,                               )
 7                                              )
                      Plaintiffs,               )
 8                                              )
       vs.                                      )
 9                                              )
      California Highway Patrol, a State Agency;)
10    Officer Christopher Bates; Supervisor     )
      Officer Sergeant Jeffrey O'Brien, and Does)
11    1 - 10, inclusive,                        )
                                                )
12                    Defendants.               )
                                                )
13

14

15

16                   DEPOSITION OF JEFF MACY

17                  SAN BERNARDINO, CALIFORNIA

18                   TUESDAY, OCTOBER 1, 2024

19                   9:07 A.M. - 12:46 P.M.

20

21

22    Reported by:
      Stacy M. Wilson
23    CSR No. 9530
24    Job No. 6884847

25
```

Page 1

## Page 2

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3                        --oOo--
 4
 5   Jeff Macy, as an individual, Jerusha Macy,)CASE NO.
     as an individual, Josiah Macy, as an      )5:23-CV-02245-
 6   individual, and Jodiah Macy, as an        )RGK-BFM
     individual,                               )
 7                                             )
             Plaintiffs,                       )
 8                                             )
        vs.                                    )
 9                                             )
     California Highway Patrol, a State Agency;)
10   Officer Christopher Bates; Supervisor     )
     Officer Sergeant Jeffrey O'Brien, and Does)
11   1 - 10, inclusive,                        )
                                               )
12           Defendants.                       )
                                               )
13
14
15          DEPOSITION OF JEFF MACY, taken on behalf of
16   the Defendants, at Regus - Three Parkside, 473 E.
17   Carnegie Drive, Suite 200, San Bernardino, California,
18   beginning at 9:07 a.m. and ending at 12:46 p.m., on
19   Tuesday, October 1, 2024, before Stacy M. Wilson, CSR
20   No. 9530, a Certified Shorthand Reporter within and for
21   the State of California.
22
23                        --oOo--
24
25
```

## Page 3

```
 1
 2
 3              APPEARANCES
 4
 5   FOR THE PLAINTIFF:    JEFF MACY, IN PRO PER
                           P.O. BOX 103
 6                         TWIN PEAKS, CA 92391
                           (909) 744-8480
 7                         macybuilders@yahoo.com
 8
     FOR THE DEFENDANTS:   STATE OF CALIFORNIA
 9                         DEPARTMENT OF JUSTICE
                           OFFICE OF THE ATTORNEY GENERAL
10                         BY: JULIO A. HERNANDEZ, ESQ.
                           1300 I STREET, SUITE 125
11                         P.O. BOX 944255
                           SACRAMENTO, CA 94244-2550
12                         (916) 210-6238
                           julio.hernandez@doj.ca.gov
13
14   THE VIDEOGRAPHER:     SAXON CHRISTIN
15
     ALSO PRESENT:         JULIE MACY
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1              INDEX OF EXAMINATIONS
 2                                          Page
 3   EXAMINATION BY MR. HERNANDEZ             7
 4
 5
 6           INDEX OF DEFENDANTS' EXHIBITS
 7   No.    Description                      Page
 8
     Exhibit A  Notice of Taking of Deposition of    13
 9     Plaintiff Jeff Macy
10   Exhibit B  Response By Plaintiff Jeff Macy to    21
       Defendant Jeffrey O'Brien's
11     Interrogatories (Set One)
12   Exhibit C  Response By Plaintiff Jeff Macy to    21
       Defendant Christopher Bates's
13     Interrogatories (Set One)
14   Exhibit D  Response By Plaintiff Jeff Macy to    21
       Defendant Christopher Bates's Request
15     For Admission (Set One)
16   Exhibit E  Screenshot taken from YouTube regarding  25
       Traffic Stop
17
     Exhibit F  Cell Phone Video taken by Plaintiff    65
18     Jeff Macy of Incident on June 27, 2023
19
20           QUESTIONS REFUSED TO ANSWER
21           PAGE   LINE
             13     16
22           13     22
             16     23
23           21      7
24
25
```

## Page 5

```
 1   TUESDAY, OCTOBER 1, 2024, SAN BERNARDINO, CALIFORNIA
 2              9:07 A.M.
 3              ---oOo---
 4
 5          THE VIDEOGRAPHER:  Good morning.  We are going    09:07
 6   on the record at 9:07 a.m. on October 1st, 2024.  Please    09:08
 7   note that the microphones are sensitive and may pick up    09:08
 8   whispering and private conversations.  Please mute your    09:08
 9   phones at this time.  Audio and video recording will    09:08
10   continue to take place unless all parties agree to go    09:08
11   off the record.                                         09:08
12          This is Media Unit 1 of the video-recorded    09:08
13   deposition of Jeff Macy in the matter of Jeff Macy,    09:08
14   et al., versus California Highway Patrol, et al., filed    09:08
15   in the United States District Court for the Central    09:08
16   District of California.  The case number is    09:08
17   5:23-CV-02245-RGK-BFM.                                  09:08
18          The location of the deposition is 473 East    09:09
19   Carnegie Drive, Suite 200, San Bernardino, California    09:09
20   92408.  My name is Saxon Christin representing Veritext    09:09
21   Legal Solutions, and I'm the videographer.  The court    09:09
22   reporter is Stacy Wilson from the firm Veritext Legal    09:09
23   Solutions.  I'm not authorized to administer an oath.  I    09:09
24   am not related to any party in this action nor am I    09:09
25   financially interested in the outcome.                  09:09
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    If there are any objections to proceeding,    09:09
2    please state them at the time of your appearance.    09:09
3    Counsel and all present will now state their appearances    09:09
4    and affiliations for the record beginning with the    09:09
5    noticing attorney.    09:09
6        MR. HERNANDEZ: Julio Hernandez on behalf of    09:09
7    the Defendants Christopher Bates and Jeffrey O'Brien.    09:09
8        MR. MACY: Jeff Macy, the prose- -- the    09:09
9    prosecuting, representing myself.    09:10
10        And the federal law in California law says you    09:10
11    can't -- you can't do -- you can't record the opposing    09:10
12    party.  It would cause -- the exact wording would be to    09:10
13    "Prevent attorneys from taking undue advantage and    09:10
14    efforts."  Civil Code Procedure 2018.020 Subsection (b).    09:10
15        MR. HERNANDEZ: Okay.    09:10
16        THE VIDEOGRAPHER: One moment.  The court    09:10
17    reporter may now swear in the witness.    09:10
18
19        JEFF MACY,
20    called as a witness, having been administered an oath
21    in accordance with C.C.P. Section 2093(b), testified as
22    follows:
23
24        MR. HERNANDEZ: Okay.  Before we begin the    09:10
25    deposition, Mr. Macy has now brought an objection to the    09:10

Page 6

1    videotaping of this deposition.  He put his objection on    09:10
2    the record, but we have agreed as defendants that    09:10
3    defendants will not take possession of the videotaped    09:10
4    deposition until the court rules on Mr. Macy's    09:11
5    objection.    09:11
6        As such, we will go forward with the deposition    09:11
7    videotaped, but the videotape will not be provided to    09:11
8    counsel until which time the court orders so.  And    09:11
9    defendants' counsel will notify videographer at that    09:11
10    time.    09:11
11        09:11
12        EXAMINATION    09:11
13    BY MR. HERNANDEZ:    09:11
14    Q.  Do you understand?  Is that agreed to,    09:11
15    Mr. Macy?    09:11
16    A.  I want -- I don't have his name and his card.    09:11
17    I want to make sure he knows it's California two-party    09:11
18    concept law.  I know this is federal, but I do not agree    09:11
19    with him being here filming me.    09:11
20    Q.  We understand.  That's why we put the objection    09:11
21    on the record.    09:11
22    A.  So can I get his card?    09:11
23    Q.  You will get it after the deposition.    09:11
24    A.  But not during?  Not before he's videoing me?    09:11
25    So I have no idea who is videoing me.    09:11

Page 7

1    Q.  Actually it will be provided to you as part of    09:11
2    the deposition transcript.  It will identify who the    09:11
3    video and court reporter is.    09:11
4    A.  So I'm asking are you willing to give me your    09:11
5    identification as to the one filming?    09:11
6    Q.  Sir, you're not the one asking questions today    09:12
7    so that would be inappropriate --    09:12
8    A.  It's not inappropriate if someone is filming    09:12
9    me.  He has a camera how many feet from me?  4 feet,    09:12
10    5 feet?    09:12
11    Q.  Okay, Mr. Macy.    09:12
12    A.  I have the right to know.    09:12
13    Q.  And you will know that information.  It does    09:12
14    not have to be --    09:12
15    A.  You're not going to give it to me now?    09:12
16    Q.  I'd prefer that he give it to you.  You will    09:12
17    get a copy of it.    09:12
18    A.  On the record too, this cost me $32 in gas.    09:12
19    $17 here.  $17 back.  $320 for dumping trash that we    09:12
20    lost today.  This is expected $354 of travel expense to    09:12
21    be paid.    09:12
22    Q.  Okay.  Mr. Macy, I need you to stop.  I'm not    09:12
23    going to let you filibuster my deposition.    09:12
24    A.  It's a simple question.    09:12
25    Q.  Okay.  Mr. Macy, can you please state and spell    09:12

Page 8

1    your full name for the record.    09:12
2    A.  I already did.    09:12
3    Q.  Can you please state and spell your full name    09:12
4    for the record.    09:12
5    A.  Again?  You want me to do it again?    09:12
6    Q.  Yes, sir.    09:12
7    A.  You're asking the same question.  I already    09:12
8    gave you my name.  J-e-f-f, M-a-c-y.  This is the second    09:12
9    time you've asked that.    09:13
10    Q.  Sir, I didn't ask you before.    09:13
11        Mr. Macy, do you understand --    09:13
12    A.  She asked me.    09:13
13    Q.  Mr. Macy, do you understand --    09:13
14    A.  You don't trust her?    09:13
15    Q.  Mr. Macy, do you understand that you're here    09:13
16    providing your deposition under oath today?    09:13
17    A.  Yes.  She's already said that.  It's been    09:13
18    repeated.    09:13
19    Q.  Okay.  I just want to make sure that you    09:13
20    understand.    09:13
21        I would like to go over some ground rules for    09:13
22    the deposition so this can be smoother and we can get    09:13
23    out of here faster.  Okay?    09:13
24        First and foremost before this deposition    09:13
25    began, you were placed under oath by the court reporter    09:13

Page 9

3 (Pages 6 - 9)

1  that's sitting to your right.  So anything you do say    09:13
2  here today that's taken down by this court reporter has    09:13
3  the same weight and authority as though you'd be    09:13
4  standing in open court before a judge or a jury.    09:13
5      Do you understand that, sir?    09:13
6  A.  Yes, sir.    09:13
7  Q.  Okay.  This is a question-and-answer session.    09:13
8  The court reporter is here to take down what's being    09:13
9  said.  It is difficult for the court reporter to take    09:13
10  down what's being said if more than one person is    09:13
11  speaking at the same time.    09:13
12      As such, I'd ask you to wait until my question    09:13
13  is completed before providing a response, and I will    09:13
14  extend you the same courtesy.  If for some reason we    09:14
15  start talking over each other, the court reporter might    09:14
16  get upset and let us know.  I'd prefer to avoid    09:14
17  upsetting the court reporter, but I will as well try to    09:14
18  -- try to extend you that courtesy?    09:14
19      Do you understand, sir?    09:14
20  A.  Yes.    09:14
21  Q.  Okay.  If you answer any of my questions, it's    09:14
22  an understanding that you understood my question.  If    09:14
23  for some reason you do not understand my question --    09:14
24  it's vague, it's unclear to you -- please let me know,    09:14
25  and I will try to clarify for you.    09:14

Page 10

1      Do you understand?    09:14
2  A.  Yes.    09:14
3  Q.  Okay.  I ask you not to guess during the    09:14
4  deposition.  If you use the word "guess," I will    09:14
5  interject a clarification.  We don't want you to guess.    09:14
6  We want you to give us your best testimony.    09:14
7      Do you understand?    09:14
8  A.  Yes.    09:14
9  Q.  Okay.  And I ask you to give me a verbal    09:14
10  response.  If you could avoid guttural sounds such as    09:14
11  huh-uh, yay, nah, that type of thing.  It's important    09:15
12  for the court reporter to be able to type down what's    09:15
13  being said.  So if you do something like that, I may    09:15
14  clarify, "Is that a yes or a no?" so we have a clarified    09:15
15  record.    09:15
16      Do you understand?    09:15
17  A.  Yes.    09:15
18  Q.  If you need to take a break for any reason, we    09:15
19  can do so.  If you'd just let me know.  I don't plan to    09:15
20  be here too long.  However, we usually take a break    09:15
21  after every hour or so.    09:15
22      Do you understand?    09:15
23  A.  Yes.    09:15
24  Q.  Did you take any medication this morning that    09:15
25  in any way will affect your ability to remember facts or    09:15

Page 11

1  events?    09:15
2  A.  No.    09:15
3  Q.  Okay.  Other than the objection that you put on    09:15
4  the record already, is there any reason why we couldn't    09:15
5  continue with this deposition here today?    09:15
6  A.  Just the objections I said --    09:15
7  Q.  Okay.    09:15
8  A.  -- about recording.    09:15
9      I didn't get a response out of the guy    09:15
10  recording me as to who he is.    09:15
11  Q.  Okay, sir.    09:15
12  A.  He's supposed to identify himself.  It says    09:15
13  that in federal law procedure.  He needs to identify    09:15
14  himself.  That's what it says.  So I can obtain the    09:16
15  video if I need it -- right? -- or whatever he has in    09:16
16  his possession.    09:16
17  Q.  As I indicated --    09:16
18  A.  I have no way to access it in front of him.    09:16
19  Q.  Mr. Macy, as I indicated to you, you will get    09:16
20  that information.    09:16
21      Did you review any documents in preparation for    09:16
22  the deposition here today?    09:16
23  A.  No, I did not.    09:16
24  Q.  Okay.  Did you speak to anybody about the    09:16
25  deposition in preparation for the deposition here today?    09:16

Page 12

1  A.  No, I did not.    09:16
2  Q.  And do you understand that you're here because    09:16
3  we sent a notice of deposition to you?    09:16
4  A.  Yes.    09:16
5  Q.  Okay.  If you look, I left a little stack of    09:16
6  documents I know you're flipping through right now.  The    09:16
7  first one is Exhibit A.  That's a copy of the notice of    09:16
8  deposition.  That's the notice that brought you here    09:16
9  today; right?    09:16
10  A.  Correct.    09:16
11      (Defendants' Exhibit A was marked for    09:16
12      identification and is attached hereto.)    09:16
13  BY MR. HERNANDEZ:    09:16
14  Q.  All right.  Mr. Macy, I just want to get some    09:16
15  quick background information from you.    09:16
16      My understanding is that your current address    09:16
17  is 26175 Augusta Way in Lake Arrowhead.  Is that    09:16
18  correct?    09:16
19  A.  It's privileged.  We don't want that on the    09:16
20  record for people to know where I live.  It's like    09:16
21  what's your address?    09:17
22  Q.  ZIP Code is 92352?    09:17
23  A.  I'm not going to answer these questions.  It's    09:17
24  privileged information.  We're not putting your name and    09:17
25  address on the video for people you don't know to have.    09:17

Page 13

Page 14

1  That's not proper.                                    09:17
2        THE WITNESS: I'm sorry. Am I talking too         09:17
3  fast?                                                 09:17
4  BY MR. HERNANDEZ:                                     09:17
5  Q.  What is your date of birth, sir?                  09:17
6  A.  That's privileged information. You already        09:17
7  have this information --                              09:17
8  Q.  How old are --                                    09:17
9  A.  -- I would imagine.                               09:17
10 Q.  How old are you, sir?                             09:17
11 A.  I'm old enough. 56.                               09:17
12 Q.  Okay.                                             09:17
13 A.  That's not information we want to --              09:17
14 Q.  At the time -- do you understand that we're       09:17
15 here to discuss an incident that occurred on June --  09:17
16 A.  Yes. We should be focused on that.                09:17
17 Q.  Do you understand we're here to discuss an        09:17
18 incident that occurred on June 27th, 2023?            09:17
19 A.  Correct.                                          09:17
20 Q.  At the time of the accident -- at the time of     09:17
21 the incident how old were you?                        09:17
22 A.  Is that something we should talk about?           09:17
23 Q.  How old were you at the time of the incident,     09:17
24 sir?                                                  09:17
25 A.  I don't know for sure. Probably 55. I don't       09:17

Page 15

1  know.                                                 09:17
2  Q.  Okay. You're married?                             09:17
3  A.  You can look it up.                               09:17
4        Yes. This is privileged information, though,    09:17
5  so I don't really want to keep answering those type of 09:17
6  questions.                                            09:18
7  Q.  At the time of the accident -- at the time of     09:18
8  the incident, my understanding is that you had your -- 09:18
9  you had three of your children with you at the time.  09:18
10 Correct?                                              09:18
11 A.  Correct. That's relevant.                         09:18
12 Q.  Okay. Do you have any other children, sir?        09:18
13 A.  That's privileged information. It's not making    09:18
14 sense. How does it matter how many people you have in 09:18
15 the car when the highway patrol pulls you over? It's  09:18
16 irrelevant.                                           09:18
17 Q.  What's your wife's name, sir?                     09:18
18 A.  It's privileged information. She was not there    09:18
19 at the accident -- or not the accident. The event.    09:18
20 Q.  Is your wife here with us today?                  09:18
21 A.  Yes, she is.                                       09:18
22 Q.  Okay. And earlier you said that she's here as     09:18
23 a witness; right?                                     09:18
24 A.  Correct.                                          09:18
25 Q.  What is her name, sir?                            09:18

Page 16

1  A.  It's privileged information. You're not making    09:18
2  sense. This has nothing to do with this case right    09:18
3  here. She's a witness just like she's a witness       09:18
4  (indicating). He's -- he won't give me his name. How  09:18
5  about to be fair? You give me his name. I'll give you 09:18
6  her name. That will be fair.                          09:18
7  Q.  Mr. Macy, I'm going to give you just one          09:18
8  warning, and that's it. You keep telling me you're    09:18
9  not -- you're refusing to answer my questions, which are 09:18
10 completely legitimate in a case like this. If -- once 09:19
11 the deposition is over, we may move to seek sanctions 09:19
12 and compel you to answer these questions.             09:19
13       So just to let you know, if you keep saying     09:19
14 that you will not answer these questions that I'm asking 09:19
15 you, that there's a possibility -- actually a strong  09:19
16 possibility that the courts -- the court will, you know, 09:19
17 have you answer these questions that are just background 09:19
18 information which is seeking information about potential 09:19
19 witnesses regarding this incident.                    09:19
20 A.  She's not a witness to this.                      09:19
21 Q.  Sir, do you understand what I just said?          09:19
22 A.  Yeah.                                             09:19
23 Q.  Okay. All right. How long have you been at        09:19
24 the Augusta Way address?                              09:19
25 A.  It's privileged information. This is not          09:19

Page 17

1  relevant to the case how long I live somewhere.       09:19
2  Q.  And are you currently employed, sir?              09:19
3  A.  Yes.                                              09:19
4  Q.  Okay. Who are you employed with, or are you       09:19
5  self-employed?                                        09:19
6  A.  Myself. I dump trash.                             09:19
7  Q.  Okay. And do you have a name for your company,    09:19
8  sir?                                                  09:20
9  A.  It's on the card. Family Firewood Trash           09:20
10 Service. It's in the paperwork. You can read it.      09:20
11 Q.  Do you have -- what's the name of --              09:20
12 A.  Here's a copy of it.                              09:20
13 Q.  What's the name of your company, sir?             09:20
14 A.  We have several. Family Firewood Hauling.         09:20
15 There's a Bible verse on it. Religiously protected    09:20
16 nonprofit organization. I guess the best answer would 09:20
17 be 1611Bible.US. and/or PTSD2Health. I'm the director 09:20
18 of both. We do good things for free for people. We    09:20
19 make money, and we give it to the community.          09:20
20 Q.  Okay. So just I understand, your company is       09:20
21 called Family Firewood?                               09:20
22 A.  It's one of our cards. Our company name -- I      09:20
23 said it more clearly -- is 1611 Bible. That's under the 09:20
24 umbrella of that. That's how we provide funds to give 09:20
25 to the community. We don't take donations.            09:20

```
 1    Q.  Your name of your self-employment is          09:20
 2  1611 Bible?                              09:21
 3    A.  Yes.  Dot US.                      09:21
 4    Q.  That's a website?                  09:21
 5    A.  You can look it up, yep.  Same exact address.    09:21
 6    Q.  Okay.                             09:21
 7    A.  See, we give free Bible, counseling.      09:21
 8    Q.  At the time of the incident, sir, you were    09:21
 9  driving --                            09:21
10    A.  It says it on there, hauling, right there.  I    09:21
11  just want to make sure that's clear on the video.    09:21
12  Hauling.
13    Q.  Mr. Macy, at the time --           09:21
14    A.  It makes a big difference to this case.    09:21
15    Q.  Mr. Macy, at the time of the incident you were    09:21
16  pulled over; correct?                    09:21
17    A.  Illegally pulled over, yes.           09:21
18    Q.  Okay.  And you were driving a -- what's    09:21
19  typically called a box truck?              09:21
20    A.  Trash truck.                      09:21
21    Q.  Okay.  Trash truck.                09:21
22    A.  Hauling right here.                 09:21
23    Q.  Who owned the trash truck at the time of the    09:21
24  incident?                              09:21
25    A.  I think it's in my name.             09:21
```
Page 18

```
 1    THE WITNESS:  Right?                  09:21
 2    Me Jeff Macy.                        09:21
 3  BY MR. HERNANDEZ:
 4    Q.  Okay.                           09:21
 5    A.  And we just got back from the dump with a    09:21
 6  receipt that was provided to you showing that the seat    09:21
 7  belt issue was irrelevant.                 09:21
 8    Q.  Sir, have you ever served in the military?    09:21
 9    A.  No.                             09:21
10    Q.  Since the date of this incident have you filed    09:21
11  for bankruptcy?                         09:22
12    A.  No.                             09:22
13    Q.  At the time of the incident you had a valid    09:22
14  driver's -- at the time of the incident you had a valid    09:22
15  driver -- California driver's license?        09:22
16    A.  Correct.                         09:22
17    Q.  Sorry.                           09:22
18    A.  And the vehicle's registered.  All paperwork    09:22
19  was provided, proof of insurance.  Everything was okay.    09:22
20  There was no -- there was no incident from us.  And    09:22
21  you're not required to wear seat belts when you're a    09:22
22  trash company as we disclosed anyways.        09:22
23    Q.  All right.  So are you going to refuse to    09:22
24  answer the questions I asked you about your wife's name?    09:22
25    A.  Julie Macy.  I'm still going to ask that you    09:22
```
Page 19

```
 1  give his name to be fair.                 09:22
 2    Q.  You will receive it, sir.            09:22
 3    And how long have you been married, sir?    09:22
 4    A.  It's privileged information.  I don't believe    09:23
 5  this is going to be relevant to the case.     09:23
 6    Q.  How long have you been married, sir?    09:23
 7    A.  She's not a witness to the case.       09:23
 8    Q.  How long have you -- how long have you been    09:23
 9  married, sir?  Are you refusing --           09:23
10    A.  A long time.                     09:23
11    Q.  Are you refusing to answer?          09:23
12    A.  I'll answer.                     09:23
13    THE WITNESS:  This is going to get you -- I    09:23
14  don't want to get you upset.  I have to think about it.    09:23
15    26 years maybe.                     09:23
16  BY MR. HERNANDEZ:                       09:23
17    Q.  Okay.                          09:23
18    A.  I don't know.  See, that's why I said I don't    09:23
19  know for sure.                          09:23
20    Q.  Now, at the time of the incident you had    09:23
21  three children with you; right?              09:23
22    A.  Correct.                         09:23
23    Q.  Okay.  Jerusha Macy?               09:23
24    A.  Yes.                            09:23
25    Q.  How old is he or she?              09:23
```
Page 20

```
 1    A.  I think 26.                      09:23
 2    Q.  Josiah Macy?                     09:23
 3    A.  I think 24.                      09:23
 4    Q.  I shouldn't be writing on this.        09:23
 5    And Jodiah, how old?                 09:23
 6    A.  I think 22.  I'm within a year.        09:23
 7    Q.  And do you have any other children, sir?    09:23
 8    A.  It's privileged.  They're not part of the case.    09:23
 9  This is not --
10    Q.  Are you refusing -- are you refusing to answer
11  that question?
12    A.  Yeah.  I don't think you should know about all
13  my kids.  And I don't think that the court's going to
14  allow that.  It's not relevant to this case.  They're
15  not going to be witnesses.  The witnesses are the people
16  in the vehicle.  I'm a witness.  You're a witness.  I
17  mean, you're not a witness.
18    All right.  What's the next question?
19    Q.  All right.  In front of you I've placed three
20  documents that are marked B, C, and D --
21    A.  Correct.
22    Q.  -- that you were flipping through.
23    A.  Right.
24    (Defendants' Exhibits B through D were marked for
25    identification and are attached hereto.)
```
Page 21

6 (Pages 18 - 21)

BY MR. HERNANDEZ:

1  BY MR. HERNANDEZ:
2  Q.  The first one is called Response By Plaintiff
3  Jeff Macy to Defendant Jeffrey O'Brien's Interrogatories
4  (Set One).
5       Do you see that, sir?
6  A.  I do see it.
7  Q.  Okay.  Can you do me a favor?  Can you flip
8  through it and confirm this is a true and correct copy
9  of the request -- your responses to a request by --
10  A.  I would have to have a copy at my house to be
11  that authentic, but --
12  Q.  But you did provide --
13  A.  I did provide some, yes.
14  Q.  If you flip to page 19.                09:25
15  A.  Okay.                                  09:25
16  Q.  Is that your signature, sir?           09:25
17  A.  Yes.                                   09:25
18  Q.  Where it says Jeff Macy and the smiley face?  09:25
19  A.  Yeah.  It says 1611 Bible Law Translator.  09:25
20  Q.  Okay.  And then below it's dated 8/30/24?  09:25
21  A.  Yes.                                   09:25
22  Q.  Okay.  Do you realize you were required to  09:25
23  provide a verification for these responses indicating  09:25
24  they're true and correct?                  09:25
25  A.  Yeah.                                  09:25

Page 22

1  Q.  Okay.                                  09:25
2  A.  Yes.                                   09:25
3  Q.  Okay.  Did you provide one?            09:25
4  A.  Did I provide what?                    09:25
5  Q.  A verification?                        09:25
6  A.  I don't know what that means.  You have to be  09:25
7  more clear what that means.  I don't know what that  09:25
8  means.                                    09:25
9  Q.  A verification is just a document that  09:25
10  indicates the responses that you provided are true and  09:25
11  correct and accurate.                     09:25
12  A.  I assume it was provided if it was submitted.  09:25
13  I mean, I don't know.  I don't know for sure.  09:25
14  Q.  Okay.  Can you turn to Exhibit C.      09:25
15  A.  What page?                            09:25
16  Q.  Exhibit C.                            09:25
17  A.  Exhibit C.  Okay.  Yes.               09:25
18  Q.  These are called Response By Plaintiff Jeff  09:26
19  Macy to Defendant Christopher Bates's Interrogatories.  09:26
20  A.  Okay.                                 09:26
21  Q.  Okay.  And as far as you know, you did prepare  09:26
22  some -- some responses; correct?          09:26
23  A.  Yes.                                  09:26
24  Q.  Okay.                                 09:26
25  A.  Yes.                                  09:26

Page 23

1  Q.  And if you flip to the back page, page 19.  09:26
2  A.  The signature page?                    09:26
3  Q.  Yes.                                   09:26
4       Is that your signature, sir, where it says  09:26
5  Jeff Macy --                              09:26
6  A.  Yes.                                   09:26
7  Q.  -- 16 --                              09:26
8  A.  Yes.                                   09:26
9  Q.  And it's dated 8/30/24?                09:26
10  A.  Correct.                              09:26
11  Q.  And these responses you prepared; correct?  09:26
12  A.  Yes.  With some help from my daughter.  09:26
13  Q.  Okay.  But you provided the response to request  09:26
14  by Christopher Bates; right?              09:26
15  A.  Correct.                              09:26
16  Q.  Let's go to Exhibit D, sir.            09:26
17  A.  Okay.                                 09:26
18  Q.  Exhibit D is called Response to Plaintiff Jeff  09:26
19  Macy to Defendant Christopher Bates's Request For  09:26
20  Admission (Set One).                      09:26
21       And these were requests asking you to admit  09:26
22  certain information.                      09:26
23  A.  Okay.  I signed it.                   09:26
24  Q.  Okay.  If you go --                   09:27
25  A.  Yes.                                  09:27

Page 24

1  Q.  -- to page 6, that's your signature, sir?  09:27
2  A.  Yes, it is.                           09:27
3  Q.  And you prepared these -- or let me rephrase.  09:27
4  A.  With help of my daughter.             09:27
5  Q.  And you provided those to our office as  09:27
6  responses; right?                        09:27
7  A.  Yes, sir.                             09:27
8  Q.  All right.                           09:27
9  A.  Exhibit E?                            09:27
10  Q.  Okay.  So let's turn to the date of the  09:27
11  incident.                                09:27
12       Sir, your understanding, it occurred June 27th,  09:27
13  2023; right?                             09:27
14  A.  I would have to look, but whenever -- I don't  09:27
15  think the date matters that much, but sure.  09:27
16  Q.  Okay.  Let's clarify the date.         09:27
17  A.  Okay.                                 09:27
18  Q.  If you look at Exhibit E.              09:27
19  A.  Okay.  E.  A picture of a car.        09:27
20  Q.  It's a copy --                       09:27
21  A.  Is that a car?                        09:27
22  Q.  Do you have Exhibit E in front of you?  09:27
23  A.  Yeah.  It's probably that date.        09:27
24       (Defendants' Exhibit E was marked for  09:27
25       identification and is attached hereto.)  09:27

Page 25

7 (Pages 22 - 25)

BY MR. HERNANDEZ:                                    09:27
Q.  Okay.  So let me for the record explain what    09:27
this is.  This is a screenshot taken from a YouTube   09:27
video.  The YouTube URL is https, colon, slash -- back   09:27
slash, back slash, www, dot, YouTube, dot com, back   09:28
slash, watch, question mark, v, equals, cap G, small v,   09:28
small m, small a, capital M, small o, small n, small u,   09:28
capital P, small e, small o.  The title of this is   09:28
called HWP Traffic Stop June 27th, 1:41 p.m.          09:28
      Do you see that, sir?                          09:28
A.  Yes, sir.                                        09:28
Q.  Okay.  And then the person who uploaded it is    09:28
Ghost man?                                           09:28
A.  That's us.                                       09:28
Q.  Okay.  Is this the video that you took at the    09:28
time of the stop that you posted --                  09:28
A.  It makes sense.  I don't think anyone else had   09:28
it unless you guys reposted it when I gave it to you.   09:28
Either that or the highway patrol had access to it.   09:28
Q.  I can represent to you that this came from the   09:28
complaint that you filed.                            09:28
A.  Okay.  I believe you.  I won't argue what the    09:29
date is.  It's not relevant to me.                   09:29
Q.  But I just want to confirm that you did post     09:29
the video under Ghost man --                         09:29

Page 26

A.  It wasn't me.  It was someone that I know.       09:29
Q.  Okay.  But this was posted on behalf of you --   09:29
A.  Sure.                                            09:29
Q.  -- onto YouTube?                                 09:29
A.  My -- I didn't -- I wasn't allowed to film it.   09:29
Q.  Once again, I need you to answer the question.   09:29
A.  Okay.  Well, I said -- the way you're saying     09:29
it, I did not upload it, no.                         09:29
Q.  Okay.  You didn't upload it, but it was          09:29
uploaded on behalf of you?                           09:29
A.  I don't know if it was on behalf of me.          09:29
Q.  Okay.                                            09:29
A.  But somebody uploaded it.                         09:29
Q.  Okay.                                            09:29
A.  I didn't tell someone to upload it.              09:29
Q.  Is your account Ghost man?                       09:29
A.  I don't think so.                                09:29
Q.  Okay.  But this is the video that you took?      09:29
A.  I don't know why this would matter.  I mean,     09:29
it's a video that's been uploaded, yeah.             09:29
Q.  Right.                                           09:29
      But is this a video -- your understanding --   09:29
A.  I did not do it personally, no.                  09:29
Q.  Okay.  But is it your understanding that --      09:29
A.  I don't have the technology for that.            09:29

Page 27

Q.  Is it your understanding that this is the video   09:29
that was taken by you and one of your children during   09:30
the stop on June 27th, 2023?                         09:30
A.  It would seem like it would have to be.          09:30
Q.  Okay.  Do you understand that the URL that's     09:30
listed at the top is the URL that you listed on one of   09:30
the complaints you filed with the federal court?    09:30
A.  Okay.  There you go.  Then someone -- maybe my   09:30
daughter uploaded it.  That's probably what happened.   09:30
It's got to be the video that we had access to.  Is that   09:30
good wording?                                        09:30
Q.  I just want to confirm --                        09:30
A.  I was in possession of the video at some point.   09:30
Q.  Okay.                                            09:30
A.  It wasn't anyone else's.                         09:30
Q.  Any reason why the date would be incorrect on   09:30
the video --                                         09:30
A.  I doubt it.                                      09:30
Q.  -- on the title of the video?                    09:30
A.  I think it's accurate.                           09:30
Q.  So as far as you know --                         09:30
A.  I'm not trying to argue.                         09:30
Q.  -- you -- this incident occurred on June 27th,   09:30
2023?                                               09:30
A.  Okay.                                            09:30

Page 28

Q.  Thank you, sir.  That's all needed you to        09:30
understand.                                          09:30
A.  I'm not disagreeing on stuff that's --           09:30
Q.  All right.  So I'd like to go step by step --    09:30
A.  Sure.                                            09:31
Q.  -- in terms of --                                09:31
A.  Want to go to F?                                 09:31
Q.  No.  We will in a minute.                        09:31
      So I just want to understand how the incident   09:31
occurred.                                           09:31
A.  Okay.                                            09:31
Q.  So my understanding is, once again, that you     09:31
were driving -- I think you called it a trash truck?   09:31
A.  Yes.                                            09:31
Q.  Do you recall what highway you were on?          09:31
A.  Highway 18.                                      09:31
Q.  Okay.  And where were you coming from at the     09:31
time of the incident?                               09:31
A.  The dump.  We provided a receipt.  We literally   09:31
came from the dump.  And I showed him that and tried to   09:31
talk him out of giving me this ticket, which was     09:31
illegal.                                            09:31
Q.  Which dump, sir?                                 09:31
A.  I got to get it right.  It's in Running          09:31
Springs.  Waste Management.  They have all this      09:31

Page 29

8 (Pages 26 - 29)

Page 30

1  different wording. They keep changing the dump name.  09:31
2  Q. But it's a dump in Running Springs?  09:31
3  A. Yes.  09:31
4  Q. Okay.  09:31
5  A. Operated by Burrtec trash company who we have a  09:31
6  lawsuit against. It's very mysterious the highway  09:31
7  patrol pulls us over covering for them.  09:31
8  Q. Okay. So where were you headed at the time --  09:31
9  A. Our competition.  09:32
10  Q. At the time --  09:32
11  A. We were headed home or to go get more trash.  09:32
12  Pick up more trash.  09:32
13  Q. Okay. You were headed home to pick up trash  09:32
14  or --  09:32
15  A. Going to get trash towards our home. Sorry. I  09:32
16  didn't say it right.  09:32
17  Q. Okay.  09:32
18  A. This is way over here (indicating) in Running  09:32
19  Springs. Our house is way over here (indicating). You  09:32
20  got to go on 18 to go that way towards -- our customers  09:32
21  are all over where we live.  09:32
22  Q. Okay. Once again, the question is, What was  09:32
23  your intended destination at the time?  09:32
24  A. To pick up more trash.  09:32
25  Q. Where, sir?  09:32

Page 31

1  A. I don't have the addresses right now. We have  09:32
2  multiple customers. Burrtec doesn't like that.  09:32
3  Q. Okay. So at the time that you were pulled over  09:32
4  by a CHP officer, you were on your way to pick up more  09:32
5  trash at a customer's home?  09:32
6  A. It harmed us.  09:32
7  Q. At a customer's house?  09:32
8    (Simultaneous cross-talk.)  09:32
9  A. Inside their house.  09:32
10  Q. At a customer location, yes.  09:32
11  A. Yeah. In their yards. That's what we do.  09:32
12  We're weed abatement. We've got numerous documents to  09:32
13  prove that with the County. They know us very well. We  09:32
14  do all weed abatement out there and trash. You do the  09:32
15  weed abatement, and then you take it to the dump.  09:33
16  Q. Okay.  09:33
17  A. And you pick up their trash cans because the  09:33
18  bears knock over cans and some people don't like the  09:33
19  Burrtec trucks when they make a lot of noise --  09:33
20  Q. Sir, I need you to stop because you're not --  09:33
21  A. Okay.  09:33
22  Q. You've already answered the question.  09:33
23  A. Sure. Sorry.  09:33
24  Q. I need you to focus.  09:33
25  A. Focus.  09:33

Page 32

1  Q. Okay. So what first alerted you that the CHP  09:33
2  was pulling you over?  09:33
3  A. Well, I recognized the guy on the side. It's  09:33
4  the same guy that harassed us before. Parked in front  09:33
5  of my house just a month previously. Followed us down  09:33
6  the street two weeks earlier. I recognized him on the  09:33
7  side of the road. And I went "This guy is going to try  09:33
8  to get us." We knew he was after us.  09:33
9    That's why I have camera all the time. I have  09:33
10  witnesses with me all the time. I can't go without  09:33
11  witnesses anymore. I do Bible, and I have serious cases  09:33
12  going on within the courts right now.  09:33
13  Q. Okay. Just stop for a second.  09:33
14    From what you're telling me is that you were  09:33
15  driving down Highway 19. You saw --  09:33
16  A. 18.  09:33
17  Q. 18?  09:33
18  A. It's all right. 18. One-eight.  09:33
19  Q. You saw the officer that ultimately pulled you  09:34
20  over --  09:34
21  A. Bald head.  09:34
22  Q. You saw the officer that ultimately pulled you  09:34
23  over on the side of the road?  09:34
24  A. The other side of the road.  09:34
25  Q. Okay. You passed him and you recognized this  09:34

Page 33

1  person --  09:34
2  A. Yes.  09:34
3  Q. -- as a person that had been --  09:34
4  A. Harassing us.  09:34
5  Q. -- parked and harassing you?  09:34
6  A. Yeah. He towed our truck four months previous  09:34
7  illegally. We won the case. The same guy.  09:34
8  Q. So you see this CHP officer on the road. You  09:34
9  continue down Highway 18. So at that point you  09:34
10  determined that it was likely that the CHP officer was  09:34
11  going to pull you over.  09:34
12    Is that what your testimony --  09:34
13  A. Absolutely. He'd been targeting us. I had  09:34
14  already been telling people the highway patrol was  09:34
15  targeting us. The reason they were covering for  09:34
16  Burrtec --  09:34
17  Q. How --  09:34
18  A. -- our trash company --  09:34
19  Q. How much further down Highway 18 did you  09:34
20  continue until you realized that the officer was  09:34
21  attempting to pull you over by having his lights on?  09:34
22  A. Not long. I mean, I saw his lights turn on.  09:34
23  He was after us. He was -- he was parked there to get  09:34
24  us.  09:35
25  Q. Okay.  09:35

1    A. I believe this wholeheartedly.            09:35
2    Q. All right. So you saw the lights and you --    09:35
3    A. We need to cover how he came up on us; right?  09:35
4  I saw him in the rearview mirror going in the other lane  09:35
5  as if it was like a mass murder job; right?       09:35
6  Dangerously, getting everybody in the community in    09:35
7  danger. I couldn't believe it. I knew he was going to    09:35
8  get us, but I didn't think he would go at it like that.    09:35
9  Normally they turn the lights on and let people pull    09:35
10  over.                                             09:35
11        He went around -- it's in the video -- the    09:35
12  other side of oncoming Highway 18 very fast, high speed  09:35
13  with corners. Going around, going around. People,    09:35
14  like, don't know where to pull over. I knew right away  09:35
15  he was after us. I was already pulling before I    09:35
16  realized he's coming.                            09:35
17    Q. Okay. Do you know the location --          09:35
18    A. It's -- it's a pullout.                     09:35
19    Q. Do you know what it's called?              09:35
20    A. It's not a very safe pullout either. This is    09:35
21  something I know. I have friends in the highway patrol.  09:35
22  I don't know the exact plot. It's on the GPS map. It    09:35
23  shows it on the video. I can get this for you.    09:35
24    Q. I just want to know if you know. If you don't    09:35
25  know the name, that's fine.                       09:35

1        All right. So you get pulled over.          09:36
2    A. I gave him the benefit of the doubt that he was    09:36
3  a good cop anyways.                                09:36
4    Q. Okay.                                       09:36
5    A. So I didn't film him immediately, which I    09:36
6  should have.                                      09:36
7    Q. Okay. So you pulled him over -- he pulls you    09:36
8  over. You pull over to the side of the road; right?    09:36
9    A. Yes.                                        09:36
10    Q. Okay. Does he come to your cab area of the    09:36
11  vehicle?                                          09:36
12    A. I think he goes over to the passenger side. We  09:36
13  roll the windows down because it's such a dangerous    09:36
14  place that we were pulled over at.                09:36
15    Q. Okay. So you rolled the window down and --    09:36
16    A. Pushed the button down. The same thing.    09:36
17    Q. Okay. And so he's on the passenger-side door;    09:36
18  right?                                            09:36
19    A. Which I didn't like. You know, he's over by my  09:36
20  kids. And I already knew this guy. I didn't trust this  09:36
21  guy. This is a bad cop in my opinion.            09:36
22    Q. Okay. And what do you recall of that initial    09:36
23  conversation with -- oh, wait. Let me rephrase.    09:36
24    A. "Do you know why we pulled you over?"        09:36
25    Q. Stop.

1        Do you understand that the officer that pulled    09:36
2  you over was Officer Bates; right?                09:36
3    A. Yes.                                        09:37
4    Q. Okay. So that way we can refer to him as    09:37
5  Officer Bates.                                    09:37
6    A. The same guy that illegally towed my truck off  09:37
7  a private road months earlier.                    09:37
8    Q. Okay. So Officer --                         09:37
9    A. I won that case.                            09:37
10    Q. Officer Bates at your window.               09:37
11        Tell me what the discussion is about?       09:37
12    A. I mean, you guys have the audio. I'm sure it    09:37
13  was -- "do you know why we pulled you over?" He's cold  09:37
14  as ice yelling. I get their authority.            09:37
15        I said, "No, I don't."                     09:37
16        He goes, "Well, we noticed -- I noticed that    09:37
17  one of your passengers doesn't have -- the fourth    09:37
18  passenger without a seat belt."                   09:37
19    Q. Okay.                                       09:37
20    A. I go, "We do have a seat belt and this is legal    09:37
21  in federal and California and every law."         09:37
22        He goes -- I don't know what he said after    09:37
23  that, but --                                      09:37
24    Q. Okay.                                       09:37
25    A. He goes, "We believe it has to be a factory" --    09:37

1  "I believe" -- him -- "it has to be a factory-installed    09:37
2  seat belt."                                       09:37
3        And I told him, "No, it doesn't. I'm a    09:37
4  dealer." And I informed him that we're a trash company.  09:37
5  You don't even need seat belts. And the driver is never  09:38
6  responsible for a passenger in a commercial vehicle.    09:38
7  The driver is never, in any law for a commercial truck,  09:38
8  responsible for a passenger having a seat belt on or    09:38
9  not.                                              09:38
10    Q. Okay. While he's at the door --             09:38
11    A. He lied to his supervisor.                  09:38
12        Okay. Go ahead.                            09:38
13    Q. While he's at the door, at that point does he    09:38
14  indicate to you he's going to cite you?           09:38
15    A. No. He didn't at the time, no.              09:38
16    Q. Okay.                                       09:38
17    A. I thought -- I tried to treat him good. He    09:38
18  goes, "Can I have your driver's license, your    09:38
19  registration, and proof of insurance."            09:38
20        So I said, "Move your hands slowly, guys.    09:38
21  Could you get it out of the glovebox for me?" Right?    09:38
22  So my nice kid -- good, obedient, Godly people, don't    09:38
23  have any criminal record -- took it out, gave it to him.  09:38
24  He took it. Took my driver's license, put it on his    09:38
25  thing taking possession of all my stuff, goes back to    09:38

**Page 38**

1  his car because I informed him immediately that I used  09:38
2  to be a dealer.  09:39
3      In fact we've had -- we know of many times  09:39
4  where people add seat belts.  As long as they're  09:39
5  sufficient space, the law says it only needs to be two  09:39
6  bolts.  A bolt on each side.  You can't use the same  09:39
7  bolt.  But two bolts.  09:39
8      So even though he knew, he wrote on his ticket  09:39
9  that it was secured -- he used the word secure on the  09:39
10  ticket.  That my daughter was secured by a -- he put a  09:39
11  non-factory seat belt.  And he's a highway patrol.  09:39
12  Doesn't he know vehicles get crashed?  This was a  09:39
13  salvaged vehicle before.  09:39
14  Q.  Okay.  09:39
15  A.  People replace seat belts all the time.  09:39
16  Q.  So I understand you gave him your driver's  09:39
17  license, proof of insurance --  09:39
18  A.  Yes.  09:39
19  Q.  -- and registration?  09:39
20  A.  He went back to his car.  He's looking through  09:39
21  his book finding a vehicle code infraction.  He's trying  09:39
22  to get me.  09:39
23  Q.  So how do you know he was looking at his book?  09:39
24  A.  Because I'm -- blessedly, you could say, I'm  09:39
25  older and I've sadly found out and learned that if you  09:39

**Page 39**

1  don't know the system, you're going to get taken  09:40
2  advantage of.  09:40
3  Q.  Okay.  09:40
4  A.  But I knew that he was shady, luckily.  People  09:40
5  wouldn't know this.  I knew the codes.  I knew the code  09:40
6  section he was going to use does not state anything to  09:40
7  do with the factory or non-factory seat belt.  09:40
8  Q.  Okay, sir.  I need you to focus.  09:40
9  A.  Oh, sorry.  So I walked back to his car and  09:40
10  said, "Could you please read the code to me."  09:40
11  Q.  Okay.  09:40
12  A.  I was trying to talk him out of giving me this  09:40
13  ticket.  09:40
14  Q.  Before you walked back, had he come back to the  09:40
15  vehicle to you?  09:40
16  A.  No, I don't think so.  I think he was in his  09:40
17  car for a long time making me wait, flipping through a  09:40
18  book this big (indicating).  Right?  I have it on video.  09:40
19  You can see how big it is.  They should know it by  09:40
20  heart.  This is highway patrol.  They're supposed to  09:40
21  know the law.  You're going -- if you're illegally  09:40
22  detaining someone, you need to have a law.  He should  09:40
23  have informed me right away, "You're being detained for  09:40
24  suspected seat belt non-factory installation that was  09:40
25  installed but not properly," or whatever he's trying to  09:40

**Page 40**

1  say.  That would have been a reasonable thing.  He  09:40
2  didn't do that.  09:40
3      He's looking through his book.  And I'm saying,  09:40
4  "What are we being charged with?"  He would not tell me.  09:41
5  I knew the law.  You have to tell someone the charge.  I  09:41
6  was being nice.  09:41
7  Q.  I need you to -- I'm trying -- I'm trying to  09:41
8  get the timeline.  09:41
9  A.  I did answer it.  09:41
10  Q.  So --  09:41
11  A.  After a while, waiting maybe 15 minutes.  09:41
12  Q.  Okay.  So you're in the cab?  09:41
13  A.  Yeah.  09:41
14  Q.  The officer comes and you see -- gives you --  09:41
15  has initial contact with you.  09:41
16  A.  Gets our information.  09:41
17  Q.  Gets your information.  Goes back to the  09:41
18  vehicle.  09:41
19      And at no time did he come back to the vehicle?  09:41
20  A.  I don't think so.  09:41
21  Q.  Okay.  You don't think so, or you don't  09:41
22  remember?  09:41
23  A.  I know he didn't because -- I mean, he didn't.  09:41
24  He didn't come back.  09:41
25  Q.  All right.  09:41

**Page 41**

1  A.  So here I'm waiting.  My kids are hot.  We need  09:41
2  to go to the bathroom.  We're on a dangerous place.  The  09:41
3  sun is beating down on us.  Right?  We're working hard.  09:41
4  We're doing trash.  He goes back to his car and camps  09:41
5  for 15 minutes.  09:41
6  Q.  Sir --  09:41
7  A.  He doesn't know the law.  09:41
8  Q.  I need you to stop.  09:41
9      So he goes back.  He does not -- so according  09:41
10  to your testimony, you don't recall whether or not he  09:41
11  came back to you?  09:41
12  A.  He didn't come back.  He stayed in his car a  09:41
13  long time.  09:42
14  Q.  Okay.  So he's in his vehicle.  09:42
15  A.  Looking for something to get me with.  09:42
16  Q.  At some point do you exit the vehicle?  09:42
17  A.  Yes.  09:42
18  Q.  Okay.  09:42
19  A.  15 to 20 minutes later.  I was hoping he would  09:42
20  read the law and let us go.  I think it's 2315  09:42
21  Section (c) seat belt law, California seat belt law.  09:42
22  Q.  Okay.  09:42
23  A.  We were innocent.  09:42
24  Q.  At some point you did ask for --  09:42
25  A.  We did win the case.  09:42

11 (Pages 38 - 41)

Page 42

```
 1    Q.  At some point you did ask for his supervisor?    09:42
 2    Yes?                                                 09:42
 3    A.  Yes.  When he's sitting in his car making me     09:42
 4    wait.                                                09:42
 5    Q.  Okay.                                            09:42
 6    A.  Please get his supervisor.                       09:42
 7    Q.  Why did you ask for his supervisor?              09:42
 8    A.  Because he was quoting the law incorrectly and   09:42
 9    he would not show his identification.  The officer   09:42
10    refused to give me his business card.  His nametag was 09:42
11    folded over on video.  That's pretty scary when you  09:42
12    an officer with a gun.  He'd already targeted us,    09:42
13    factually.  We have cases we won.  His name was folded 09:42
14    over like this (indicating).  It's on video.  You guys 09:43
15    can see his part.                                    09:43
16    Q.  Okay.  So --                                     09:43
17    A.  You could not read it.  I asked him to show me   09:43
18    his name.  He still would not give me his name.      09:43
19    Q.  So just so I don't lose track, so the reason     09:43
20    you asked for a supervisor is that he was not        09:43
21    identifying himself?                                 09:43
22    A.  There was multiple reasons.  There's a lot of    09:43
23    red flags.                                           09:43
24    Q.  Give me all the reasons why you asked for a      09:43
25    supervisor.                                          09:43
```

Page 43

```
 1    A.  Just off memory, the most concerning by far is   09:43
 2    when he showed up with this thing out my window like 09:43
 3    this and my kids are nearby him.                     09:43
 4    Q.  Okay.                                            09:43
 5    A.  And I don't trust all cops.  Yes.  I believe in  09:43
 6    authority, but there's signs you look for.           09:43
 7    Q.  Nametag.  What else?                             09:43
 8    A.  He's aggravated.  He's highly -- he recklessly   09:43
 9    drove to pull over for a seat belt violation.  Even if 09:43
10    no one had a seat belt on, that's not the way you do it. 09:43
11    You turn your lights on, get there, pull them over, and 09:43
12    give them a ticket for whatever if that's what you think 09:43
13    it is.  But you need to identify yourself.  That's a  09:43
14    law.  It's federal and state.  It's in my document.  09:43
15    Q.  Okay.  What other reasons?                       09:43
16    A.  His name is like this (indicating).  I go,       09:43
17    "What's your name?"  He wouldn't give it to me.  I knew 09:43
18    it from seeing him all the times he pulled us over.  09:43
19    Q.  Okay.  You've explained that.                    09:43
20    What other reasons did you --                        09:43
21    Number 1, the identification.                        09:43
22    Q.  Okay.                                            09:44
23    A.  His behavior was reckless and dangerous.  I      09:44
24    didn't trust him as a cop.  I like cops.  I support  09:44
25    police.  I mean, not all of them; right?             09:44
```

Page 44

```
 1    Q.  Any other reasons?                               09:44
 2    A.  Okay.  That's two reasons so far.                09:44
 3    Third one, he wouldn't tell us the charge when       09:44
 4    I asked him when he was still at the door.  Maybe he did 09:44
 5    come back a second time.  Something happened where I go, 09:44
 6    "What's the charge?"  I was very concerned at that   09:44
 7    point.  That's when I decided we need to start       09:44
 8    filming -- right? -- when we wouldn't tell me the    09:44
 9    charge.  And then he finally tells me.  He goes, "rrr, 09:44
10    rrr, rrr."  I couldn't even hear him.                09:44
11    I'm like, "Are you quoting the seat belt law?        09:44
12    There's nothing in there anywhere -- I used to be a  09:44
13    dealer -- about seat belt, required factory."        09:44
14    Q.  Any other reasons you called his supervisor?     09:44
15    A.  His behavior.  He's cold as ice.  He looked      09:44
16    shady.  I judge people.  The Bible say you are to judge 09:44
17    people.  Not to condemn them to hell.  People can    09:44
18    change.                                              09:44
19    Q.  Okay.                                            09:44
20    A.  He looked dangerous.  He was cold as ice.  He    09:44
21    was mean.  I knew this was targeted.  I mean, I knew it. 09:44
22    You could see it in his face.  He was evil.  You can 09:45
23    tell a good cop from one that's just maybe having a bad 09:45
24    day, kind of pull people over and do what they're doing. 09:45
25    He was after me.  He wanted to find a charge on me.  He 09:45
```

Page 45

```
 1    was looking at everything, my truck.                 09:45
 2    Q.  Okay.  Any other reason --                       09:45
 3    A.  I'd have to look at my lawsuit.  There were      09:45
 4    several reasons.  Let me think.                      09:45
 5    So he wouldn't -- he didn't have a body camera       09:45
 6    on.  I didn't think that was good.  Apparently in that 09:45
 7    office it's optional.  You can wear one or not.  In my 09:45
 8    experience you should be wearing one.  It's required by 09:45
 9    sheriffs.  I don't know why the highway patrol is giving 09:45
10    them an option.                                      09:45
11    Q.  Any other reasons why?                           09:45
12    A.  There's no video on him, and he was pulling me   09:45
13    over.  I knew it was a false ticket.  His supervisor had 09:45
14    already pulled us over for the same thing and said we 09:45
15    were fine.  We did nothing wrong.  He checked the seat 09:45
16    belt.  He understood the law.  It did not need to be a 09:45
17    factory one.  It's correct.  It just needs to be a seat 09:45
18    belt.  It doesn't need to be a two-point seat belt.  09:45
19    Q.  Any other reasons?                               09:46
20    A.  I think the harassment by far.  By far it was    09:46
21    the harassment because as I said -- so here's the    09:46
22    biggest one, problem -- you asked the question.  I'm 09:46
23    going to answer it.                                  09:46
24    The biggest reason by far we're being targeted,      09:46
25    we have another case against Burrtec trash company.  09:46
```

**Page 46**

1   What do they do?  The County -- we have a case against   09:46
2   County Counsel as well.  County Counsel, to go through   09:46
3   this slowly, has allowed and violated the Constitution   09:46
4   saying that Burrtec is the only people that can dump   09:46
5   trash --   09:46
6       Q.   Okay.  Sir --   09:46
7       A.   -- in our area.   09:46
8           (Simultaneous cross-talk.)   09:46
9       Q.   Sir, I need you to focus.  We're not talking   09:46
10  about --   09:46
11      A.   This is relevant why he pulled me over.   09:46
12      Q.   -- a collateral lawsuit.   09:46
13          So you believe, then, another reason you asked   09:46
14  for a supervisor is because Christopher Bates -- Officer   09:46
15  Bates was targeting you --   09:46
16      A.   Absolutely targeting --   09:46
17      Q.   -- because --   09:46
18      A.   -- as I told his boss.   09:46
19      Q.   Did Officer Bates indicate to you that he would   09:46
20  call his supervisor?   09:46
21      A.   He was reluctant, but, yeah, he did.  I was   09:46
22  strong about it.  I'm "Hey, we need a supervisor.  This   09:46
23  is an illegal detainment.  This is an illegal charge."   09:47
24  His nametag is folded over.  I wanted to wait until his   09:47
25  supervisor got there to really explain it so he could be   09:47

**Page 47**

1   a witness.  He didn't have a body camera either.   09:47
2       Q.   Okay.  So you wanted the supervisor there so --   09:47
3   to explain why Officer Bates was --   09:47
4       A.   Illegally detaining me and my family.   09:47
5       Q.   Okay.  All right.  Any other reason why you   09:47
6   wanted Officer Bates (sic) there?   09:47
7       A.   For safety.  For safety.   09:47
8       Q.   Okay.   09:47
9       A.   Intelligently, people should know this.  If you   09:47
10  don't trust a cop, his attitude, you need another   09:47
11  sheriff there to see his demeanor and to check on him   09:47
12  and say, "Why are you pulling this person over?"   09:47
13      Q.   You know, I realize I said Officer Bates.  I   09:47
14  meant to say his supervisor.   09:47
15          That was the reason why you wanted his   09:47
16  supervisor, for safety reasons as well?   09:47
17      A.   For safety for sure.  That was number one,   09:47
18  safety.  Anybody should know.  When an officer is coming   09:47
19  up aggro, his demeanor, his blood pressure for something   09:47
20  not -- not matching -- if someone's recklessly driving,   09:47
21  has a warrant for theft, some type of felony thing going   09:47
22  on, they're going to be that way.  But when you're   09:48
23  talking about a seat belt, which is not even required in   09:48
24  every -- in every state even.  And federal law says --   09:48
25  it doesn't mention the seat belt.  But when it does   09:48

**Page 48**

1   mention the seat belt, it only needed to be a two-point   09:48
2   seat belt.   09:48
3       Q.   So it was important to you --   09:48
4       A.   Safety for sure.   09:48
5       Q.   -- to --   09:48
6       A.   I don't think he should be a cop anymore.   09:48
7       Q.   Let me finish my question.   09:48
8           So it was important for you to have his   09:48
9   supervisor there so you could explain to his supervisor   09:48
10  why Officer Bates had pulled you over unlawfully, had --   09:48
11      A.   Have you ever seen that before?   09:48
12      Q.   -- and -- sir -- and what he was going to cite   09:48
13  you --   09:48
14      A.   The police officer is like this (indicating).   09:48
15      Q.   Let me restart the question, sir.  Let me ask   09:48
16  the question.   09:48
17      A.   There was multiple reasons.  You're only naming   09:48
18  a few.  You're kind of minimizing everything I said.   09:48
19      Q.   I'm asking you --   09:48
20      A.   Everything I said.   09:48
21      Q.   -- if you -- let me ask my question, sir.   09:48
22          I'm asking you, it was important for you to   09:48
23  ensure that Officer Bates' supervisor was there so you   09:49
24  could explain to the supervisor how Officer Bates was   09:49
25  unlawfully detaining you?   09:49

**Page 49**

1       A.   And all the things I said previously.   09:49
2       Q.   Right.   09:49
3           And how the citation that he was attempting to   09:49
4   give you was --   09:49
5       A.   The office was not very far away as well.  It   09:49
6   should have been quick.  Right?  Highway 18 is where the   09:49
7   headquarters is where his sergeant came from; right?   09:49
8   Very quick drive.   09:49
9       Q.   Sir, I'm asking you reasons why you wanted his   09:49
10  supervisor there.   09:49
11      A.   All the things I said.  I'm not going to say   09:49
12  just the things you're saying because it was all the   09:49
13  things I said was important.   09:49
14      Q.   So all those reasons that you had just   09:49
15  mentioned that I asked you were the reasons for -- you   09:49
16  wanted his supervisor there and you wanted to ensure   09:49
17  that the supervisor understood those things; right?   09:49
18      A.   Well, yeah.  Of course.  But I didn't want to   09:49
19  waste his time, so I kept it more minimal with him.  I   09:49
20  respect the officer.  I thought he would be a good   09:49
21  sergeant and go -- I thought he would read the law and   09:49
22  say, "Okay.  This is what you pulled them over for, but   09:49
23  you literally said on your ticket they did have a seat   09:49
24  belt on.  But you gave them a ticket for no seat belt   09:50
25  for the driver."  California law says you have to give   09:50

Page 50

1  the ticket to the passenger. But he wanted to target    09:50
2  me.                                          09:50
3      Q. So when --                            09:50
4      A. They don't care about my daughter. They want    09:50
5  to get me. I'm the Bible translator.              09:50
6      Q. Okay. So when the supervisor whose name is    09:50
7  Jeffrey O'Brien                                09:50
8      A. Uh-huh.                               09:50
9      Q. -- arrived at the scene, you proceeded to    09:50
10 explain to him why Officer Bates had wronged you?    09:50
11     A. Illegally detained us. He goes, "Well, it    09:50
12 wasn't illegal."                              09:50
13     I'm like -- well, for the sake of being    09:50
14 peaceful, I get that people can pull -- still giving the    09:50
15 benefit -- just like you. I respect people. You're    09:50
16 not -- you work for the attorney general, but I think    09:50
17 it's way cool.                                09:50
18     But people are not always as shady as they may    09:50
19 be, in my view. But I could be wrong. There's a    09:50
20 one percent chance that this was a legitimate stop and    09:50
21 the sergeant's going to correct this and let us go on    09:50
22 our way.                                     09:50
23     Q. So Sergeant O'Brien arrived at the scene.    09:50
24     A. I was very disappointed.                09:50
25     Q. But you --                            09:50

Page 51

1      A. He knew us. He knew us.                09:50
2      Q. Okay. You had an opportunity --          09:50
3          (Simultaneous cross-talk.)            09:50
4      A. For him.                            09:50
5      Q. You had an opportunity to speak to Sergeant    09:50
6  O'Brien; right?                              09:51
7      A. Yes.                               09:51
8      Q. And during this time you were able to explain    09:51
9  to Sergeant O'Brien why you were, I guess, upset?    09:51
10     A. I was illegally detained.                09:51
11     Q. You were upset? Yes?                   09:51
12     A. Was I upset? Not that upset because I don't    09:51
13 want to get upset. I try to stay calm. I don't want to    09:51
14 be upset at people -- we don't know for sure what    09:51
15 they're doing exactly. Only God knows, and a judge and    09:51
16 jury can figure it out.                        09:51
17     Q. So while you're at the scene when you were    09:51
18 speaking to Sergeant O'Brien you were explaining to him    09:51
19 why you believed that --                       09:51
20     A. Everything was wrong and all the reasons we    09:51
21 were innocent. Multiple reasons. I mentioned the    09:51
22 federal law that says you only need -- I had it all    09:51
23 memorized. A two-point harness is all that is required.    09:51
24 That's what's there. That a trash company does not have    09:51
25 to have a seat belt on anyways. We all could have had    09:51

Page 52

1  no seat belt on. People just aren't informed of this.    09:51
2      What they say is "Well, we only enforce    09:51
3  California law," which circumvents -- they swore and    09:51
4  oath to the constitution. The federal law says --    09:52
5      Q. All right, sir.                       09:52
6      A. -- you only have to have a two-point, which you    09:52
7  can't see from driving; right?                  09:52
8      The lap belt is down here (indicating). You    09:52
9  don't have to have a three-point. He was misinformed.    09:52
10 He thought everybody had to have a three-point harness.    09:52
11     Q. Right.                             09:52
12     But what you just told me is what you were    09:52
13 trying to explain to Sergeant Bates (sic) at the scene;    09:52
14 right?                                      09:52
15     A. All these things. It was, like, five different    09:52
16 ways we were innocent. It was interesting. It was the    09:52
17 most innocent you could ever be. I never had these many    09:52
18 different angles.                             09:52
19     I mean, one, we're a trash company. Right    09:52
20 there he should have let us go. "Oh, you're a trash    09:52
21 company." The knew we were a trash    09:52
22 company, and he still pulled us over.             09:52
23     When his sergeant showed up, he had our card.    09:52
24 We've worked for him. We dumped trash and moving for    09:52
25 him and stuff. We liked him. We thought he was a good    09:52

Page 53

1  police officer; right? We thought, "Oh, great. He's    09:52
2  here."                                      09:52
3      We find out he's his buddy. He says it on the    09:52
4  recording. "This is my personal friend." I was, like,    09:52
5  that's it. That's not good. How is that good?    09:52
6      So he chose -- he had a decision to make. He    09:52
7  could have, A, said, "Let him go. I've pulled him over    09:52
8  previously." The same guy, he pulled us over as well.    09:53
9  He checked. He saw the seat belt was legally sufficient    09:53
10 by federal law, two-point. He even pulled on it and    09:53
11 checked previously. He said, "We're good. We're good    09:53
12 to go." He let us go. Hey, trust the system. It was    09:53
13 all good.                                    09:53
14     He shows up, already knows the same thing. He    09:53
15 should have -- he should have said, "I know these guys.    09:53
16 They're good people. They didn't have any other things    09:53
17 going on. Registration good," da, da, da, da.    09:53
18     Q. All right.                          09:53
19     A. "Let them go. They're a trash company. I know    09:53
20 they're a trash company. They worked for me." And I    09:53
21 showed him the receipt we just got from the dump with    09:53
22 the date and time on it.                       09:53
23     Q. So when you were at the scene, then, you    09:53
24 ensured to take the time to explain to Sergeant O'Brien    09:53
25 all these things; right?                       09:53

1    A.  They're always -- they want -- they rush.    09:53
2    Q.  But --    09:53
3    A.  I didn't have time to tell them everything.  I    09:53
4    told you I kept it very simple because I don't need to    09:53
5    go into that.  It's not my job to fight and argue with    09:53
6    police.  I said, "This is not good.  I will have to sue    09:54
7    you guys."    09:54
8        He goes, "That's the right way to do it.  Bring    09:54
9    it to court."    09:54
10        I'm not going to get mad at you guys.  I'm not    09:54
11    going to yell at you.  I think it's very concerning your    09:54
12    supervisor and your officer has no nametag showing.    09:54
13    Even I asked him, "Can you please have him identify    09:54
14    himself."  He didn't do anything.  He made no effort to    09:54
15    get his -- whatever you call it -- the one under him to    09:54
16    comply.    09:54
17        He should have said, "Take your -- fold your    09:54
18    thing right."  Refused to give me a business card even    09:54
19    in his car.  Even there.  At the end he goes, "At the    09:54
20    end his name will be on the ticket."    09:54
21    Q.  So you --    09:54
22    A.  That's not the proper identification policy.    09:54
23    Q.  While you were at the scene, though, you    09:54
24    ensured that you were going to tell Sergeant O'Brien    09:54
25    these things; right?    09:54

Page 54

1    A.  I'm not going to ensure anything.  It's not my    09:54
2    job to force --    09:54
3    Q.  No.  No.    09:54
4    A.  I told him slowly.    09:54
5    Q.  But at the scene --    09:54
6    A.  Whatever you want to say.    09:54
7    Q.  At the scene --    09:54
8    A.  At the scene.    09:54
9    Q.  -- you --    09:54
10    A.  After waiting forever.    09:54
11    Q.  You made sure that Officer O'Brien understood    09:54
12    that --    09:54
13    A.  There's no making sure.  He --    09:54
14    Q.  No.  Let me ask you.    09:55
15    A.  Just like you're --    09:55
16    Q.  You ensured --    09:55
17    THE COURT REPORTER:  I'm sorry.  You guys are    09:55
18    talking too much over each other.  I can't get it.    09:55
19    BY MR. HERNANDEZ:    09:55
20    Q.  Yeah.  You need to slow down.    09:55
21    So at the scene you made sure that you    09:55
22    expressed your belief that -- to Sergeant O'Brien that    09:55
23    Officer Bates was in the wrong?    09:55
24    A.  Quickly.  I did it very quickly because I don't    09:55
25    want to hold them up.  They're important people.    09:55

Page 55

1    They're supposed to be on real calls: violence, traffic    09:55
2    accidents, stolen cars, shootings.  Not a seat belt.    09:55
3    Q.  So let's go back to --    09:55
4    A.  That we won the case on.    09:55
5    Q.  Let's go back to the initial contact with    09:55
6    Officer Bates.    09:55
7        So you just rolled down the window at that    09:55
8    point; right?    09:55
9    A.  Well, that's -- that's what you do in traffic    09:55
10    stops.  You put your hands on the steering wheel so they    09:55
11    don't shoot you.  You don't reach for a gun.  You don't    09:55
12    have any guns, but you don't want to give them any    09:56
13    reason.  You want to be calm, don't act agitated, these    09:56
14    things.    09:56
15    Q.  Did Sergeant -- I'm sorry.    09:56
16    A.  Officer.    09:56
17    Q.  Did Officer Bates reach into your vehicle?    09:56
18    A.  At that point, no.    09:56
19    Q.  Yes.    09:56
20    A.  Later.  He illegally enters our vehicle later.    09:56
21    Q.  Hold on.    09:56
22    A.  We're going to get to that?  It's up to you.    09:56
23    Q.  Hold on.  I'm trying to get the scene.    09:56
24        So at that point he didn't try to enter your    09:56
25    vehicle in any way?    09:56

Page 56

1    A.  Not at that point, no.    09:56
2    Q.  So later on --    09:56
3    A.  I don't know.  My window is down.  He reaches    09:56
4    to grab the stuff.  But at that point I presume he was    09:56
5    legit.    09:56
6    Q.  Okay.  So the door wasn't open at that point;    09:56
7    right?    09:56
8    A.  No.    09:56
9    Q.  It was just the window; right?    09:56
10    A.  Right.    09:56
11    Q.  Okay.  The information is handed over to him;    09:56
12    right?    09:56
13    A.  Correct.    09:56
14    Q.  Okay.  Did he attempt to look inside your    09:56
15    vehicle at that point?    09:56
16    A.  I don't know that.  I mean, they always do.    09:56
17    Q.  Okay.  So at that point --    09:56
18    A.  They look for drugs.  We don't have any drugs,    09:56
19    but they look for stuff.  And it's reasonable to look    09:56
20    around for a weapon or something.  It's allowed by law    09:56
21    to look in from the outside, but not to enter the    09:56
22    vehicle, which he does illegally later.    09:57
23    Q.  Okay.  So --    09:57
24    A.  Looking is different than entering a vehicle    09:57
25    without permission.    09:57

Page 57

15 (Pages 54 - 57)

1    Q.  And when he entered the vehicle later, was that    09:57
2    on videotape?    09:57
3    A.  They're the defendants.  No, I don't think it    09:57
4    was.  Because we were trying to go, "Hey, he's    09:57
5    misinformed, he's going to find out we're legit, and let    09:57
6    us go."    09:57
7    Q.  Okay.  I want to get the timeline here you're    09:57
8    telling me.    09:57
9         So after Officer Bates returns to the vehicle,    09:57
10   at some point you get out of the vehicle and walk over    09:57
11   to --    09:57
12   A.  To help him out.    09:57
13   Q.  -- his vehicle; right?    09:57
14   A.  He didn't know the code.  I was going to give    09:57
15   him the section.    09:57
16   Q.  Okay.    09:57
17   A.  He's looking for a -- he didn't even -- this is    09:57
18   how bad this ticket was.  They really only do a few    09:57
19   things.  You get speeding tickets.  You get DUIs.  I    09:57
20   mean, it's not a hard job.  You think -- there is a big    09:57
21   book, but they really only give about five of the same    09:57
22   tickets all day long.  Right?  Here's for the seat belt,    09:57
23   which is the passenger.    09:57
24   Q.  Right.    09:57
25   A.  Not the driver.  He illegally -- I want to make    09:57

Page 58

1    sure it's on record.    09:58
2    Q.  So I'm just trying to get --    09:58
3    A.  Factually the judge ruled that I was innocent    09:58
4    of the traffic ticket, so factually it was an illegal    09:58
5    stop.    09:58
6    Q.  So when you go to talk to Officer O'Brien    09:58
7    because he's in his vehicle, are you videotaping at that    09:58
8    point?    09:58
9    A.  Yeah.  Because when I realize he's making us    09:58
10   wait and there was -- this is not making sense.  I have    09:58
11   wisdom.  A traffic stop should take about five minutes    09:58
12   factually.  They go up to your window if it's a normal,    09:58
13   not high risk, and they say, "Please roll your window    09:58
14   down.  Give me your registration."    09:58
15        The dumb thing they usually ask is, "Do you    09:58
16   know why you're doing something illegal?"    09:58
17   A lot of people say, "Yeah" or whatever.    09:58
18        But anyways you give him all that stuff.  He    09:58
19   tells you why he pulled you over after that.  He goes,    09:58
20   "I pulled you over because you're speeding.  I pulled    09:58
21   you over because you don't have a seat belt.  I pulled    09:58
22   you" because of some reason.    09:58
23   Q.  All right.  Just so I understand --    09:58
24   A.  Then they give you a ticket right there.  They    09:58
25   don't even have to go back to their car.    09:59

Page 59

1    Q.  Okay.    09:59
2    A.  They have a book.  They write down your    09:59
3    driver -- your license plate.    09:59
4    Q.  Mr. Macy, I need you to stop for a second.    09:59
5    A.  He didn't do this.    09:59
6    Q.  Okay.  I'm just trying to get the timeline.    09:59
7    A.  Sure.    09:59
8    Q.  I'm going to ask you some specific questions.    09:59
9         So he's back in his vehicle.  Then you get out    09:59
10   at some point.  You go over to his vehicle.  And at that    09:59
11   point you're videotaping; right?    09:59
12   A.  Yes, I was videotaping.    09:59
13   Q.  So had he returned back to your vehicle after    09:59
14   he left after the initial encounter?    09:59
15   A.  He might have.  He might have came back.    09:59
16   Q.  Okay.    09:59
17   A.  I mean, he probably did.    09:59
18   Q.  Okay.    09:59
19   A.  Probably did.    09:59
20   Q.  So let's say that he did.    09:59
21        At that point did he open the door and look    09:59
22   into the vehicle?    09:59
23   A.  Not at that point.    09:59
24   Q.  Okay.  So then it was only after you talked to    09:59
25   him while he was flipping through the book -- it was    09:59

Page 60

1    sometime after that that he entered your vehicle; right?    09:59
2    A.  It was after, yes.    09:59
3    Q.  Okay.  So that means --    09:59
4    A.  He should not have entered the vehicle ever.    09:59
5    They knew us.  We don't do drugs.  We're a Christian    09:59
6    organization.  We're well known in the community.    10:00
7    Famous Bible translator.  Why are you going in the    10:00
8    truck?  We don't have drugs in our truck.  What if my    10:00
9    kids -- people don't want to be dealing with cops.    10:00
10   Q.  Mr. Macy --    10:00
11   A.  If you're not in a high-risk situation, they    10:00
12   should leave people alone.    10:00
13   Q.  Mr. Macy, I'm trying to get through this so you    10:00
14   can get going as --    10:00
15   A.  Thank you.    10:00
16   Q.  But you keep talking and you answer the    10:00
17   question, and then you add some more.  But I want you to    10:00
18   focus.  Okay?    10:00
19   A.  I --    10:00
20   Q.  I'm just trying to get a timeline here.    10:00
21   A.  I want to go too.    10:00
22   Q.  Okay.  So just so we have a timeline, so    10:00
23   initial -- the initial encounter.  He goes back to his    10:00
24   vehicle --    10:00
25   A.  He probably comes back again.    10:00

Page 61

16 (Pages 58 - 61)

1    Q.   Okay.  He probably comes back again.          10:00
2    A.   He probably tries to give me a ticket.  "I want    10:00
3    to talk to your supervisor."          10:00
4    Q.   Right.          10:00
5    A.   That seems reasonable.          10:00
6    Q.   Okay.  Then he goes back --          10:00
7    A.   He goes back.  Camps in his car forever.          10:00
8    Q.   Okay.  And it's at that point you start          10:00
9    videotaping; right?          10:00
10   A.   Probably.          10:00
11   Q.   Okay.  So you're -- when you're videotaping    10:00
12   him, you're talking to him while he's in the vehicle;    10:00
13   right?          10:00
14   A.   I think we started outside.          10:00
15   Q.   Okay.  But at some point --          10:00
16   A.   Outside.  Not in his car.          10:00
17   Q.   Okay.  So that would seem to indicate to me    10:00
18   then once you started videotaping him, you continued    10:01
19   until the end of the stop; right?          10:01
20   A.   Yeah.  Towards -- well, towards the -- until he    10:01
21   told us to get in the car.          10:01
22   Q.   Okay.  So take a look --          10:01
23   A.   We're missing the timeline before I start    10:01
24   videoing and afterwards.  Right?  How long we were    10:01
25   totally there.          10:01

                                                    Page 62

1    Q.   Right.          10:01
2    A.   It was a long stop.  We have documents to show    10:01
3    the time.  Over an hour.          10:01
4    Q.   So your YouTube video that we've already    10:01
5    discussed that was, you know, a reference --          10:01
6    A.   I hoped you'd be on my side, to be honest.    10:01
7    You're a sworn officer.  You have to be Godly.  Attorney    10:01
8    general right here.  This is a good guy.          10:01
9    Q.   Sir, according to the YouTube video and me    10:01
10   having watched this video, this video is approximately    10:01
11   27 minutes and 10 seconds.          10:01
12   A.   That's after waiting in the car forever.  And I    10:01
13   go, "This is not okay."          10:01
14   Q.   Right.          10:01
15   A.   I informed him, "You can't hold us this long.    10:01
16   This is not okay."          10:01
17   Q.   Right.          10:01
18        So then the time that he looked into your    10:01
19   vehicle you said, sir --          10:01
20   A.   Later.          10:01
21   Q.   -- would have been on the videotape; right?    10:01
22   A.   I'm sure it would have been.          10:01
23   Q.   Okay.  Perfect.          10:02
24   A.   You have it.          10:02
25   Q.   All right.          10:02

                                                    Page 63

1    A.   It's an easy case.  You have video.  We have    10:02
2    video.          10:02
3    Q.   Okay.          10:02
4    A.   Yours got edited illegally.  I have not    10:02
5    received it.  Is this the video finally?          10:02
6    Q.   No.  This is your video.  This is a copy of    10:02
7    your video --          10:02
8    A.   Ours?          10:02
9    Q.   -- that I'm going to show you.          10:02
10        Can we go off the record for a second.    10:02
11   A.   You guys still have not provided to me, that I    10:02
12   asked for in the interrogatory, in the request for    10:02
13   documents.          10:02
14   Q.   All right, sir.  We've been going about an    10:02
15   hour.  I would like to take a break now so we all calm    10:02
16   down.          10:02
17        Oh, regarding that invoice, I will get that.    10:02
18   We have 30 days from the day you send it to us.  I will    10:02
19   get it to you.          10:02
20   A.   I'm trying to get you to get it to me to show    10:02
21   they edited the video.          10:02
22   Q.   I will get it to you.  I will get it to you.    10:02
23   A.   I'd think you would want to know this.  I hope.    10:02
24   You're a Godly attorney general.          10:02
25   THE VIDEOGRAPHER:  Watch out for your cord.    10:02

                                                    Page 64

1    THE WITNESS:  See, this is better like this.    10:02
2    THE VIDEOGRAPHER:  Okay.  Are we ready to go    10:02
3    off the record?          10:02
4    MR. HERNANDEZ:  Yes.          10:02
5    THE VIDEOGRAPHER:  The time is 10:01 a.m.  We    10:02
6    are now off the record.          10:02
7    (Recess taken from 10:01 a.m. until 10:09 a.m.)    10:04
8    THE VIDEOGRAPHER:  The time is 10:09 a.m.  We    10:09
9    are now back on the record.          10:10
10   BY MR. HERNANDEZ:          10:10
11   Q.   Mr. Macy, we are back on the record, so just    10:10
12   understand that you're still under oath.          10:10
13        Do you understand that?          10:10
14   A.   Yes.          10:10
15   Q.   Okay.  And all right.  So I want to turn our    10:10
16   attention to Exhibit F, which is the YouTube video which    10:10
17   has been posted, that's noted in Exhibit E.          10:10
18   A.   Exhibit F.          10:10
19   Q.   That's been noted on the --          10:10
20   A.   Oh, sorry.          10:10
21   Q.   -- Exhibit E.          10:10
22   (Defendants' Exhibit F was marked for    10:10
23   identification and is attached hereto.)          10:10
24   BY MR. HERNANDEZ:          10:10
25   Q.   I just want to get some quick background.    10:10

                                                    Page 65

                                        17 (Pages 62 - 65)

Page 66

1    What kind of cell phone was this video taken    10:10
2  on?                                          10:10
3    A.  Right here.  My phone.            10:10
4    Q.  Do you know what type of phone that is?    10:10
5    A.  Samsung Galaxy Note 10, I think.  It's not a    10:10
6  weapon.                                      10:10
7    Q.  Okay.                               10:10
8    A.  That's the reason they said I -- the sergeant    10:10
9  said I couldn't record.  He thought this was a weapon.    10:10
10    Q.  Sir --                             10:10
11    A.  It's a battery on top of the phone.  It's    10:10
12  relevant.                                   10:11
13    Q.  So my understanding is that you initially    10:11
14  started to record and then during the time that you were    10:11
15  recording, at one point you gave the cell phone to one    10:11
16  of your children; right?                     10:11
17    A.  Yeah.  I was forced to.  I was ordered to.    10:11
18    Q.  Okay.                              10:11
19    A.  It was lawful command.  He's a sergeant.  Not    10:11
20  just an officer.  He's a sergeant.  Very expected to be    10:11
21  professional and know the laws of the state of    10:11
22  California and federal law.  You are allowed -- in fact    10:11
23  to video-record an officer is why the law exists.  It's    10:11
24  not for any other reason.  I bet you already know it by    10:11
25  heart, I'm sure.                            10:11

Page 67

1    Every citizen has a right involving officers    10:11
2  and the public to record an officer.  So I was doing    10:11
3  that peacefully.  Held it like this (indicating).    10:11
4  Didn't hold it -- I wasn't acting -- I like police.  My    10:11
5  board of directors is a sheriff.  You know, we believe    10:11
6  in law and order.                           10:11
7    Q.  Okay.                              10:11
8    A.  We tried to get him to not harass us.  Right?    10:12
9  So we're just filming peacefully.  I'm filming.    10:12
10    Q.  Just so I have it on the record, you had    10:12
11  indicated just now you were holding your phone kind of    10:12
12  like breast, about the size of your chest?    10:12
13    A.  That's how the police do it.            10:12
14    Q.  -- in --                          10:12
15    A.  The exact same way.                   10:12
16    Q.  -- in what we would call portrait mode up and    10:12
17  down; right?                                10:12
18    A.  This is not -- this is not a weapon style.    10:12
19  It's some type of -- he knew us.  The sergeant knew we    10:12
20  were good.  He even told this guy, "These are good    10:12
21  family people."                             10:12
22    Q.  Okay.                              10:12
23    A.  We didn't come across as threatening.    10:12
24    Q.  I had asked you earlier and you agreed that    10:12
25  you -- at one point you provided the phone to one of    10:12

Page 68

1  your children to continue the videotape?    10:12
2    A.  That's not the right wording.  That's not    10:12
3  proper.                                     10:12
4    Q.  You indicated you were ordered?        10:12
5    A.  The sergeant said, "You cannot film because    10:12
6  why" -- or he goes, "Could you set" -- this is why it    10:12
7  was another red flag.  This is really bad.  The first    10:12
8  guy is shady.  Not the second guy, which I thought was a    10:13
9  good guy.  Right?                           10:13
10    He goes, "You guys, can you please set your    10:13
11  phone down."  Now, what does that normally mean in law    10:13
12  enforcement?  You're getting arrested.  You got to put    10:13
13  all your stuff down.  They're arresting you.  Right?    10:13
14  That's why you put it down.  There's no logical reason.    10:13
15  This is not -- so later I was smart, while I was    10:13
16  backing, to hand it to my son.  Right?      10:13
17    Q.  Okay.                              10:13
18    A.  I go, "Can I give it to my son?"        10:13
19    He goes, "Yeah."                        10:13
20    Q.  Okay.  So --                       10:13
21    A.  I was smart.  On the way walking over to my    10:13
22  son, I turned around and said, "Why -- why can't I    10:13
23  record you?"                                10:13
24    He goes, "Because that could be a weapon."    10:13
25  This cell phone with the battery on it.      10:13

Page 69

1    Q.  Okay.                              10:13
2    A.  It's not a taser.  It's not anything dangerous.    10:13
3  I'm not a dangerous person.  I have no violence in my    10:13
4  background.  I don't have a threat towards any police.    10:13
5  I love everybody.  Even shady people still change.  I    10:13
6  deal with dangerous people all the time.  That's what we    10:13
7  do.  We still believe in forgiveness and change.    10:13
8    Q.  Mr. Macy --                        10:13
9    A.  So I handed it to him.  I said, "Please record    10:14
10  for me, Josiah."                            10:14
11    Q.  What's the name of the son you gave the --    10:14
12    A.  Josiah Macy.  Who I'm blessed to have -- if I    10:14
13  didn't have him there, I would have no film, guys.  We    10:14
14  would have no proof that the officer had identification    10:14
15  folded over, refused to give me his name.    10:14
16    Q.  So then --                        10:14
17    A.  We would have no evidence.            10:14
18    Q.  So at that point --                 10:14
19    A.  We would have lost our case.          10:14
20    Q.  At that point, then, you gave it to your son,    10:14
21  and he continued recording until the end of the video?    10:14
22    A.  I told him.  He knows.  I said, "You need to    10:14
23  record."  He knew my life was in jeopardy.    10:14
24    Q.  Okay.  I'm trying to establish who recorded    10:14
25  when.  Okay?                                10:14

18 (Pages 66 - 69)

1    Initially you started recording. You were    10:14
2    asked by the officer to provide it to your son.    10:14
3        A.  Sergeant.    10:14
4        Q.  Or the sergeant. I'm sorry.    10:14
5        The sergeant --    10:14
6        A.  He didn't ask. He commanded. Officers don't    10:14
7    ask, "Hey --    10:14
8        Q.  Sir --    10:14
9        A.  -- you like the weather?"    10:14
10       No.  They go, "Put the phone down."    10:14
11       Q.  So I might have used the wrong word. So let    10:14
12   me restart --    10:14
13       A.  And then they handcuff you. That's the normal    10:14
14   thing. Do you think I was concerned?    10:15
15       Q.  Mr. Macy --    10:15
16       A.  For my daughter having a seat belt on they    10:15
17   didn't think was sufficient.    10:15
18       This is out of control. I hope you would    10:15
19   investigate this.    10:15
20       Q.  Mr. Macy, you initially were videotaping.    10:15
21       The sergeant then commanded you to give it to    10:15
22   your son?    10:15
23       A.  Commanded. Gave an order -- a lawful order is    10:15
24   the proper wording. It's a called a lawful -- he    10:15
25   believed it was lawful. I believed it was unlawful.    10:15

Page 70

1        Q.  Okay. So then at that point, then, you gave it    10:15
2    to your son Josiah?    10:15
3        A.  Yes. I was smart, intelligent. I'm not    10:15
4    going -- if I were to obey his command completely, we    10:15
5    would not have a case. You guys would have got away    10:15
6    with harassing me and my family for over an hour that    10:15
7    we won in court.    10:15
8        You made us go all the way down the hill, go    10:15
9    through a two-day trial, and the judge -- I didn't even    10:15
10   have to finish it off. Didn't even get to the rest of    10:15
11   my evidence -- said, "This" -- he told the officer, "Was    10:15
12   this an illegal ticket? Did you fill in the wrong box?"    10:15
13       And he goes, "Yeah."    10:15
14       Well, then he explained it to him, "This box --    10:15
15   this box that you filled in on the ticket is for a    10:16
16   passenger. You got Jeff Macy in court, a famous Bible    10:16
17   translator who gives people his life for free. And    10:16
18   guess what? Do you want to dismiss this ticket?"    10:16
19       Q.  Mr. Macy, I was asking who was videotaping. I    10:16
20   didn't finish my question.    10:16
21       A.  Okay.    10:16
22       Q.  So Josiah, then, once he took the cell phone,    10:16
23   videotaped it until the end of the stop; right?    10:16
24       A.  Until the end. They said, "Get in your car."    10:16
25       Q.  Okay. Once you got in the vehicle --    10:16

Page 71

1        A.  They said it very intimidating. He said, "Get    10:16
2    in your car." What are you supposed to do? Get in your    10:16
3    car. That's what we do. We obey the law.    10:16
4        Q.  Okay.    10:16
5        A.  "Get in your truck." Sorry.    10:16
6        Q.  So then you videotaped it first and then your    10:16
7    son and no one else; right?    10:16
8        A.  That's correct.    10:16
9        Q.  Okay. Thank you.    10:16
10       A.  The cars were supposed to have cameras on them.    10:16
11   You asked a question. I have the right to answer it.    10:16
12   You said no one else. Well, the cars were supposed to    10:16
13   have cameras on them.    10:16
14       Q.  No one else used your phone to videotape;    10:16
15   right?    10:16
16       A.  The main officer who pulled me over illegally,    10:16
17   his got edited and deleted. There's sections deleted    10:17
18   out of the time. You can see it. We've checked it many    10:17
19   times over on the video. Why would he delete what was    10:17
20   said out there?    10:17
21       Q.  Okay. Once again, I just want to establish who    10:17
22   used your cell phone.    10:17
23       A.  I need to answer -- you said did anyone else    10:17
24   film. I need to answer that. At the end of the traffic    10:17
25   stop --    10:17

Page 72

1        Q.  Mr. Macy, you need to stop.    10:17
2        A.  Okay.    10:17
3        Q.  Okay. I've never raised my voice in a    10:17
4    deposition before, but I need you to stop so I can ask    10:17
5    the question, please.    10:17
6        A.  You're getting awfully close to me.    10:17
7        Can you document that?    10:17
8        Q.  It's on the videotape.    10:17
9        Sir -- sir --    10:17
10       THE WITNESS:  You need to be calmer.    10:17
11       MR. HERNANDEZ:  Can we go off the record.    10:17
12       THE WITNESS:  He's not being filmed, sir. He    10:17
13   needs to be on the thing. He's yelling at me with his    10:17
14   hand like this in my face telling me to stop. He's    10:17
15   yelling it. This is very important. I need this -- I    10:17
16   need this documented. He needs to be on there with his    10:17
17   hand in my face like this (indicating). He's    10:17
18   representing the highway patrol.    10:17
19       THE VIDEOGRAPHER:  Okay.    10:18
20       THE WITNESS:  You can't get in my face. His    10:18
21   hand is this far (indicating) across the table in my    10:18
22   face. That's threatening. He's yelling at me, "You    10:18
23   need to stop." That's what he's saying. I'm not saying    10:18
24   that to anybody. He doesn't let me finish answering the    10:18
25   question. He needs to be filmed. I'm asking you nicely    10:18

Page 73

19 (Pages 70 - 73)

Page 74

1 to film his behavior. You need to put that back where 10:18
2 we're both on camera, please. 10:18
3    THE VIDEOGRAPHER: Okay. Are we ready to go 10:18
4 off the record? 10:18
5    THE WITNESS: Or stop this recording and go to 10:18
6 court and say you do not -- I don't believe this is safe 10:18
7 right now. His behavior is unsafe. Factually he's 10:18
8 yelling -- 10:18
9    MR. HERNANDEZ: Mr. Macy -- 10:18
10    THE WITNESS: -- with his hand like this 10:18
11 (indicating) in my face. He's not a cop. 10:18
12    MR. HERNANDEZ: Mr. Macy -- 10:18
13    THE WITNESS: He's a lawyer. 10:18
14    You don't get this close in court, do you? Do 10:18
15 you go up to a guy on the stand and go, "You need to 10:18
16 stop?" I don't think so. 10:18
17    You're not recording this. This is a safety 10:18
18 concern. This is common sense. This needs to be 10:18
19 documented and reported. 10:18
20    You can't go like that to me. 10:18
21    THE VIDEOGRAPHER: Okay. We're ready to go off 10:18
22 the record. The time is 10:18 a.m. We are now off the 10:19
23 record. 10:19
24    (Recess taken from 10:18 a.m. until 10:21 a.m.) 10:19
25    THE VIDEOGRAPHER: The time is 10:21 a.m. We 10:22

Page 75

1 are now back on the record. 10:22
2    THE WITNESS: So this is Jeff Macy again. I 10:22
3 want to finish the question I was interrupted on. I was 10:22
4 interrupted on. 10:22
5 BY MR. HERNANDEZ: 10:22
6    Q. Sir, this is my deposition, and I asked you a 10:22
7 question about who continued videotaping with your 10:22
8 cellphone. All right? 10:22
9    So let me ask you again. The only individuals 10:22
10 who used your cell phone to videotape this -- the 10:22
11 incident was yourself and your son Josiah; is that 10:22
12 correct? 10:22
13    A. My phone, yes. Correct. 10:22
14    Q. Thank you. 10:22
15    And, Mr. Macy, I understand that I did raise my 10:23
16 voice and I apologize. 10:23
17    A. Apologize? You should never do that. You 10:23
18 should be disbarred for that type -- 10:23
19    Q. Let's talk about the video itself. Sir, I have 10:23
20 it brought up on my computer. 10:23
21    A. You're a lawyer. 10:23
22    Q. I have it brought up on my computer, sir. 10:23
23    Do you see that? It's on the screen. 10:23
24    A. Yes. 10:23
25    Q. Can you take a look at it for a second? 10:23

Page 76

1    A. I see it. I did look. 10:23
2    Q. All right. As far as your understanding, this 10:23
3 is the videotape that was part of the incident that I 10:23
4 pulled from YouTube? 10:23
5    A. I would have to look to be accurate. I need to 10:23
6 view that video. I'm going to ask. 10:23
7    Q. I'm going -- 10:23
8    A. Because you guys edited the other one that you 10:23
9 didn't let me finish talking about. 10:23
10    Q. I'm going to let it run. 10:23
11    A. I don't trust the highway patrol right now. 10:23
12    Q. Sir, I'm going to let it run. Can you watch a 10:23
13 few minutes of it and see if you recognize it. Okay? 10:23
14    A. Okay. 10:23
15    Q. So I am now going to show portions of 10:23
16 Exhibit F. 10:23
17    A. I would have to have my video here for this to 10:23
18 be accurate. 10:24
19    (Playing video: MR. MACY: "I've been 10:24
20    here since 1:00 o'clock. The highway patrol 10:24
21    has pulled me over saying I don't have a 10:24
22    seat belt, and he's taking our time up. 10:24
23    He's going to get a supervisor over here. 10:24
24    He won't give me his business card, and, 10:24
25    you know, this is my truck. We got a seat 10:24

Page 77

1    belt. Here's the seat belt. Do you 10:24
2    see the seat belt? He's saying that 10:24
3    it's not a factory seat belt, so if 10:24
4    it's not factory installed, we can't 10:24
5    have a fourth seat belt. This is 10:24
6    totally shady.") 10:24
7 BY MR. HERNANDEZ: 10:24
8    Q. All right. So I'm stopping the video at 10:24
9 35 seconds into the video. 10:24
10    Did you recognize the voice of the person that 10:24
11 was speaking, sir? 10:24
12    A. Yes. 10:24
13    Q. Okay. Who was it? 10:24
14    A. Me. 10:24
15    Q. Okay. And then you quickly showed the cab and 10:24
16 those are the three children that were with you; right, 10:24
17 sir? 10:24
18    A. Yes. 10:24
19    Q. Okay. All right. Let's let it run a little 10:24
20 bit more. 10:24
21    (Playing video: MR. MACY: "It's on the record. 10:25
22    We're sitting here. Nothing to do.") 10:25
23 BY MR. HERNANDEZ: 10:25
24    Q. Okay. I'm stopping it at 46 seconds in. 10:25
25    How long had you been waiting before you 10:25

20 (Pages 74 - 77)

1  started videotaping?                          10:25
2      A.  A long time.                          10:25
3      Q.  Can you give me -- was it ten minutes,   10:25
4  20 minutes, 30 minutes?  Can you give me an estimate of   10:25
5  time?                                         10:25
6      A.  20 or 30 minutes.                     10:25
7      Q.  Okay.                                 10:25
8      A.  I should have recorded at the very beginning   10:25
9  but I didn't because I was trying to give him -- you   10:25
10 know, to keep things deescalated, give him the benefit   10:25
11 of the doubt that it was a legitimate stop.  It could   10:25
12 have been something I didn't know about.  Maybe I had a   10:25
13 taillight out.                                10:25
14     Q.  Okay.                                 10:25
15     A.  I was giving him the benefit of the doubt.   10:25
16 Maybe I thought I was being targeted, but it was a   10:25
17 taillight out.  No.  It was exactly what I thought it   10:25
18 was.  I answered your question.               10:25
19     (Playing video:  MR. MACY:  "You're   10:25
20     saying you don't have a business card with   10:25
21     your name on it.  The reason you stopped me was   10:26
22     because we don't have a factory-installed seat   10:26
23     belt; correct?")                          10:26
24     THE WITNESS:  Look how big that DMV book is.   10:26
25 He's trying to find a charge.                 10:26
                                              Page 78

1  BY MR. HERNANDEZ:                             10:26
2      Q.  Let me ask the question, sir.        10:26
3      A.  It's a good case.                     10:26
4      Q.  Let me ask the question, sir.        10:26
5      So at about -- a little before we get to the   10:26
6  first minute of the videotape, it shows you walking over   10:26
7  to Officer Bates' vehicle; right?            10:26
8      A.  Yeah.  I'm walking over to his vehicle.   10:26
9      Q.  And then you videotape inside the vehicle?   10:26
10     A.  Asking him what the charge is.        10:26
11     Q.  You're asking --                      10:26
12     A.  He hadn't given me a charge yet.      10:26
13     Q.  And you look inside his vehicle with your   10:26
14 camera and yourself; right?  And then you see the book   10:26
15 out; right?                                   10:26
16     A.  Very smart.  Look at that.  That's beautiful.   10:26
17 The jury is going to love this.              10:26
18     Q.  Okay.                                 10:26
19     A.  Can you imagine that?  The jury going, this guy   10:26
20 has still not told me what I'm charged with.  We've been   10:26
21 waiting -- what? -- 20, 30 minutes.  And he doesn't have   10:26
22 a charge, and he's trying to read it -- I'm sorry about   10:26
23 touching your thing.                          10:27
24     Q.  All right.                            10:27
25     A.  That should be on the camera showing this.  Can   10:27
                                              Page 79

1  you video that?                              10:27
2      (Playing video:  MR. MACY:  "That's your   10:27
3      suspicion because that's normal standard.   10:27
4      I understand that.  But now you've        10:27
5      done your investigation; right?  You saw   10:27
6      that we had a factory -- not a factory.  But a   10:27
7      higher Sparco top-of-the-line seat belt   10:27
8      installed, bolted in.  And we had already been   10:27
9      pulled over last year for the same thing.   10:27
10     That officer let us go and said we were fine.")   10:27
11 BY MR. HERNANDEZ:                             10:27
12     Q.  All right.  So at that point it's now 1:22 at   10:27
13 the end where I stopped the video.  You had indicated   10:27
14 that he completed his investigation.          10:27
15     What is your understanding was the        10:27
16 investigation he completed?                   10:27
17     A.  When did I say he completed his investigation?   10:27
18 He's still looking.  He hasn't -- he's never told me   10:27
19 until the last of the very ticket what the charge was   10:27
20 factually.  He's trying to cite right now.  He's looking   10:27
21 up stuff.  He's going, Well, 12-something said whatever.   10:27
22 I said, "Can you please read it out of your   10:27
23 book."  If you read it, it has nothing to do with a   10:27
24 manufactured or factory seat belt.           10:27
25     Q.  Okay.  So at this point even in the video it   10:28
                                              Page 80

1  says that you -- you indicated to him that he had   10:28
2  completed his investigation.                  10:28
3      A.  It said that in the video?  Why would I say   10:28
4  that?  That doesn't make any sense.  I said that he had   10:28
5  completed investi-- well, maybe I did, then.  That's   10:28
6  funny.  That's pretty good if I did.          10:28
7      Q.  What was the investigation, do you think, that   10:28
8  he did at this point?                         10:28
9      A.  The seat belt issue.  Nothing else.  It had   10:28
10 nothing to do with me, and I won the case.  So he   10:28
11 illegally ticketed me.                        10:28
12     Q.  What --                               10:28
13     A.  The passenger should have gotten a ticket.  And   10:28
14 even then she still would have won.           10:28
15     Q.  What was the investigation?           10:28
16     A.  Of a non-factory seat belt is his words.  I   10:28
17 can't speculate.  We don't know.  He didn't tell me.   10:28
18     (Playing video:  MR. MACY:  "I get that.   10:28
19     We know you all have your investigation.")   10:28
20     THE WITNESS:  I'm answering your questions.   10:28
21     (Playing video:  MR. MACY:  "And then you   10:28
22     looked up the code, which you quoted was?"   10:28
23     OFFICER BATES:  "27315(e)."             10:28
24     "MR. MACY:  "Which I read.  Do you want   10:28
25     me to read it to you?  It actually said the   10:28
                                              Page 81

Page 82

```
 1  opposite.                              10:28
 2      Maybe you have a different book.  Maybe the   10:29
 3  phones are on.  Can you read it to me out    10:29
 4  loud."                                  10:29
 5      OFFICER BATES:  "Let's wait until my    10:29
 6  sergeant gets here."                    10:29
 7      MR. MACY:  "I would like to have it on record,   10:29
 8  please.  Does it say there we can't have a    10:29
 9  factory seat belt?")                    10:29
10  BY MR. HERNANDEZ:                        10:29
11      Q.  All right.  So the officer just indicated that   10:29
12  "We will wait until my supervisor gets here."  This is   10:29
13  now 1:50 into the video.                 10:29
14      So by this point you had already asked him for   10:29
15  the supervisor to come to the scene; right?    10:29
16      A.  Probably.                        10:29
17      Q.  Okay.  I'm actually going to skip a little bit   10:29
18  of this.                                 10:29
19      A.  That book is beautiful.  He didn't know the   10:29
20  code.  It's 100 percent evidence.  He didn't know.  He   10:29
21  lied to his sergeant.  His sergeant trusted him.  His   10:29
22  sergeant word-for-word said, "Does it say somewhere in   10:29
23  there it has to be a factory seat belt?"  Bates lied to   10:29
24  his sergeant.  This should be concerning to you.  He   10:29
25  said it does say it in the book, and he lied on record   10:29
```

Page 83

```
 1  right on this film.                      10:30
 2      Q.  Okay.  Okay.  So I want to move forward with   10:30
 3  the video.  I'm going to start it at about 8:51.  It   10:30
 4  looked like by this point Sergeant O'Brien had appeared;   10:30
 5  right?                                   10:30
 6      A.  Yep.  And Bates.                 10:30
 7      Q.  And Bates.  So at 8:51 they're both on the   10:30
 8  screen.  They had spent some time talking at this   10:30
 9  time -- right? -- out of your earshot?      10:30
10      A.  Yes.  That's what's shady.  We want a copy of   10:30
11  it.  You're not providing.  We want to know what he said   10:30
12  to him.  He took him in private and said, "What's this   10:30
13  about?"  Why would he do it in private?     10:30
14      Q.  So at this point --              10:30
15      A.  He had things to say in private.   10:30
16      Q.  Okay.  We're at about 8:51.        10:30
17      A.  I'm answering your question.  You know that;   10:30
18  right?  You literally asked me.            10:30
19      Q.  Okay.  So at this point at eight fifty -- at   10:30
20  9:00 o'clock --                          10:30
21      A.  What are they saying?             10:30
22      Q.  -- nine minutes they're talking to each other.   10:30
23      A.  So another nine minutes I have to wait while   10:31
24  they figure out if I should get a ticket or not.   10:31
25      (Playing video:  SERGEANT O'BRIEN:  "That's   10:31
```

Page 84

```
 1  good probable cause for a stop.")        10:31
 2  BY MR. HERNANDEZ:                        10:31
 3      Q.  Okay.  So at that point Sergeant O'Brien   10:31
 4  indicates that it was probable cause.  My understanding   10:31
 5  is you just said that you agreed with that?   10:31
 6      A.  Well, to be peaceful.  Not that I agreed.  It   10:31
 7  was an illegal detainment or I wouldn't have the   10:31
 8  sergeant show up.  Remember, you got to let me answer,   10:31
 9  though.  Right?  I think you're forgetting this.  If you   10:31
10  ask me a question and I have to have an answer you might   10:31
11  not like, you should let me finish.  This is proper.   10:31
12  Instead of getting angry at me, just don't ask too much   10:31
13  open questions maybe.                     10:31
14      (Playing video.)                    10:31
15      THE COURT REPORTER:  I can't hear it.   10:31
16      THE WITNESS:  Well, she can't hear it.   10:31
17  BY MR. HERNANDEZ:                        10:31
18      Q.  It's okay.  What's being said is not as   10:31
19  important.  I'll get to the question.  I'm just trying   10:32
20  to get the setup of the scene.            10:32
21      Okay.  So at this point it's your son that's   10:32
22  recording you; right?                    10:32
23      A.  Yeah.  Risking his life.          10:32
24      Q.  I can see you and Sergeant O'Brien at 9:32 of   10:32
25  the video; right?                        10:32
```

Page 85

```
 1      A.  Yeah.  The first guy already told me I can't   10:32
 2  record.  Now he's -- he could say the same thing to him.   10:32
 3      Q.  All right.                       10:32
 4      What is it you guys want to hide?  That's the   10:32
 5  question, I would say.                    10:32
 6      (Playing video; inaudible.)           10:32
 7  BY MR. HERNANDEZ:                        10:32
 8      Q.  Okay.  We're now skipping to 11- --   10:32
 9      A.  How big are you?  How much do you weigh?   10:32
10  What's your height?                      10:32
11      Q.  We're not --                     10:32
12      A.  It's relevant when you're like this   10:32
13  (indicating) to me.  I want to know.       10:32
14      Q.  We're at 11:01.                   10:32
15      A.  You didn't answer me.             10:32
16      (Playing video; inaudible.)           10:32
17      THE WITNESS:  Look at that.  Hello.   10:33
18  BY MR. HERNANDEZ:                        10:33
19      Q.  So we're now --                  10:33
20      A.  For the record -- well, I have to answer your   10:33
21  question.  Sorry.  You're right.          10:33
22      Q.  I'm going to put it on --         10:33
23      A.  Hopefully you'll be --            10:33
24      Q.  -- on the record.                 10:33
25      So we are now at approximately 11:12 of the   10:33
```

22 (Pages 82 - 85)

1 video. The video shows -- it appears to be Officer 10:33
2 Bates on the step up to the cab of the vehicle; is that 10:33
3 correct? 10:33
4  A. Look at his hands. 10:33
5  Q. Okay. 10:33
6  A. Well, you're asking me a question. 10:33
7  Q. Yeah, I know. 10:33
8  But is that correct? 10:33
9  A. Am I allowed to answer my way? You want me 10:33
10 to -- I don't believe that's a correct interpretation. 10:33
11  Q. Okay. 10:33
12  A. There's more going on there. 10:33
13  Q. You describe to me what's in this shot. 10:33
14  A. His head is inside our vehicle. The door is 10:33
15 open. Illegal search and seizure. Right? You're not 10:33
16 allowed -- you can look outside but not inside. You can 10:33
17 look. You can look. The window's down. You don't have 10:33
18 to -- you don't go in a door just because it's open. If 10:33
19 you have a front door of a house, doesn't mean you're 10:33
20 welcome to go in. 10:33
21  He enters the cab. His hand is holding on 10:33
22 inside -- I touched your screen. Sorry about that. 10:34
23 He's holding on, I presume to be, the hand grab inside 10:34
24 the truck. His foot is on the step. His right foot. 10:34
25 His right hand -- who knows what he's doing with his 10:34

Page 86

1 right hand, to be honest. 10:34
2  Look at my son. Imagine that? You have a cop 10:34
3 and my son's sitting there. That's not cool. He was 10:34
4 inside. Clearly his head is 100 percent inside. I 10:34
5 don't know if you guys can -- I'm testifying to that. 10:34
6  Do you agree or you don't agree, I mean? 10:34
7  Q. I'm just asking you what you describe -- 10:34
8  A. You feel this is accurate, what I'm saying? 10:34
9  Q. Okay. So I'm going -- 10:34
10  A. He's inside our truck. 10:34
11  Q. Okay. I'm going to stop for a second. 10:34
12  A. His head is inside, man. 10:34
13  Q. I'm going to -- 10:34
14  A. The door is open. 10:34
15  Q. I'm going to run the video of him looking 10:34
16 inside. Okay? 10:34
17  A. He goes in deeper anyways. 10:34
18  Q. Stop for a second. I'm going to show you that 10:34
19 portion. Okay. I want you to pay attention, and then 10:34
20 when we're done just describe to me what you saw. Okay? 10:34
21  A. Afterwards you want me to describe what I see? 10:34
22  Q. Yes. So . . . 10:34
23  A. You're not going to say how big you are, how 10:35
24 tall you are, if you're an ex-cop, something like that. 10:35
25 That's your motive possibly to why you're going after 10:35

Page 87

1 the person who's the victim in this case. I'm the 10:35
2 victim and my kids. We're victims. 10:35
3  Q. Okay. So the video is now at 11:10. Describe 10:35
4 what you see. 10:35
5  A. His hand inside our truck -- 10:35
6  Q. Okay. 10:35
7  A. -- from a partial picture. 10:35
8  I need it -- you're cutting me off. I need to 10:35
9 answer this completely. 10:35
10  Q. What do you see -- 10:35
11  A. This is a partial picture not showing the 10:35
12 center of where he's at in the vehicle at this time, 10:35
13 like you're trying to manipulate me. This is 10:35
14 disappointing. People aren't dumb. It's showing a 10:35
15 partial. Not the center where he's at right now. 10:35
16 You're showing a part of his arm inside our truck, not 10:35
17 showing his body. 10:35
18  Q. Mr. Macy, I'm going to let the video run. This 10:35
19 is where it starts. 10:35
20  A. You said at the end you're going to let me 10:35
21 respond. 10:35
22  Q. This is where the video starts. 10:35
23  A. Okay. 10:35
24  Q. Just watch it. Okay? 10:35
25  (Playing video; inaudible.) 10:35

Page 88

1 BY MR. HERNANDEZ: 10:35
2  Q. Okay. We are now at 11:26. 10:36
3  A. Look what he's doing to my passengers. These 10:36
4 are my kids. 10:36
5  Q. Can you do me a favor -- 10:36
6  A. You're aggro with something you don't even 10:36
7 know. This is my family right here. 10:36
8  Q. Can you describe for me between ten -- no -- 10:36
9 11:10 and 11:26 what you saw on the video. 10:36
10  A. The officer illegally enters the vehicle. 10:36
11 Nobody can question this. This is video evidence, 10:36
12 indisputable. We didn't edit it. Your copy of the 10:36
13 video. Illegally enters the vehicle to get a view of 10:36
14 the seat belt that he thinks is non-factory. This is my 10:36
15 guess. It logically matches what he's accusing. While 10:36
16 doing it, makes my passenger completely nervous. 10:37
17  Look at my daughter. He probably asked her 10:37
18 to move -- "Can you lean up so I can see?" Who knows 10:37
19 what happened to my daughter and my son. They don't -- 10:37
20 they know not to let people get close. It's called a 10:37
21 6 foot rule. This is unsafe at this point. He can 10:37
22 punch them. He could do whatever. I know you think -- 10:37
23 you trust people, whatever. We don't trust the guy who 10:37
24 pulls us over for some reason who towed the same truck 10:37
25 months earlier. 10:37

Page 89

23 (Pages 86 - 89)

**Page 90**

1    He came in and he's still looking. It's not    10:37
2    complete. You're just being fair to you. This is where    10:37
3    it ended. He's still looking inside my truck. Now he's    10:37
4    doing it legit outside the truck. Nothing wrong with    10:37
5    that part. It's where he went in the truck was the    10:37
6    problem.    10:37
7    Look what he did to my passenger, my son, who    10:37
8    knows not to trust cops. To a certain point you don't    10:37
9    trust anyone. I don't trust you when you put your hand    10:37
10   like that. I don't trust you anymore. I'm not going to    10:37
11   lie. I had a lot of respect for you. Your office is a    10:37
12   very important position. I've never seen any judge do    10:37
13   that, any lawyer go up to someone and say, "You need to    10:37
14   stop." The judge -- the bailiff would have arrested    10:37
15   you. You're lucky you're here in my opinion.    10:38
16   Q.  Sir, remember I told you, just answer the    10:38
17   question.    10:38
18   A.  I'm trying to answer it.    10:38
19   So he made -- he clearly caused duress on me.    10:38
20   I can tell you if this wasn't a cop, I would have    10:38
21   grabbed him and said, "Don't get near my kids. Don't go    10:38
22   in my vehicle." I would have done it peacefully. I    10:38
23   wouldn't hurt people. I would have grabbed him. I    10:38
24   would have detained him if he acted agjro -- aggro.    10:38
25   Sorry. And I would have called the police and said,    10:38

**Page 91**

1    "This guy illegally violated my federal law."    10:38
2    He made my kids nervous. I already protect my    10:38
3    kids. We're homeschool. We're nonprofit. They don't    10:38
4    go to public school. We protect everybody, anyone who    10:38
5    works for us, in a peaceful way. This behavior was    10:38
6    threatening. Look what it did to my son. He knows you    10:38
7    got to defend yourself at some point. At some point it    10:38
8    doesn't matter if you have a badge. It doesn't matter    10:38
9    if you're a lawyer and you put your hands in someone's    10:38
10   face. There's behavior that's unacceptable.    10:38
11   Q.  Have you ever spoken to either of the two    10:38
12   children that were still in the vehicle --    10:38
13   A.  Yeah. They're very concerned because they    10:38
14   already knew they're targeting us. We had a history    10:38
15   before this moment, so the answer is yes.    10:39
16   Q.  What did they tell you that Officer Bates did    10:39
17   at that moment?    10:39
18   A.  They didn't know what he was doing. He was    10:39
19   going in the vehicle. You don't know what people are    10:39
20   doing. You have to look at what they're doing. Not    10:39
21   what they say.    10:39
22   Q.  Okay. Did they --    10:39
23   A.  Criminals and con artists, what do they say?    10:39
24   "I'm here to help you" and then they rob you. This guy    10:39
25   could be looking for drugs, and he could just look for a    10:39

**Page 92**

1    charge. He's trying to -- he had his book open.    10:39
2    Okay. What did they say? They said he was    10:39
3    dangerous, he was threatening, they don't trust him. I    10:39
4    had discussions with them. We had to have a whole    10:39
5    two days talking to my kids after this, about not    10:39
6    trusting this officer ever again or his sergeant ever    10:39
7    again, because they're in our community. We have to    10:39
8    worry. We're responsible for our community. A lot of    10:39
9    people trust our decision. We tell people obey the    10:39
10   government. But when they do certain things, don't get    10:39
11   violent. You film it, and that's why we're here. We're    10:39
12   doing a case against this officer for his behavior.    10:39
13   Right?    10:40
14   Q.  Sir --    10:40
15   A.  He should not be a cop anymore.    10:40
16   Q.  Sir --    10:40
17   A.  He has a long history of abuse.    10:40
18   Q.  Sir, once again --    10:40
19   A.  I'm answering that.    10:40
20   Q.  You answer the question --    10:40
21   A.  These are things I'm telling them. Let me keep    10:40
22   going, then. I'll try to answer it. This is a good    10:40
23   question.    10:40
24   Q.  I want to know if they described to you the    10:40
25   actions that Officer Bates took when he looked into the    10:40

**Page 93**

1    truck?    10:40
2    A.  He's threatening. He has a gun on him. He has    10:40
3    a taser. He has Mace. We know this stuff. He -- his    10:40
4    intent is everything. Everybody knows this. If a guy's    10:40
5    here as your friend, you don't care what people do with    10:40
6    your friend. They're in our house. They walk around.    10:40
7    But as soon as they act weird --    10:40
8    His was threatening from the start. He came    10:40
9    out of his car. I told them -- I told them when he    10:40
10   pulled us over, This guy's up to no good. Put your    10:40
11   hands -- be careful. Don't move." They're already    10:40
12   scared half to death. Right? They're like this. I'm    10:40
13   like, "Don't reach for anything. You know this. He's    10:40
14   not here to help us." He's working for Burrtec -- this    10:40
15   is another one of our cases -- to try to stop us from    10:40
16   functioning and disabling our ability to pick up trash.    10:40
17   These are the things.    10:41
18   I'm answering the questions, so don't get mad    10:41
19   at me. I'm on the topic of what I told my kids. These    10:41
20   are the things I told my kids. She's a witness to this.    10:41
21   We sat down on a couch in our house. I went over the    10:41
22   case. I said, "Guys, this is serious. We need to save    10:41
23   a copy of this film right away and remember how good I    10:41
24   taught you? Anytime you feel threatened" --    10:41
25   Like now I messed up. I regret not filming    10:41

24 (Pages 90 - 93)

Page 94

```
 1   this.  This is bad.  You know, if I had my son here, he    10:41
 2   would have filmed you, and you might not have done this    10:41
 3   to me.                                                      10:41
 4        "When you feel threatened, go with the facts.    10:41
 5   You need to film right away.  Stay your distance, don't    10:41
 6   get loud, stay calm because people will snap on you and    10:41
 7   they can hurt you.  You don't know this guy.  You don't    10:41
 8   know him."  And he had already -- you know how upset    10:41
 9   they were already?                                         10:41
10        So we already had a whole thing about how we're    10:41
11   going to react when they towed our car -- the same truck    10:41
12   got towed months earlier by this officer.  You know when    10:41
13   he lied?  He lied to the court.  These are things I    10:41
14   told.  You asked me this.  He said we parked in front of    10:41
15   a fire hydrant, and he said we blocked a road.            10:42
16        Well, guess what?  I took a picture and filmed    10:42
17   it.  I was genius back then.  We didn't even have to go    10:42
18   to trial on that case against this guy.  His supervisor    10:42
19   threw the case out.  He looked at it.  He saw we were on    10:42
20   a private road.  You're not allowed to tow off a private    10:42
21   road.  We were not in front of a hy- -- he was willing    10:42
22   to lose his job to harass us.  This is not good.  In    10:42
23   fact he was five minutes after we ran out of gas like    10:42
24   they were tracking us.  This is a real story.  You guys    10:42
25   won't even get this.                                       10:42
```

Page 95

```
 1   Q.  Mr. Bates --                                           10:42
 2   A.  Macy.                                                  10:42
 3   Q.  Mr. Macy --                                            10:42
 4   A.  Can I finish all the things I told them?  This    10:42
 5   has to do with the damages.                                10:42
 6   Q.  My question was not what you told them.  My    10:42
 7   question was did they describe --                          10:42
 8   A.  They responded --                                      10:42
 9   Q.  No.  My question was did they describe to you    10:42
10   Mr. -- Officer Bates' behavior when he looked into the    10:42
11   truck?                                                     10:42
12   A.  Yes.  They said he was cold as ice.  Cold as    10:42
13   ice.  You can tell somebody -- the Bible says look in    10:42
14   their eyes.  His eyes are cold as ice.  If you meet him,    10:42
15   you can talk to him.  He was cold as ice.  You're going,    10:43
16   What's his motive here?  He's not a good person.  He was    10:43
17   not here to do good for us.  He was trying to find a    10:43
18   charge to arrest their dad who they said put his phone    10:43
19   down.                                                      10:43
20        They said, "Dad, we were afraid they were going    10:43
21   to arrest you."  I'm answering you.  They were afraid    10:43
22   that one of these two guys or both of them when they    10:43
23   surround you we're going to arrest you for nothing, an    10:43
24   illegal detainment, take me to jail.  And then they were    10:43
25   going to impound my truck again, and I had to figure out    10:43
```

Page 96

```
 1   how my kids were going to get home.  It's a long walk on    10:43
 2   Highway 18.  There's no buses there.  There's no bus    10:43
 3   there.  You have to walk along Highway 18.              10:43
 4   I don't think you understand the mountains.            10:43
 5   It's not like the city.  They don't have a nice         10:43
 6   sidewalk.  Some time you're on the white line.  Some    10:43
 7   time you're in the road to get home.  They have to      10:43
 8   figure out how to get home.  If he arrested me, he would    10:43
 9   have taken my phone probably so that I couldn't have the    10:43
10   video evidence.                                          10:43
11        These were things we were concerned -- they      10:43
12   told me they were concerned about.  He was going to     10:43
13   steal my phone so we had no video, put me in jail for    10:43
14   what?  You know what the charge is going to be?  And I    10:43
15   knew this.  I had to stay calm.  I was more calm then    10:43
16   for them.  For impeding an investigation was what they    10:44
17   were trying to get me with because they didn't have a    10:44
18   charge.  But if I would have been not cooperative, they    10:44
19   would handcuff me.                                       10:44
20   Q.  Mr. Macy, we are now at 11:30.                      10:44
21   A.  He's got shades on.  You can't see his eyes.       10:44
22   Q.  Is the video demonstrating that Officer Bates     10:44
23   is walking away from the cab of the truck?              10:44
24   A.  Yes.                                                 10:44
25   Q.  Thank you.                                          10:44
```

Page 97

```
 1        (Playing video; inaudible.)                        10:44
 2        THE WITNESS:  Look how nice and calm I was.       10:44
 3   You wouldn't know that, huh?  Now I'm not as calm      10:44
 4   because I'm not in front of an officer.  This is a     10:44
 5   lawyer.  I tried to be respectful to you.              10:44
 6        MR. HERNANDEZ:  Let me cue up the next portion.   10:44
 7        (Playing video; inaudible.)                        10:44
 8        THE WITNESS:  Look how big his hands are.          10:44
 9   BY MR. HERNANDEZ:                                        10:45
10   Q.  All right.  Sir, I'm going to try to get this     10:45
11   as loud as I can.  Okay.  So it is now 12:50 of the    10:45
12   videotape.  And if -- I just want you to listen to it    10:45
13   for about 30 seconds.  Okay?  And hopefully we can get    10:45
14   it on.  Okay.                                            10:45
15        Don't say anything.  Just let the video play.     10:45
16        (Playing video; inaudible.)                        10:45
17   BY MR. HERNANDEZ:                                        10:45
18   Q.  Now, at any point did you agree for the           10:46
19   officers to search the inside cab --                    10:46
20   A.  No.                                                  10:46
21   Q.  -- of the truck?                                    10:46
22   A.  I did not.  He gave a lawful command for my        10:46
23   kids to get out.  He was not even the arresting officer.    10:46
24   He was a sergeant.  He took over illegally in my        10:46
25   opinion.  The stop was already voided as soon as he took    10:46
```

25 (Pages 94 - 97)

1    it over.                                    10:46
2         So the sergeant takes over the stop at this    10:46
3    point and tells -- gave an order. It doesn't matter how    10:46
4    you say it. He has a badge on. This guy has a nametag    10:46
5    at least. You can see it. Right? Look at his    10:46
6    folded-over one. This one actually shows his nametag,    10:46
7    the real sergeant. Right? He moved to a different    10:46
8    spot. He's actually legit. We knew him. Right? He    10:46
9    was a nice guy, we thought. So the question I'm    10:46
10   answering; right?                            10:46
11        Q. So then just --                      10:46
12        A. He ordered. I need it to be clear. He    10:46
13   ordered. It doesn't matter if he said, "Get out of the    10:46
14   car" or "Could you please ask them to get out of the    10:46
15   vehicle." It's still an officer of the law, and it    10:46
16   doesn't matter his wording.                   10:47
17        If you understand his words, you need to comply    10:47
18   or they will arrest you. Then they can get you for --    10:47
19   for what? What's the charge? -- impeding an    10:47
20   investigation. If I go, "No, we're not going to    10:47
21   cooperate with you," he could have said, "Put your hands    10:47
22   behind your back. We already got your phone down. Get    10:47
23   in the car." Well, the traffic stop was shady, but we    10:47
24   got you for this.                             10:47
25        Q. Okay. Just so I understand because that was    10:47

Page 98

1    kind of a long answer --                      10:47
2        A. He just said it right there.           10:47
3        Q. Just answer this question.             10:47
4        A. I answered it. We did not give permission.    10:47
5    You can look because that's the law, but you cannot    10:47
6    enter.                                        10:47
7        Q. So your testimony is today --          10:47
8        A. He said it right there.                10:47
9        Q. Your testimony is today that you did not    10:47
10   provide either Officer Bates or Sergeant O'Brien    10:47
11   permission --                                 10:47
12        A. Not on this stop. Not on this one. There was    10:47
13   a previous one I did. Not this one.           10:47
14        Q. I'm going to have to try to get my question out    10:47
15   before you answer.                            10:47
16        A. Sorry.                                10:47
17        Q. Therefore it is your testimony here today that    10:47
18   at no time did you provide Officer Bates or Sergeant    10:47
19   O'Brien permission to search your vehicle during this    10:48
20   stop we're discussing?                        10:48
21        A. Not to go inside and search. Why would I say    10:48
22   it? "Do you want to go search?" Why would I say that?    10:48
23   "Go in and dig through my car and tear it up." It's not    10:48
24   intelligent.                                  10:48
25        Q. We're going to run the video, and I want you to    10:48

Page 99

1    not say anything and wait until we're done watching the    10:48
2    portion I want to show you, and then I'll ask you some    10:48
3    questions. Okay? Do you understand?           10:48
4        A. I'm shaking my head yes.               10:48
5        Q. Okay.                                 10:48
6        A. You can see that. It sounds like antagonistic    10:48
7    when you keep asking someone. Do you want me to say    10:48
8    yes? Just say yes or no. Will you not ask until it's    10:48
9    done. That's antagonistic. I don't know what kind of    10:48
10   lawyer you are doing here. You're going to get in    10:48
11   trouble in court. Not me. I'm the victim.    10:48
12        (Playing video; inaudible.)               10:48
13   BY MR. HERNANDEZ:                             10:49
14        Q. Okay. So we started that video at about 13:12,    10:49
15   and we are now finishing a portion at 14:01.    10:49
16        Mr. Macy, describe what you just saw in the    10:49
17   video.                                        10:49
18        A. Officer Bates -- I'd have to see it again. I    10:49
19   mean, he goes up on the -- it's a different part of the    10:49
20   video. He goes in there twice, I think.       10:49
21        Q. Do you want to see it again?           10:49
22        A. Sure. Let me see it again. I want to be    10:49
23   accurate. I didn't know your question. If you ask the    10:49
24   question first, it'd probably be better. Say, "What are    10:49
25   going to" -- "what do you think you see here?" And then    10:49

Page 100

1    you play the video. That's the proper way.    10:49
2        Q. So once again I'm going to play the video.    10:50
3        A. Thank you.                            10:50
4        Q. When we're done, then just tell me what you    10:50
5    saw; okay?                                    10:50
6        A. Yep.                                  10:50
7        (Playing video; inaudible.)               10:50
8        MR. HERNANDEZ: Go back to 12:55 and we'll let    10:50
9    the video run.                                10:50
10       (Playing video; inaudible.)               10:50
11   BY MR. HERNANDEZ:                             10:51
12        Q. Okay. So we're stopping again at 14:01.    10:51
13   Describe what you just saw, sir.              10:51
14        A. It shows me being really proud of myself. I    10:51
15   was very calm even though I was being targeted,    10:51
16   illegally detained, factually the court approved of it.    10:51
17   They threw the case out that this was an illegal stop.    10:51
18        So what I'm describing is me being very calm.    10:51
19   I was very proud of it. Then Officer Bates making a    10:51
20   lawful command to get my kids out of the truck who did    10:51
21   nothing wrong to anybody. That is not a normal stop. I    10:51
22   knew this. And even with knowing as much as I knew, I    10:51
23   was so proud of myself. I'm still proud of myself how    10:52
24   calm I was. I didn't do anything threatening. I stayed    10:52
25   away. My hands were like this (indicating). I felt    10:52

Page 101

26 (Pages 98 - 101)

1 really good.                          10:52
2        He goes over, illegally obtains photos with the  10:52
3 door open illegally. That is a factual word-for-word  10:52
4 law and violation. You cannot obtain video evidence as  10:52
5 we're going to have an issue with this, without  10:52
6 permission. And he walked over to the truck. He asked  10:52
7 his sergeant to take a second look as well trying to get  10:52
8 his sergeant to support his decision, I would assume,  10:52
9 presuming illegally obtained video evidence.  10:52
10       This is a solid black-and-white case in front  10:52
11 of a jury. When we're allowed to read this to the jury,  10:52
12 I'll read the law to them. I think it's the Fourth  10:52
13 Amendment. You cannot take video evidence. You cannot  10:52
14 enter. The rights -- you cannot obtain people's  10:52
15 personal property. It's pretty simple. I think the  10:52
16 people will be on our side. I can't imagine them going,  10:53
17 "I want cops to do this to me."  10:53
18    Q.  Okay.                       10:53
19    A.  Look at this.                10:53
20    Q.  Let me cue --               10:53
21    A.  The door is open. It's not through the window.  10:53
22    Q.  Let me cue this up.         10:53
23    A.  He's forced our kids to leave the vehicle.  10:53
24 That is huge on its own. They told them to get out of  10:53
25 the vehicle. There was not a crime.  10:53

                                       Page 102

1    Q.  Okay.                        10:53
2    A.  It's not a felony. It's a misdemeanor traffic  10:53
3 stop. It's an infraction. Sorry. The lowest.  10:53
4    Q.  Let me put the section of the video and then  10:53
5 you can describe it.               10:53
6        (Playing video; inaudible.)  10:53
7 BY MR. HERNANDEZ:                   10:53
8    Q.  Okay. So we are now at 13:41 of the video and  10:53
9 describe what you see, sir.        10:53
10   A.  Officer Bates illegally obtaining evidence to  10:53
11 try to support his illegal traffic stop, which needs to  10:53
12 be said that this did get proven in court to be a  10:53
13 violation. He was wrong. And the court did give us our  10:53
14 money back. Factually what you're seeing by law has  10:53
15 already been judged on that we were wronged factually.  10:53
16 This isn't disputable. The only dispute is how much  10:53
17 trouble this guy should be in for doing these type of  10:54
18 behaviors over infractions.        10:54
19   Q.  Did Officer Bates at any time move any items  10:54
20 within the cab that you're aware of?  10:54
21   A.  I think he does later. I'm pretty sure. I  10:54
22 think there's a part we'll have to present in court or  10:54
23 show you where he grabs -- he calls it a pillow and  10:54
24 throws it. We had to put it back.  10:54
25   Q.  So --                        10:54

                                       Page 103

1    A.  It was part of the seat.     10:54
2    Q.  Your testimony is that one of the  10:54
3 officers pulled --                 10:54
4    A.  I think he did. I don't want to say for sure  10:54
5 yet. I want to look at the video. I don't want to lie.  10:54
6 I want to know.                    10:54
7    Q.  That's fine.                 10:54
8    A.  I have to look at the video because I don't  10:54
9 want to go off of memory and say, "Here he is inside our  10:54
10 cab disturbing our vehicle." I want to have that  10:54
11 factual. Not speculatory. I'm 56 so --  10:54
12   Q.  Okay. So just --            10:54
13   A.  It could be a different traffic stop. They had  10:54
14 already done the same thing to me before, so I'm  10:54
15 answering the question.            10:54
16   Q.  Okay. Potentially other than the pillow did  10:54
17 Officer Bates --                   10:54
18   A.  He calls it a pillow. It's a seat.  10:54
19   Q.  Seat pillow.                 10:54
20   A.  Makes a difference between a seat and a pillow.  10:55
21 All seats are padded. We know this -- right? -- for  10:55
22 comfort. That's why it's padded.   10:55
23   Q.  Did Officer Bates remove anything else from the  10:55
24 vehicle other than potentially the seat pillow?  10:55
25   A.  That's my memory was that.   10:55

                                       Page 104

1    Q.  Did -- other than perhaps a seat pillow --  10:55
2    A.  I would have to look carefully. I mean, this  10:55
3 guy -- if you look carefully, maybe you'll see he did  10:55
4 something else. I have to worry about -- that's why  10:55
5 we're filming. He could have planted drugs in our  10:55
6 truck. That's why you don't let them in your vehicle.  10:55
7 Okay? If no one else understands that. If they're not  10:55
8 in, they can't say, "Hey, guess what we found under the  10:55
9 seat? Look now we've got them for something they didn't  10:55
10 have." I've never done drugs in my life.  10:55
11   Q.  Was anything removed from the inside of the  10:55
12 truck?                             10:55
13   A.  I can't say that for sure.   10:55
14   Q.  Okay. Was there anything missing that you  10:55
15 determined was missing from --     10:55
16   A.  We were pretty rattled. We were pretty  10:55
17 rattled. This is why I had to do a lawsuit. Right?  10:55
18 This is not simple. This is where everything changed  10:56
19 from supporting highway patrol that we fund to not  10:56
20 funding them anymore.              10:56
21   Q.  Mr. Macy --                  10:56
22   A.  This is not okay what happened here.  10:56
23   Q.  Mr. Macy, was -- did you find anything missing  10:56
24 from the cab of the vehicle after the stop?  10:56
25   A.  I don't know. That's the answer. I already  10:56

                                       Page 105

                                    27 (Pages 102 - 105)

Page 106

1 told you. You're asking me the same question twice. Is 10:56
2 that something you normally do too? You get an answer. 10:56
3 You ask it. I answer it, and then later on you go, 10:56
4 "Here's the same question." One question, please. 10:56
5 Q. Mr. Macy, was anything -- 10:56
6 A. We don't know. I answered that three times. 10:56
7 Q. Sir, are you going to let me finish the 10:56
8 question? 10:56
9 A. Okay. 10:56
10 Q. Was any items other than perhaps the pillow 10:56
11 seat disturbed inside the vehicle after this? 10:56
12 A. Disturbed? He grabbed our thing. We don't 10:56
13 know what he's up to. So I don't trust him. So you're 10:56
14 asking the wrong person this question. 10:56
15 Q. Other than -- other than -- 10:57
16 A. Called dirty cops. 10:57
17 Q. Did you ever see either Officer Bates or 10:57
18 Sergeant O'Brien enter into the cab with their complete 10:57
19 body? 10:57
20 A. Yes, I did. On a previous stop Sergeant -- you 10:57
21 asked it that way. You didn't ask on this particular 10:57
22 stop. 10:57
23 Q. Fine. Okay. I'll grant you that. 10:57
24 A. Yes, he did. The sergeant had already been in 10:57
25 my vehicle. He inspected the seat belt and said it was 10:57

Page 107

1 fine and safe and we could go. It's very important. 10:57
2 Q. During the stop of June 27th, 2023 -- 10:57
3 A. There you go. 10:57
4 Q. -- did you see Officer Bates completely enter 10:57
5 the cab of the truck with his body? 10:57
6 A. I don't think it was complete. I don't think 10:57
7 so. 10:57
8 Q. Okay. 10:57
9 A. I was in a different location. I'm not filming 10:57
10 this. See the shadow? That's my son. I'm over here 10:57
11 with the sergeant. I don't have a good view. Maybe 10:58
12 that's part of their distraction trick. This guy talks 10:58
13 to me and he jumps in my truck. That's what happened. 10:58
14 We don't know what he's doing. 10:58
15 So all I can go with is the video which I 10:58
16 believe from the section you showed only used, like, 10:58
17 this moment -- I think he's just filming right here. 10:58
18 Later you showed previously he jumped into the vehicle 10:58
19 and put his head through the thing. He's holding on to 10:58
20 the handle reaching in to do something, but it's -- the 10:58
21 angle is blocked by his body. We don't know what he's 10:58
22 doing with this hand. You know that. I'm not making 10:58
23 stuff up. You saw it yourself. 10:58
24 Q. Mr. Macy, did you during the stop of June 27th, 10:58
25 2023, ever see Sergeant O'Brien completely enter the cab 10:58

Page 108

1 of the truck -- 10:58
2 A. No. I'm sorry. I'll wait until you're done. 10:58
3 Q. -- with his body? 10:58
4 A. That part I'm wrong on. I should wait until 10:58
5 you're done. I said no. 10:58
6 Q. Thank you, sir. All right. 10:58
7 A. Sergeant already been in my truck. I trusted 10:58
8 him. I didn't trust this guy. 10:58
9 Q. So if Officer Bates disturbed the pillow, 10:59
10 slash, seat, it would have occurred -- 10:59
11 A. It's a seat. Okay. 10:59
12 Q. It would have occurred sometime after you 10:59
13 started videotaping; right? 10:59
14 A. Correct. 10:59
15 Q. Okay. If the video does not demonstrate that 10:59
16 Officer Bates disturbed the pillow/seat, would you have 10:59
17 any reason to believe that he did? 10:59
18 A. Well, you're talking about one clip. 10:59
19 Previously -- I'm answering your question. Previously 10:59
20 you showed me a video of him entering the truck. Now 10:59
21 you're showing a different part of the video. So the 10:59
22 answer is not -- it's not a good question. You've 10:59
23 already factually established he entered the vehicle. 10:59
24 Now you're showing another part trying to trick me or 10:59
25 something. It doesn't sound ethical. 10:59

Page 109

1 Q. I'm going to ask -- 11:00
2 A. This is common sense, you know. This is 11:00
3 manipulative. 11:00
4 Q. I'm going to ask you again, sir. The video 11:00
5 that was -- that you took and your son took during the 11:00
6 subject stop, the stop on June 27th, 2023, if the 11:00
7 entirety of the video does not demonstrate that Officer 11:00
8 Bates disturbed the pillow or the seat, seat belt area 11:00
9 which is at question, would you have any other reason to 11:00
10 believe that he actually did? 11:00
11 A. That's a lot of -- that's a lot of compound 11:00
12 question, but the answer is I already told you, I 11:00
13 believe he did disturb the seat at some point in the 11:00
14 video. You're showing parts of the video. That's my 11:00
15 answer. To be determined or whatever was alleged in the 11:00
16 claimant -- in the complaint I'm sure is accurate. I 11:00
17 have witnesses. I can't answer it the way you want me 11:00
18 to. Sorry to say that to you. 11:00
19 Q. Did you attempt to make a verbal complaint -- 11:00
20 A. Yes. 11:01
21 Q. -- about Officer Bates to Sergeant O'Brien -- 11:01
22 A. Yes. 11:01
23 Q. -- while during the stop? 11:01
24 A. Absolutely. 11:01
25 Q. And what did Officer -- I'm sorry -- Sergeant 11:01

28 (Pages 106 - 109)

1  O'Brien tell you?                              11:01
2      A.  You're going to let me answer, I hope.  I don't    11:01
3  mean to sound rude.  Sorry about that.  But he said he    11:01
4  believed it was within -- it was normal.  I told him,    11:01
5  "That's not true.  You in fact, you, pulled us over in    11:01
6  Cedar Glen on the way to pick up trash and you" --    11:01
7  because I liked him because he was one of our customers.    11:01
8  I didn't expect him to be a shady cop.  Right?  He    11:01
9  seemed like a nice guy at the job.  He paid us fairly.    11:01
10  I said, "Go ahead and check."  And I knew the laws.  He    11:01
11  was a legit officer at that time.                11:01
12      He acknowledged that "You're right.  If the    11:01
13  seat belt is installed and there's sufficient space and    11:01
14  it's secured properly, you can have a seat belt added."    11:01
15  And he said, "You're right.  I'm sorry I pulled you    11:01
16  over.  Have a good day.  It was nice to see you again."    11:01
17  He just wanted to make sure everyone was safe.    11:02
18      It was a legitimate stop in the sense that he    11:02
19  was concerned.  And I like him as an officer.  The first    11:02
20  stop.  Not this one.  This one -- they already knew it    11:02
21  was legit, and that's how shady this was.  Even after    11:02
22  knowing -- his sergeant knew we were legit.  We have a    11:02
23  record of him pulling us over.  We have a record of him    11:02
24  saying, "Go ahead and drive on, keep going.  Everything    11:02
25  is fine."  We didn't complain about it.  We try to be    11:02

Page 110

1  good to people.  People make mistakes.  Maybe he just    11:02
2  wanted to know.  I'm flexible with people.  Okay.    11:02
3      So even after that, he shows up.  And here I    11:02
4  complaining about this?  Yes, I was.  I was saying, "You    11:02
5  already know this is legit.  You personally inspected    11:02
6  our truck previously and you said we could go" because I    11:02
7  didn't want to argue with him.  I was trying to be    11:02
8  quick.  Right?                                  11:02
9      If you come in an argumentative position --    11:02
10  because for me to sit there and push it on him hard and    11:02
11  say, "You already said this was fine," I don't want to    11:02
12  be aggressive.  You guys are lawyers.  I told them or do    11:02
13  something with paperwork.  We're not going to give    11:02
14  anybody any trouble.  We're out on the street.  You    11:03
15  already knew this was legit.  So this guy -- you would    11:03
16  not support him.  And I'm asking you nicely that you    11:03
17  already know what's going on here.  You know who we are.    11:03
18  You know that we're a trash company.  He knew all this.    11:03
19      I said, "You have my business card.  It says    11:03
20  trash on it.  We did trash for you."  This was all    11:03
21  straight.  We were doing good.  I'm like, "Could you    11:03
22  just talk to him nicely and say, 'Hey, not only does the    11:03
23  driver not have to enforce a passenger, the federal law    11:03
24  says a two-point, which you already acknowledged.  We're    11:03
25  in the duty of delivering trash.  We don't need to have    11:03

Page 111

1  it.  You don't need to have a three-point harness.  You    11:03
2  know this; right?"                              11:03
3      He knows.  He was doing good.  We were so good    11:03
4  for a while.  Right?  And I can't remember the fifth one    11:03
5  right now.  He goes back and talks to him.  I thought he    11:03
6  was going to be like, "These are good people.  I already    11:03
7  pulled them over.  They're legitimate.  Don't pull them    11:03
8  over for this."  And then let them go and everybody is    11:03
9  happy.                                         11:03
10      That's not what happened.  After a long    11:03
11  discussion in private that we don't have access to --    11:03
12  they turned off their cameras and they deleted stuff.    11:03
13  We don't know what was said.  I've asked multiple times.    11:04
14  I know what they said.  I know what was going on.  I'm    11:04
15  pretty smart.                                   11:04
16      He comes back and he's like, "Well, I would    11:04
17  have done" --                                   11:04
18      I go, "You wouldn't have done this."  And he    11:04
19  lied to me.  He lied.                           11:04
20      He goes, "I would have done the same thing."    11:04
21      "You just -- you pulled us over just like a    11:04
22  month ago for the same thing and you said we're fine.    11:04
23  You're lying."  But I didn't say he's lying.  Right?    11:04
24  Because I don't want to escalate things and I don't want    11:04
25  to cause trouble.  That's what the paperwork is for.    11:04

Page 112

1  That's why we're in court.                       11:04
2      So I go, "He doesn't have his name badge.  Look    11:04
3  (indicating)."  Sorry.  I'm pointing at him.    11:04
4      THE WITNESS:  I don't mean to point at you, but    11:04
5  he was over there.  I'll point some other way.    11:04
6      "Look at his -- he doesn't have his nametag --    11:04
7  his nametag is folded over (indicating)."  I was acting    11:04
8  calm then.  Not like this.  Right?  I was very calm    11:04
9  because they have guns.  They're not there to help me.    11:04
10  Right?  They're not doing public service.  They're    11:04
11  trying to arrest somebody who is doing Bible, helping    11:04
12  out the community.                              11:04
13      You could not -- it was folded over like I've    11:04
14  never seen before.  These uniforms are strong.  It is    11:04
15  strong material.  They're quality.  You can look at any    11:04
16  uniform if you're investigating at all.  This is how he    11:04
17  showed up.  He got -- he already folded it over before    11:04
18  he came up to my car.  I said, "This is not okay."  He    11:05
19  refused to give me -- he refused to give me his card.    11:05
20      I also told him he refused to look in the book.    11:05
21  He wouldn't even read me the code.  He wouldn't even    11:05
22  tell me the charge.  And at the time I had it memorized.    11:05
23  I was doing better back then because I knew about stuff.    11:05
24  It's 13-whatever something seat -- seat belt must be    11:05
25  installed.                                      11:05

Page 113

29 (Pages 110 - 113)

Page 114

1    It means you must have a seat belt on, simply    11:05
2    said. It doesn't matter if it's a factory seat. That's    11:05
3    what I was telling him. It doesn't matter if it's a    11:05
4    factory seat belt. It doesn't matter if you buy it. As    11:05
5    long as it's certified a certain rating they have. And    11:05
6    I have it memorized, and I have all that in federal    11:05
7    code. As long as it's safe. Right? It can't be a    11:05
8    cheap one.    11:05
9    In fact a seat belt, as I told him -- right? --    11:05
10   a seat belt, they're only good for, like, five years.    11:05
11   Five years most of them. You buy a brand-new car, it's    11:05
12   only legal for five years. And guess what? You're    11:05
13   going to have to switch it if you want to be all    11:05
14   compliant.    11:05
15   And the law says -- and I explained it to them    11:05
16   too. In the vehicle there's certain parts of the    11:06
17   vehicle that you do have to have factory. I don't lie.    11:06
18   Right? Like a computer that runs the thing. You can't    11:06
19   get an aftermarket and reprogram it. It has to be a    11:06
20   real computer one. It has to be brakes, the engine    11:06
21   stuff.    11:06
22   BY MR. HERNANDEZ:    11:06
23   Q.   So just --    11:06
24   A.   Did I answer it pretty good? I have a lot of    11:06
25   complaints.    11:06

Page 114

1    Q.   So you spent the time while you were at the    11:06
2    scene explaining this to Sergeant O'Brien; right?    11:06
3    A.   Not very detailed like I am now. Not as    11:06
4    detailed because I have to do it properly. He said,    11:06
5    "You need to fill out a form, go into the office," which    11:06
6    I did. I filled out a complaint. And I asked him at    11:06
7    that time, "All you had to do was say you're sorry and    11:06
8    dismiss it. That's all you guys had to do." And they    11:06
9    refused to do it.    11:06
10   And then they dragged me into court all the way    11:06
11   down to Fontana an hour and something from my house.    11:06
12   There's snow. There's rain. There's fires going on.    11:06
13   Q.   So --    11:06
14   A.   And the judge goes, "There's no case here."    11:06
15   Q.   So at some point, though, you did -- were    11:06
16   issued the citation; right?    11:07
17   A.   At the very end, yeah. That's the only time I    11:07
18   got his name, which he would not read to me.    11:07
19   Q.   So the citation you signed; right?    11:07
20   A.   Yes.    11:07
21   Q.   And my understanding is that you wrote you    11:07
22   signed it under duress. Right?    11:07
23   A.   Yes. Well, that's the proper way to do it if you    11:07
24   feel it's an illegal traffic stop.    11:07
25   Q.   So I've cued up --    11:07

Page 115

1    A.   I answered you.    11:07
2    Q.   I cued up the area where the ticket is. It's    11:07
3    at about 17:30.    11:07
4    Do you see that, sir, at the bottom 17:30?    11:07
5    A.   Do you see his name? Look at his uniform.    11:07
6    Q.   Okay.    11:07
7    A.   You guys should all be concerned.    11:07
8    Q.   Sir, I'm just going to run the video for a    11:07
9    moment here. Okay. Ready?    11:07
10   A.   Yeah. Do you see his name?    11:07
11   (Playing video; inaudible.)    11:07
12   BY MR. HERNANDEZ:    11:08
13   Q.   Okay. So --    11:08
14   A.   He changes the claim.    11:08
15   Q.   -- at 17:44 you've been handed the ticket;    11:08
16   right?    11:08
17   A.   Yes.    11:08
18   Q.   Okay. And then you're having additional    11:08
19   discussion with Sergeant O'Brien about the ticket;    11:08
20   right?    11:08
21   A.   Correct.    11:08
22   Q.   Okay. What was your discussion with Sergeant    11:08
23   O'Brien about the ticket?    11:08
24   A.   He literally took over the traffic stop, which    11:08
25   is not normal. Right? Bates is the arresting officer    11:08

Page 116

1    in theory. Right? He's going to be -- he shows up. He    11:08
2    was only supposed to be there to decide if this was a    11:08
3    valid ticket or not, which he supported. He lied. He    11:08
4    said, "I would have done the same thing."    11:08
5    So as you can see, his name shows us. This guy    11:08
6    is legit compared to the other guy. He's at risk of    11:08
7    losing his job to support his friend. It's pretty sad.    11:08
8    Notice what he said. "The ticket that you're being    11:08
9    given" -- he's the closer officer. The other guy knows    11:08
10   he's shady. You can tell by physical demeanor. Look    11:08
11   how far away the officer was, the shady one. He's not    11:09
12   even near me. He hands it to me, and he's way back    11:09
13   there. He's not a threat to him.    11:09
14   This guy knows, though. He's a real -- he's    11:09
15   human. People are good, they get near you. They're    11:09
16   not -- they're human. They're normal people. Right?    11:09
17   They don't stand way over there. If they're doing    11:09
18   something bad, that's what they do. They have bad    11:09
19   signs.    11:09
20   He's literally telling me, "The ticket that    11:09
21   you're holding in your hand" -- right? -- "is not for    11:09
22   what the ticket says." Did you notice that? The ticket    11:09
23   is for having four people in the vehicle. And you    11:09
24   skipped a lot of stuff here. Right?    11:09
25   You missed the part where he lies to him and    11:09

Page 117

**Page 118**

1  says, "It does say in the law" -- that big book -- "it     11:09
2  had to be factory." He straight lied to him. You     11:09
3  think -- just the fact that people are lying under oath     11:09
4  is not okay. It's not okay.     11:09
5      So he's telling me, "The reason you're getting     11:09
6  this ticket now is for having four people." It doesn't     11:09
7  have to do with the seat belt anymore. But he does let     11:09
8  us leave. If this is really legit, he would have said,     11:09
9  "Stay on the side of the road, somebody. Only leave     11:10
10  with three people." Right? That would have been normal     11:10
11  behavior. If they thought we were really wrong -- if he     11:10
12  thought in his mind -- so he violated the oath of law,     11:10
13  you could say, if you thought about it, both of them.     11:10
14      If we were endangering my daughter by not     11:10
15  having the -- whatever seat belt they felt should have     11:10
16  been there, she should -- "One of you guys got to stay     11:10
17  on the side of the road. You go drive, drop people off,     11:10
18  and come back and pick them up, because we don't want     11:10
19  anybody getting hurt."     11:10
20      This is a good case. By admission "You guys     11:10
21  can go." The same thing. Seat belt was already on for     11:10
22  anyways. Right? Put it back on and drive away on a     11:10
23  major Highway 18. So he had to have believed we did     11:10
24  nothing wrong. His sergeant allowed us -- they both     11:10
25  allowed us to leave. You guys know this.     11:10

**Page 119**

1      If it was a DUI, they're not going to let you     11:10
2  drive. If you're breaking the law, they're going to     11:10
3  arrest you. They're not going to let you, "Okay. Go     11:10
4  violate -- keep driving with the seat belt thing and     11:10
5  we're going to pull you over again in another five     11:11
6  minutes." This is a solid case.     11:11
7      So he's now changing the ticket causing an     11:11
8  argumentative. Right? You think about it. I should be     11:11
9  arguing, but I'm not. I should be going, "Why am I     11:11
10  getting a ticket for a seat belt when you're saying it's     11:11
11  for four people? If it's four people, then one of them     11:11
12  should stay on the side of the road."     11:11
13      Q. So just to confirm, at 17:44 you already had     11:11
14  the ticket that you signed under duress in your hand;     11:11
15  right?     11:11
16      A. Right. I'm still making a complaint. The     11:11
17  ticket is still -- I don't agree with the ticket.     11:11
18      Q. Right.     11:11
19      So then --     11:11
20      A. And he's trying to push it on me that it's     11:11
21  valid, and I don't agree with it.     11:11
22      Q. I'm just going to fast-forward this.     11:11
23      A. Okay.     11:11
24      Q. Just -- you know.     11:11
25      A. I'm answering your questions. You know, if you     11:11

**Page 120**

1  ask me a question, I'm going to say things.     11:11
2      Q. Okay. So I'm quickly fast-forwarding. It's     11:11
3  jumping about every ten seconds. And it shows your     11:11
4  conversation with officer -- Sergeant O'Brien.     11:11
5      Do you agree?     11:11
6      A. Uh-huh.     11:11
7      Q. Yes?     11:11
8      A. Yeah.     11:11
9      Q. Okay.     11:11
10      A. He did not say I'm free to go yet, so don't --     11:12
11  please don't manipulate this court system process here.     11:12
12  Just because someone is handed a ticket, you're not free     11:12
13  to go until they say, "You can go." I'm out in the     11:12
14  street here in front of two cops. He didn't say, "Do     11:12
15  you want to talk to me about something else, but you're     11:12
16  free to leave." You know they have to say, "You're free     11:12
17  to leave." You know this. Don't manipulate, please.     11:12
18  You're a lawyer.     11:12
19      Q. So we are now at 26:54, and at that point.     11:12
20      (Playing video.)     11:12
21      THE WITNESS: Look how nice I was to them. I     11:12
22  try to be nice to everyone until I figure out who they     11:12
23  are. Right?     11:12
24  BY MR. HERNANDEZ:     11:12
25      Q. So at 27 minutes and a few seconds you shook     11:12

**Page 121**

1  both Sergeant O'Brien and Officer Bates' hands; correct?     11:12
2      A. Yep.     11:12
3      Q. Because you're being nice?     11:12
4      A. That doesn't mean I'm free to go.     11:12
5      Q. You're being nice; right?     11:12
6      A. This is the arresting officer. You should know     11:12
7  the law. I hope you're studying.     11:12
8      Q. Okay.     11:12
9      A. He has to tell me I can go.     11:12
10      Q. Okay. So at this point, though, you shake     11:13
11  their hands?     11:13
12      A. That was my choice. I chose to. I can shake     11:13
13  your hand. See, you don't want to shake my hand. Or     11:13
14  you do. Okay. See, if I shook your hand doesn't mean     11:13
15  this deposition is over, does it?     11:13
16      Q. We're at 27:03. And at that point -- you     11:13
17  believe at that point you're now free to go; right?     11:13
18      A. No, I didn't. I know the law. I don't believe     11:13
19  that.     11:13
20      Q. Okay. So you're walking away from both --     11:13
21      A. He has to say I'm free to go. He'll say it     11:13
22  after a while if you listen. They didn't do the stop     11:13
23  right. It's not a proper stop.     11:13
24      Q. So the video ends 27 minutes after it started,     11:13
25  27:10.     11:13

31 (Pages 118 - 121)

| | Page 122 | | Page 124 |
|---|---|---|---|

**Page 122**

1    At that point what do you do?    11:13
2    A.  We drive away, I'm sure, which to me I was -- I    11:13
3    didn't want to say it because I didn't want any more    11:13
4    problems with the cops.  Right?  The only thing they had    11:13
5    if they were going to claim the fourth person or the    11:13
6    seat belt, we should not have been allowed to drive    11:13
7    away.    11:13
8        This was -- if they're going to claim that's    11:13
9    their argument, it's a whole 'nother charge.  Somebody    11:14
10   in the jury -- someone is going to be mad.  You're going    11:14
11   to let people knowingly drive down the road if you don't    11:14
12   think they have a proper seat belt.  If they got in a    11:14
13   wreck, you could sue the highway patrol for that.    11:14
14   Q.  Okay.  So once this -- once the stop was over    11:14
15   you --    11:14
16   A.  That's the whole case.    11:14
17   Q.  -- left and where did you go?    11:14
18   A.  It's the fact we left.    11:14
19   Q.  Where did you go?    11:14
20   A.  We were freaked out.  We were freaked out.  I    11:14
21   have to do a lawsuit.  We had other customers.  I think    11:14
22   I went to another house to pick up some more trash, but    11:14
23   we were in a problem because he delayed us so long that    11:14
24   we don't -- we're not late.  I've been late once all    11:14
25   year.  I wasn't late to this either.  He causes a lot of    11:14

**Page 123**

1    harm.    11:14
2    Q.  Okay.  What harm --    11:14
3    A.  We need to do paperwork now.    11:14
4    Q.  What harms did he cause you, Officer Bates?    11:14
5    A.  I have been supporting the highway patrol for a    11:14
6    long time.  I have friends that work there.  I won't say    11:14
7    names.  I have worked on their houses, multiple highway    11:14
8    patrol officers.    11:15
9        Because of this, I am 100 percent convinced    11:15
10   that they are being paid off by Burrtec to harass me.    11:15
11   They have impounded my vehicle.  They pulled me over at    11:15
12   another place.  They stalk me on my street.  This same    11:15
13   officer is so shady.  I hope you're a good lawyer.  I    11:15
14   hope you are, deep down somewhere.    11:15
15       My house is on a private road.  That same    11:15
16   Officer Bates was parked -- I have 16 cameras at my    11:15
17   house now, so I'll explain -- I'll have to explain what    11:15
18   they did, and then I'll get to the damage to make more    11:15
19   sense.    11:15
20       He's parked in front of my car on my property,    11:15
21   highway patrol, on my private road.  This is a private    11:15
22   road.  Why is he out there?  I have to come out of my    11:15
23   house.  I have to bring witnesses, start filming, "Hey,    11:15
24   why are you on my street running my license plates on my    11:15
25   vehicles on my private street?"    11:15

**Page 124**

1    He goes, "You did nothing wrong."  And he    11:15
2    drives away.    11:15
3    Q.  Okay.    11:16
4    A.  He's on my private road.    11:16
5    Q.  This incident you just described --    11:16
6    A.  So because of all these things, which    11:16
7    accumulates in the factual pullover, which was factually    11:16
8    awarded in court.  Here's the damages:  I had to put up    11:16
9    16 cameras at my house.    11:16
10   Q.  So then the incident you just --    11:16
11   A.  So that when he does it again, we have it on    11:16
12   film.  When they're driving up on my street -- he also    11:16
13   drove down on Chipmunk following us.    11:16
14       Then another time on there -- if you knew the    11:16
15   area, they don't have any reason to be out there.  No    11:16
16   crime.  This is a very rich, nice -- they just don't    11:16
17   have that type of crime.  Not in there.  Other areas.    11:16
18   There's no reason for the highway patrol to be driving    11:16
19   around there looking in my truck like this and slowing    11:16
20   down.  I thought he was going to get us then.  That time    11:16
21   he let us go.  I don't know what he's up to.  He's    11:16
22   looking for something.    11:16
23   Q.  That incident you just described that was in    11:16
24   front of your house --    11:16
25   A.  Yes.    11:16

**Page 125**

1    Q.  -- was that before or after --    11:16
2    A.  Before this.    11:16
3    Q.  Before --    11:16
4    A.  After I filed a complaint, everything has got    11:16
5    better.  A miracle.  Everything's gotten better.    11:16
6    Lawsuits work.    11:17
7    Q.  So this incident you just described that's on    11:17
8    video?    11:17
9    A.  No.  That's why I got the cameras.  I mess --    11:17
10   this is regretful.  When you don't film, you always    11:17
11   regret it.  You guys are filming for a reason; right?    11:17
12   Q.  Okay.  So let's talk about your damages.    11:17
13       What damages do you claim as a result of the    11:17
14   incident that you filed a lawsuit?    11:17
15   A.  I mean, they have multiple -- they charge --    11:17
16   they cost me for towing.  You know how much it cost me    11:17
17   to get my truck towed from Hesperia?  This is how shady    11:17
18   they are.  You're not sure at all what's going on.    11:17
19       When you tow a vehicle, you tow it by law to    11:17
20   the nearest yard.  Because it's a commercial truck --    11:17
21   right? -- they took it, I believe, absolutely    11:17
22   intentionally -- because look at all the tow yards.  I    11:17
23   called them all to check too.  They'd all take it.  They    11:17
24   love my truck because when they tow a truck this    11:17
25   valuable, they make a lot of money.  The highway patrol    11:17

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1  makes a lot of money. The courts make a lot of money,    11:17
2  and the tow company makes a killing. Right? If they    11:17
3  get the truck, it's a 45-day lien sale.    11:17
4      What they do is they make the tow so expensive    11:17
5  you can't pay it. And if you don't pay it, they get    11:18
6  your vehicle for free. So what they did is they towed    11:18
7  it -- you know where Hesperia is probably? I don't know    11:18
8  where you're from. I live in Lake Arrowhead. Right?    11:18
9      It was in Crestline at the time. We ran out of    11:18
10  gas because of a steep hill. The needle wasn't    11:18
11  accurate. Right? So we ran out of gas. Something    11:18
12  happened, boom. We went to go get gas. In less than    11:18
13  five minutes -- I think they had a tracker on, but I    11:18
14  can't prove that. Right?    11:18
15      Somehow my truck, the same guy comes out and    11:18
16  calls a tow company from Hesperia. This isn't even    11:18
17  normal if you call the normal line and say I need a tow.    11:18
18  Tows it all the way down there. Do you know how much it    11:18
19  cost to get it out of impound? Thousands and thousands    11:18
20  of dollars. And guess what? You can't go pick it up.    11:18
21  You've got to get it towed back to your place. It's a    11:18
22  super shady deal.    11:18
23      Q. Are you saying as a result of this incident    11:18
24  when you were pulled over, your truck was towed?    11:18
25      A. No.    11:18

Page 126

1      Q. Okay. Explain to me how that connects with    11:18
2  this incident, though. How does a tow --    11:18
3      A. Now I can't drive anywhere without witness. I    11:18
4  don't drive anywhere. Ask my family. We don't -- look    11:19
5  at my wife is here. She doesn't need to be here. She's    11:19
6  here for my safety for your behavior, anybody's    11:19
7  behavior.    11:19
8      I'm a famous -- look it up online. I'm a    11:19
9  famous -- I'm the only free Bible translator in the    11:19
10  whole world. You may not understand all that. There's    11:19
11  reasons. There's things I expose as a good person about    11:19
12  what's being done wrong in churches, which is causing    11:19
13  people to quit churches. And we're trying to -- we    11:19
14  don't want devasation. We want people to know that    11:19
15  leaders are shady. The system is shady. If you do    11:19
16  things right, it all works out.    11:19
17      And that's why I'm doing this. I'm trying to    11:19
18  prove to the people lawsuits work. Don't get angry.    11:19
19  Don't picket and break things down.    11:19
20      Q. I just want to know what the connection is that    11:19
21  you see between your truck being towed --    11:19
22      A. The trust, the emotional distress beyond    11:19
23  belief.    11:19
24      Q. Wait. Hold on.    11:19
25      You just --    11:19

Page 127

1      A. You get that connection. There is a    11:19
2  connection.    11:19
3      Q. You just explained to me --    11:19
4      A. It's a history of abuse.    11:19
5      Q. You just explained to me that your vehicle was    11:19
6  towed to, I guess, Hesperia which cost you --    11:19
7      A. Thousands.    11:20
8      Q. -- lots of money --    11:20
9      A. Thousands.    11:20
10      Q. -- to get your vehicle back because of the lien    11:20
11  sale and whatnot.    11:20
12      My question to you is, though, how does your    11:20
13  truck being towed connect to this incident that we're    11:20
14  here to discuss?    11:20
15      A. There you go. I thought he was going to do    11:20
16  that again. I told you that previously. You might not    11:20
17  have wrote it down. I believe they were trying to get    11:20
18  me for impeding an investigation. They didn't have    11:20
19  anything, not on the seat belt. It's not something you    11:20
20  can put someone in jail for.    11:20
21      Even if he said -- as long as you signed the    11:20
22  ticket -- and he tried to say I wouldn't sign the    11:20
23  ticket. He lied under oath on his -- as a sworn officer    11:20
24  too. He told that to his sergeant, that I refused to    11:20
25  sign the ticket. That's nowhere on the video. Why    11:20

Page 128

1  would I refuse? I knew you could be arrested. Say I'm    11:20
2  not signing -- why -- if I don't refuse, you go to jail.    11:20
3  Everybody knows that. You have to sign even if you're    11:20
4  innocent.    11:20
5      He claimed that. So I thought he was going to    11:20
6  get me for impeding an investigation, which he could    11:20
7  have then arrested me, just causing everybody to have    11:20
8  trouble. Then he was going to impound my truck    11:21
9  illegally because, remember, it was a passenger seat    11:21
10  belt. It wasn't -- I had a seat belt. We all had seat    11:21
11  belts on factually. He was going to take my truck. I    11:21
12  knew how much it was going to cost. He was going to do    11:21
13  the same thing, take it to Hesperia instead of right    11:21
14  there up on the mountain, Mountain Towing. It's right    11:21
15  there.    11:21
16      Q. So from what I understand --    11:21
17      A. And he should have left it on the side and we    11:21
18  could picked it up. It's all connected.    11:21
19      Q. Just so I have it clear, the towing occurred    11:21
20  prior to this incident?    11:21
21      A. Correct.    11:21
22      Q. Okay. While you were at the scene --    11:21
23      A. Emotional distress.    11:21
24      Q. -- you were concerned that the truck was going    11:21
25  to be towed and you would have to deal with getting the    11:21

Page 129

33 (Pages 126 - 129)

| | |
|---|---|
| 1 car out again, the vehicle?                          11:21 | 1   A.   You know, you went to law school.          11:23 |
| 2   A.   That's why I got the sergeant to show up.  It's   11:21 | 2   Q.   Okay.                     11:23 |
| 3 another reason.  If he was there, he would not allow   11:21 | 3   A.   Work with me.                 11:23 |
| 4 that because it's hard to believe the sergeant would go,   11:21 | 4   Q.   So that's one clear damage; right?        11:23 |
| 5 "It's a seat belt.  Let's not tow the truck.  If you   11:21 | 5   A.   We're still doing paperwork.          11:23 |
| 6 want to give him a ticket, give him a ticket."  That's   11:21 | 6   Q.   Okay.                     11:23 |
| 7 what would have been said.  He was my safety.  Without   11:21 | 7   A.   I'm at a deposition today.           11:23 |
| 8 that, I think it would have got a lot worse really   11:21 | 8   Q.   Right.  So --                11:23 |
| 9 quick.                              11:21 | 9   A.   I'm the victim being deposed.  This is      11:23 |
| 10   Q.   Okay.  So then your truck did not get towed --   11:21 | 10 additional harassment, which we'll allege.  Right?  Of   11:23 |
| 11   A.   No.                        11:22 | 11 course you're going to say you're allowed to do it.    11:23 |
| 12   Q.   -- as a result of this incident?           11:22 | 12   Q.   In terms of your emotional distress, have you   11:23 |
| 13   A.   It's common sense.  They tow it, though.     11:22 | 13 sought any --                      11:23 |
| 14   Q.   What other claims of damage do you have related   11:22 | 14   A.   Do I look distressed now?           11:23 |
| 15 to this incident?                        11:22 | 15   Q.   Have you sought any medical treatment for    11:23 |
| 16   A.   Emotional is the biggest thing.  And the fact   11:22 | 16 emotional distress, sir?                  11:23 |
| 17 that our jobs -- it messed up my jobs.  Now we've been   11:22 | 17   A.   No.  Because bad things happen to everybody.   11:23 |
| 18 having to do paperwork.  Right?  We're not lawyers.  We   11:22 | 18   Q.   So you haven't --              11:24 |
| 19 have to learn lawyer stuff.  Right?  How much time are   11:22 | 19   A.   You got to deal with it.            11:24 |
| 20 we learning, studying.  Today I got the wrong -- with   11:22 | 20   Q.   You haven't sought --             11:24 |
| 21 the California thing.  That's my bad.  I thought it was   11:22 | 21   A.   I have stress for sure.  Look how stressed out   11:24 |
| 22 the federal one.  Just today.               11:22 | 22 I am with you.  I'm starting to wonder if -- you know, I   11:24 |
| 23      So instead of doing Bible, free counseling --   11:22 | 23 know you represent them, but now I'm starting to wonder   11:24 |
| 24 we take people to horse camp, we pay for it.  When we   11:22 | 24 how much are you on their side.  It's concerning at this   11:24 |
| 25 make money, guess what?  Our money goes to help others.   11:22 | 25 point, yes.                        11:24 |
| Page 130 | Page 132 |

| | |
|---|---|
| 1 We don't take donations.  No one donates to me.  Right?   11:22 | 1      I've never seen a guy do this (indicating)    11:24 |
| 2 I need to be working.  I need to be helping out the   11:22 | 2 that was a lawyer.  Cops do that.  So I don't know if   11:24 |
| 3 community.  Now guess what?                11:22 | 3 you're an ex-cop.                    11:24 |
| 4      What's the highest priority.  We're not going   11:22 | 4   Q.   So you didn't seek therapy for the emotional   11:24 |
| 5 to be doing anything if they put me in jail.  If I get   11:22 | 5 distress; right?                     11:24 |
| 6 put in jail and my -- if my truck is taken away for good   11:22 | 6   A.   No, I did not.               11:24 |
| 7 this time because they can claim how many times we had   11:22 | 7   Q.   Okay.                     11:24 |
| 8 to tow it -- the cops can be as shady as they want to   11:22 | 8   A.   I talked to people.  I have a cop that's a   11:24 |
| 9 be.  You don't know how much power they have.  It's in   11:22 | 9 counselor.  He does it for free for me.        11:24 |
| 10 there -- they're an instant judge.  When they show up,   11:22 | 10   Q.   Okay.  Have you expended any funds for     11:24 |
| 11 they make a decision.  Right?  You can appeal it later.   11:23 | 11 treatment of your emotional distress?          11:24 |
| 12      But in the meantime your truck is in the pound.   11:23 | 12   A.   My time.  Time is everything.  Do you know that   11:24 |
| 13 You can't work.  You can't -- our job is our truck.   11:23 | 13 you're on a clock?  What is your value of your time?    11:24 |
| 14 Without a truck we have no income.             11:23 | 14 How many years do I have to sue the highway patrol to   11:24 |
| 15   Q.   Okay.  So let's talk about the emotional     11:23 | 15 get them to stop?  Guess what?  They stopped pulling me   11:24 |
| 16 distress.                           11:23 | 16 over.                           11:24 |
| 17      So you just mentioned numerous things.  One,   11:23 | 17   Q.   Okay.  Can you estimate --          11:24 |
| 18 you said you had to take time away from --        11:23 | 18   A.   It used to be every couple months.        11:24 |
| 19   A.   Working.                     11:23 | 19   Q.   Can you estimate for me how much time you    11:24 |
| 20   Q.   -- your religious work and other work --     11:23 | 20 believe you have spent dealing with emotional distress   11:24 |
| 21   A.   And doing free Bible translating.         11:23 | 21 resulting from this stop?                 11:24 |
| 22   Q.   -- to do, I guess, legal research and legal   11:23 | 22   A.   Every day.  Think about it.  I have to counsel   11:24 |
| 23 stuff?                             11:23 | 23 my kids to remind them that not all cops are bad, but if   11:25 |
| 24   A.   Yeah.                       11:23 | 24 you see a bad sign, I have to explain they need -- I   11:25 |
| 25   Q.   Okay.                       11:23 | 25 have to train my kids how to do legal stuff.  And I'm   11:25 |
| Page 131 | Page 133 |

34 (Pages 130 - 133)

1  not even a lawyer.                               11:25
2      "When I'm dead, they're going to come after   11:25
3  you." We're building the only free church in the world.   11:25
4  They've already -- did you see all the cases I've got?   11:25
5  We have cases against San Bernardino County Code. They   11:25
6  did over 300 cases factually if you're going to put it   11:25
7  on the news. And I won every case. They went out to my   11:25
8  property. They cut our cables out there. You think I   11:25
9  don't have emotional distress?                   11:25
10      We have factual admission that the County of   11:25
11  San Bernardino cut my security cables. Factually it's   11:25
12  on record. You have film of it. They admitted to it.   11:25
13  This is all related. That's what I'm saying. It's --   11:25
14  what do they call it? -- a conspiracy.           11:25
15  Q.  And you believe --                           11:25
16  A.  You don't think we have distress from this?   11:25
17  Q.  Just I understand, so you had emotional      11:25
18  distress from other --                           11:25
19  A.  County agencies, government agencies.        11:26
20  Q.  Okay.                                        11:26
21  A.  We believe they're colluding all together.   11:26
22  Q.  Okay.                                        11:26
23  A.  These are our allegations, but they took it out   11:26
24  of this case.                                    11:26
25  Q.  And then as a result of the emotional distress   11:26

Page 134

1  that you had related to all these other agencies --   11:26
2  A.  Your guys popped it the most because you've got   11:26
3  me going into trial.                             11:26
4  Q.  Okay.                                        11:26
5  A.  Those ones were fines. Yours is criminal. If   11:26
6  you don't show up to trial, you go to jail.      11:26
7  Q.  So then you already had emotional distress?   11:26
8  A.  Correct.                                     11:26
9  Q.  And this --                                  11:26
10  A.  Set it off.                                 11:26
11  Q.  -- made it worse?                            11:26
12  A.  This was -- there's no doubt that the County   11:26
13  is, absolutely correct. There's no doubt that the   11:26
14  highway patrol -- guess what? They all get paid from   11:26
15  the same people.                                11:26
16  Q.  So then --                                   11:26
17  A.  You're getting paid by the people that are   11:26
18  going after me. This is crazy. And you're the top of   11:26
19  the line.                                       11:26
20  Q.  And then the emotional distress was exacerbated   11:26
21  as a result of this --                          11:26
22  A.  Exasperated is a good way to say it, yeah.   11:26
23  Q.  Exasperated or exacerbated?                  11:26
24  A.  Remember, we have to do legal paperwork now   11:26
25  because of this talk. Right?                     11:26

Page 135

1  Q.  Okay. So part of your damage claim --        11:26
2  A.  Continue. After today you're going to have   11:27
3  paperwork. I've got to go to trial. It's going to keep   11:27
4  going on. We already won the case. I don't know why   11:27
5  you guys are even doing this. It makes no sense.   11:27
6      The judge already said you guys did wrongdoing   11:27
7  factually. The judge. Not me. Not a -- he said you're   11:27
8  wrong. And he admitted to it. He said, "You're right.   11:27
9  I did it wrong." He said why he did it wrong. "I was   11:27
10  trained improperly." That's his excuse.          11:27
11  Q.  So, Mr. Macy, then in terms of your emotional   11:27
12  distress claim --                               11:27
13  A.  Do I look distressed?                        11:27
14  Q.  You just told me you had an emotional distress   11:27
15  claim.                                          11:27
16  A.  I got the lawyer -- the top lawyer of the state   11:27
17  going like this to me, "You need to stop (indicating)."   11:27
18  And you get paid by them. I'm not in good shape.   11:27
19  Q.  Sir, once again, regarding your emotional   11:27
20  distress claim alleged in this incident, part of the   11:27
21  stress related to you having to learn legal --   11:27
22  A.  Yeah.                                        11:27
23  Q.  -- stuff; right?                             11:27
24  A.  It's not easy. I didn't go to law school.   11:27
25  Q.  Right.                                       11:27

Page 136

1  A.  I had to file this by myself going, God, if I   11:27
2  can do Bible -- I know Bible law. And that's where the   11:28
3  laws came from. They're getting more jacked up. I   11:28
4  should be the most protected person by law. I don't   11:28
5  know if you even understand this. There are laws to   11:28
6  protect me.                                      11:28
7      Look what you're doing. I'm in a deposition.   11:28
8  You've got a free Bible translator who helps the   11:28
9  community factually. Everybody knows us up there. We   11:28
10  are well liked. You know why the community doesn't know   11:28
11  is because I don't want them to know. This is   11:28
12  embarrassing. If they found out, there probably would   11:28
13  be riots.                                       11:28
14  Q.  So any other claims of damage other than   11:28
15  emotional distress? Do you have any wage loss, loss of   11:28
16  wages, anything like that?                       11:28
17  A.  You got today. I'm down here doing what?     11:28
18  Q.  Okay.                                        11:28
19  A.  Do you know I don't come down here for safety   11:28
20  reasons too. I don't come down here. This is not a   11:28
21  safe place. San Bernardino is very crime. If I get   11:28
22  invited to go the Vatican, I don't go because I could   11:28
23  get -- I don't think you understand. I'm the only free   11:28
24  Bible translator.                               11:29
25  Q.  Explain --                                   11:29

Page 137

35 (Pages 134 - 137)

1    A.  There's not another one.                11:29
2    Q.  You've mentioned --                      11:29
3    A.  You don't get that.                      11:29
4    Q.  You know, you've mentioned that numerous times.  11:29
5    A.  I don't think you understand why that's  11:29
6  important.                                     11:29
7    Q.  Yeah.                                     11:29
8        Explain to me what that is.              11:29
9    A.  It's super important.                     11:29
10   Q.  Well, what is it?                         11:29
11   A.  The Bibles -- it's the -- first of all, it's  11:29
12  free.  That's -- anyone understands free.  Free is good.  11:29
13  No one does free.                              11:29
14   Q.  Okay.                                     11:29
15   A.  That's how you -- you work in pro bono for  11:29
16  somebody for some reason.  That's a good deed.  You're  11:29
17  going to -- if it's a good cause, you do it for free.  11:29
18       So this is why it's important:  Every Bible  11:29
19  since 1611 has been copyrighted.  Copyrighted.  You're a  11:29
20  lawyer.  Hopefully you know about it.  You can't speak a  11:29
21  Bible without violating copyright law.  You can't print  11:29
22  a Bible verse.  If you want a red shirt that says, "I  11:29
23  love God based on John" whatever, it's a federal  11:29
24  violation.  It's two years in federal prison and up to  11:29
25  $150,000 fine per infraction.                 11:29

Page 138

1        I give the only free -- when I mean "free," you  11:29
2  can print it.  You can speak it.  If you read it, you  11:29
3  can look it up, 1611bible.us and do the brainwash test.  11:29
4  I'm a major threat -- a major threat to corrupt  11:30
5  organizations.  Because when you tell someone you're a  11:30
6  Bible translator, even brainwashed people go, "Well,  11:30
7  that's a pretty high position."  Right?          11:30
8        So if you say something, it's considered very  11:30
9  credible.  Right?  So saying that -- so they think  11:30
10  pastors are supposed to be good.  Right?  I'm a Bible  11:30
11  translator.  Right (indicating)?               11:30
12       And if I tell you these bad things are  11:30
13  happening, people believe it.  And then when they read  11:30
14  it and they go, "Wow, it's true."  Then they find out  11:30
15  churches are robbing them.  They're telling them to bow.  11:30
16  You're not supposed to bow.  It's in your Bible.  You're  11:30
17  not supposed to give in public.  If you donate in an  11:30
18  offering plate, it's a word-for-word sin.  I'm a major  11:30
19  threat to these churches.  Do you understand it?  11:30
20       Their pocket -- their money would drop like a  11:30
21  rock if they told the truth.  If people knew that you're  11:30
22  not supposed to call someone a pastor -- it's a  11:30
23  violation of the Bible.  They don't know this.  I'm the  11:30
24  only person risking my life to tell people this.  11:31
25       I'm trying to build a free church.  While  11:31

Page 139

1  trying to do this free church -- I built houses before.  11:31
2  I had no trouble with that.  The County was great.  When  11:31
3  I went to do a free church, they went and cut my cables  11:31
4  at least five times.  My security.  My security.  I  11:31
5  can't put parts out there to build a church because they  11:31
6  will be taken.                                  11:31
7        Guess who was taking this stuff?  The County of  11:31
8  San Bernardino, CSA 18 factually.  They admitted to it.  11:31
9  When I filed a complaint, it went to the local office.  11:31
10  I didn't know the law at the time.  Right?  It was  11:31
11  supposed to go to Risk Management.  You probably know  11:31
12  this stuff.  They threw it in the trash.  11:31
13       So when I went to do this -- well, guess  11:31
14  what? -- it expired.  You have six months to file  11:31
15  something.  I go, "They destroyed it."  11:31
16       And they were, "Well, yeah.  We had, but, you  11:31
17  know."  This -- the guy who cut my cables went out there  11:31
18  with two workers, and the guy right in front of us cut  11:31
19  our cables.  We thought he was going to go out and fix  11:31
20  it.  We're trying to be Bible, Godly.  Right?  11:31
21       This is real stuff.  I'm not, "Hey, people make  11:31
22  mistakes.  Could you please put our security back.  11:32
23  That's it.  We don't want to sue.  We don't want any  11:32
24  trouble."                                       11:32
25       He goes out there with two thug guys from  11:32

Page 140

1  San Bernardino.  Instead he takes our "no trespassing"  11:32
2  sign.  He says, "Remove it, then.  We'll solve it that  11:32
3  way."  We were told that the meeting was going to be  11:32
4  peaceful and he was going to put a government -- you  11:32
5  know, they were going to pay the government money to put  11:32
6  back security.                                  11:32
7        Instead he cuts the cable, pulls up our thing,  11:32
8  breaks our glasses to keep people from going off the  11:32
9  cliff on this other section.  It's a big property.  11:32
10  37 acres.  God blessed us with it because we're honest  11:32
11  and legitimate, so we have the best property there is.  11:32
12       So that's part of the problem too.  The  11:32
13  County -- there's another department -- the water  11:32
14  company is out there.  We won the suit against them.  11:32
15  They illegally put locks up on our property.  They  11:32
16  didn't even service water.                      11:32
17       But they, through talking and negotiations,  11:32
18  went out and removed that stuff that they illegally put  11:32
19  out there.  They promised to not go out there and  11:32
20  destroy our property anymore.  The County has been  11:32
21  dumping trash out there, cutting our cables.  So now we  11:32
22  show up, and we don't want any crime.  No crime.  It  11:33
23  represents me.  If bad things happen, they're going to  11:33
24  say it's me.  So we need to protect it.  11:33
25       Then the County gave us a ticket.  So a trailer  11:33

Page 141

36 (Pages 138 - 141)

Page 142

```
1   shows up.  After they disabled all of our security, a      11:33
2   trailer shows up.  Some random guy and his wife in a       11:33
3   trailer parks on our property because it's a beautiful     11:33
4   view.  So we call the sheriff, "Can you please help us     11:33
5   get them off?"                                             11:33
6       "No.  We can't help you."                              11:33
7       But they can tow my truck.  They can tow my            11:33
8   truck, no problem.  But with someone we want help,         11:33
9   "Please we don't know who this person is.  We want them    11:33
10  off."  Then the County finds out about it -- and guess     11:33
11  what? -- they give us a notice.  "You are responsible      11:33
12  for someone you don't know who came out to your            11:33
13  property, is out there in a trailer."                      11:33
14      While I'm on a cruise, I'm on the phone going,         11:33
15  "Why don't you guys do something?  Help us out.  We're     11:33
16  trying to build a free church.  We don't know why -- no    11:33
17  one should be out there."  We already had a paper I        11:33
18  scanned with a thing that said, "You can arrest anyone     11:34
19  who trespassed that goes out there."  Instead they come    11:34
20  after me hard.  Hard.                                      11:34
21      Do you want to know how hard?  I had to go to          11:34
22  the San Bernardino -- right here -- the Board of           11:34
23  Supervisors thing and defend myself.  Emotional           11:34
24  distress.  Right?                                          11:34
25      We did nothing wrong.  And the law said               11:34
```

Page 143

```
1   federally you can't get -- same thing with this ticket.    11:34
2   It's going to match up.  They went after me for a          11:34
3   passenger, some type of seat belt issue.  Right?           11:34
4   Q.  Uh-huh.                                                11:34
5   A.  This time they went after these two people that        11:34
6   were out on my property.  We told them to leave.  Right?   11:34
7   Then the sheriff said, "You can't -- you can't do          11:34
8   anything physical.  You can't do this.  You can't do       11:34
9   that."                                                     11:34
10      "What are we supposed to do?"                          11:34
11      He's all, "Well, you can just tow it."  Well,          11:34
12  then they would sue us for taking their personal           11:34
13  property.  So anyways I bribed the guy, and he finally     11:34
14  left, which was good, but it was -- I called him for a     11:34
15  long time.  And it was the County made us -- they would    11:34
16  not let go.  They're going to get me.  It's a multiple     11:34
17  million dollar property.  Right?                           11:34
18      That God gave is really -- we pay, but a really        11:34
19  good deal.  God's trying -- we're trying to build a free   11:34
20  church.  This is going to be the greatest thing ever, I    11:34
21  think.  You go in.  There's no offering plate.  There's    11:35
22  no bowing.  "Hey, can we give you -- do you want food?     11:35
23  Do you want clothes?"  We're not a priest.  We just read   11:35
24  Bible.  You don't have to agree, but this is what you're   11:35
25  here for.  It's Bible.  It says love your neighbor as      11:35
```

Page 144

```
1   yourself."  This is what we push.                          11:35
2       That's going to expose all the churches.              11:35
3   People are going to say, "Why" -- there's going to have    11:35
4   doors.  One says, "If you're a child of God, you're free   11:35
5   to come in."  The other one is going to say, "If you're    11:35
6   not a Christian, you're not a believer, then it's five     11:35
7   bucks for the popcorn."  You know, it's a joke.  We        11:35
8   don't want people to go through that.                      11:35
9       We're trying to say it's free, you know.  You          11:35
10  don't really have to give to -- we're going to teach       11:35
11  them that God doesn't want your money.  Right?             11:35
12      So I'm a major threat to all -- and I'm a              11:35
13  serious person.  Right?  Millions of followers, you        11:35
14  know.  And here I am getting targeted.  It's like I        11:35
15  can't go anywhere.                                         11:35
16  Q.  Wait.                                                  11:35
17      So you don't believe in tithing?                       11:35
18  A.  See, you don't know this.                              11:35
19  Q.  I'm just asking.                                       11:35
20  A.  No, I don't.                                           11:35
21  Q.  That's interesting.                                    11:35
22  A.  I can tell you it's a long -- I'm an expert.  I        11:35
23  am the expert at Bible.  There is no one else to go --     11:35
24  it's me.  Right?  You can read it word-for-word.  You      11:35
25  would have to build it up.                                 11:35
```

Page 145

```
1       The fast version was tithing was required for         11:35
2   only one tribe.  There's all these lies.  They're not      11:36
3   telling you this.  There's 13 tribes of Israel.  Right?    11:36
4   They don't tell you that.  They want to brainwash you.     11:36
5   There's only 12.  I don't think everyone is brainwashed.   11:36
6       One tribe is called the Levi Tribe of Israel.         11:36
7   Right?  They were required to tithe.  They were the        11:36
8   farmers.  It was instruction.  It was 12 tribes that       11:36
9   fought, fought the bad guys to protect themselves.         11:36
10      This tribe had to be a priest because they            11:36
11  didn't violate -- it's a long story.  But it was a thing   11:36
12  with a statue and a cow.  I'm trying to give you the       11:36
13  fastest version possible.                                  11:36
14      So these guys were legit back in the day.             11:36
15  Because of that God said, "You're the only ones that can   11:36
16  be a priest.  If you're not a Levi Jew, you can't be a     11:36
17  priest.  We don't trust you."  I'm just paraphrasing       11:36
18  trying to make it simple.                                  11:36
19      These guys are your farmers.  "So you same            11:36
20  farmers are going to give your best tithes."  You can      11:36
21  say tithes.  The word back means 10 foot -- 10 percent     11:36
22  of a food product is what the word actually means          11:36
23  continuing the t-h.  Tithe is 10 percent of food.  It's    11:36
24  never money anyways.  It was never money ever at any       11:36
25  point in the whole Bible old or new.  It never required    11:36
```

37 (Pages 142 - 145)

**Page 146**

1 money. So it was food.                                    11:37
2      So you had to give your 10 percent the best.        11:37
3 So if you had a good crop of good corn, you gave the    11:37
4 good corn to the priest. If you had a cow, you gave a -- 11:37
5 there's certain parts on the cow -- you probably know    11:37
6 this -- like pastrami. It's more -- considered more      11:37
7 valuable. That goes to them. The rest you can sell.     11:37
8 Right? Produce for the whole -- the other 12 tribes      11:37
9 when they're fighting. They're kind of like the         11:37
10 resource people. They need food. You got to go bring   11:37
11 it to them. These guys have to be your priest.          11:37
12      So that's what people don't know. To be a         11:37
13 priest, you have to be a Levi Jew. They don't even tell 11:37
14 you that. Almost nobody is a Levi Jew who's a priest    11:37
15 today. We just covered this one. So these guys -- lost  11:37
16 focus here.                                             11:37
17 Q. Let's focus, you know --                             11:37
18 A. Anyways, it says in Matthew 17:24 if you are a       11:37
19 child of God, you're free from giving to the temple.    11:37
20      So have you heard that verse?                      11:37
21 Q. No.                                                  11:37
22 A. It's straight up. You do not have to give to         11:37
23 the church.                                             11:37
24 Q. All right. So the reason we went --                  11:37
25 A. Do not let your left hand know what your right       11:38

**Page 147**

1 hand is doing and do not give where anyone can see.      11:38
2 Q. So the reason I asked --                              11:38
3 A. It's a sin if you give an offering plate.            11:38
4 Q. The reason I asked you to explain that like you       11:38
5 just did is kind of want to know --                      11:38
6 A. They're trying to shut this down.                    11:38
7 Q. No. No.                                               11:38
8      I'm trying to -- yeah. I'm trying to connect        11:38
9 this particular stop to how --                           11:38
10 A. Everything else.                                     11:38
11 Q. -- how it affected the free church.                  11:38
12      Are you suggesting --                               11:38
13 A. We can't call the highway patrol anymore.            11:38
14 Q. Okay.                                                11:38
15 A. That's the problem. We need security. There's        11:38
16 people that park out there. We need to get them towed.  11:38
17 We've got to come up with some type of -- how are we    11:38
18 going to fix this problem? It has to be through         11:38
19 paperwork.                                              11:38
20 Q. Okay. So --                                          11:38
21 A. We need a judge to say, "The highway patrol has      11:38
22 to help us out at Macy's land." Right? The Jewish       11:38
23 temple, if someone parks out there, just like any other 11:38
24 business -- if they're illegally doing bad things, you  11:38
25 need to do the same service that you're doing for       11:38

**Page 148**

1 them -- the grocery store, a private residence -- that   11:38
2 they will help impound that vehicle or at least get it  11:38
3 off the property. They're not doing that. They told me  11:38
4 they will not come out and remove that trailer. You     11:38
5 know why? It will cost too much is what he said.        11:39
6 Q. Okay. So then --                                      11:39
7 A. We have a lot of problems.                            11:39
8 Q. I'm trying to connect -- because you make -- in      11:39
9 your complaint you make a comment -- you make a claim   11:39
10 for compensatory damages of a million dollars. And I'm  11:39
11 trying to get a feel as to how did you come up with     11:39
12 that.                                                   11:39
13 A. To stop the County from continuing this.             11:39
14 They're not going to care without money. You can't yell 11:39
15 at cops. You make a complaint. It probably goes         11:39
16 nowhere. We did that. You risk going to jail if you     11:39
17 make a complaint. Did you know that? The next step      11:39
18 is -- what? -- internal IA. People don't know.          11:39
19      If you read that paper, it says, "If you wrote     11:39
20 one thing wrong" -- like this video. I accidentally say 11:39
21 the wrong date -- "you will be investigated. You will   11:39
22 be put in jail for up to six months to a year."         11:39
23      Do you know about that?                            11:39
24 Q. So I'm trying to figure out what your claim of       11:39
25 damages are. I'm kind --                                11:39

**Page 149**

1 A. Emotional distress and penalties to get them to      11:39
2 stop doing this because that's what will move people.   11:39
3 You have power. I assume you have a lot of power. And   11:39
4 you go to these people and say, "You've got to stop     11:39
5 doing this or you're going to keep getting sued,"       11:40
6 something like that.                                    11:40
7 Q. I'm just a lawyer.                                    11:40
8 A. You're not just a lawyer. You're not.                11:40
9 Q. So we're talking about emotional distress --         11:40
10 A. Uh-huh.                                              11:40
11 Q. -- right?                                            11:40
12      And you've kind of explained how you have         11:40
13 emotional distress from other issues and this          11:40
14 exacerbated that emotional distress.                   11:40
15 A. They're refusing to do their job.                   11:40
16 Q. Right.                                               11:40
17      And then the other claim of damages that this     11:40
18 lawsuit then has caused you to lose time from your     11:40
19 church?                                                 11:40
20 A. From Bible translation.                             11:40
21 Q. Right.                                               11:40
22      From your church.                                 11:40
23 A. I'm not where I should be. I should be here,        11:40
24 but we're here. Because what do I have to do when I go  11:40
25 home? I have to do something with this.                 11:40

38 (Pages 146 - 149)

| | |
|---|---|
| 1 Q. So you're losing time to devote to the church? 11:40 | 1 We are a major threat to every church by being good, by 11:42 |
| 2 A. The world. 11:40 | 2 being a light exposes darkness. You don't have to go 11:42 |
| 3 Q. Okay. 11:40 | 3 crazy. People come in and they feel the love. They go, 11:42 |
| 4 A. The church. The whole world reads my stuff. 11:40 | 4 "Why is everything free?" 11:42 |
| 5 It's a free Bible on an app on whatever you need. 11:40 | 5 Because everyone is told it must cost a lot to 11:42 |
| 6 Q. Have you lost time related to this incident -- 11:40 | 6 turn the lights on. No, it doesn't. We fund it. The 11:42 |
| 7 A. Absolutely. I'm teaching people how to do 11:40 | 7 lights don't cost much. 11:42 |
| 8 lawsuits to keep the government out of your life. 11:40 | 8 Q. Okay. 11:42 |
| 9 Q. Okay. Related to your businesses have you lost 11:40 | 9 A. We pay for it. It's simple. 11:42 |
| 10 any income? 11:40 | 10 Q. So then -- 11:42 |
| 11 A. Yes. Of course. 11:40 | 11 A. Do not donate. It would be a sin. To give an 11:42 |
| 12 Q. Explain to me how. 11:41 | 12 offering plate is a sin. It's a word-for-word sin, 11:42 |
| 13 A. This is a priority. 11:41 | 13 Matthew chapter 6. Do not let your left hand know what 11:42 |
| 14 Q. Okay. 11:41 | 14 your right hand is doing when you give. And do not give 11:42 |
| 15 A. If you don't do paperwork, people get angry, 11:41 | 15 where everyone can see. Isn't an offering plate an 11:42 |
| 16 people get violent. 11:41 | 16 exact violation? 11:42 |
| 17 Q. Okay. So then -- 11:41 | 17 Q. So you have not expended any attorney's fees 11:42 |
| 18 A. It's actually normal criminal. The cop 11:41 | 18 outside of the time that you've put into this case? 11:42 |
| 19 harasses them. What do they do? They want to fight 11:41 | 19 A. Yeah. We are representing ourselves. Me and 11:42 |
| 20 with them because they don't know how to do lawsuits. 11:41 | 20 my kids. 11:42 |
| 21 Q. So the impact to your business, your ability to 11:41 | 21 Q. Okay. 11:42 |
| 22 go and -- 11:41 | 22 A. They're being trained. We're going to have 11:42 |
| 23 A. It's embarrassing too. 11:41 | 23 problems. We're going to make mistakes. But I've tried 11:43 |
| 24 Q. -- haul trash is related to the lawsuit? 11:41 | 24 to be really -- I trust you a lot, and I've tried to be 11:43 |
| 25 A. Absolutely. We have to -- I can't drive around 11:41 | 25 very -- 11:43 |
| Page 150 | Page 152 |

| | |
|---|---|
| 1 solo anymore. 11:41 | 1 Q. Did you -- 11:43 |
| 2 Q. Okay. 11:41 | 2 A. -- reasonable with you, I believe. 11:43 |
| 3 A. If I have to go pick up something, it's like 11:41 | 3 Q. Did you get your fees waived from the court? 11:43 |
| 4 only need one person, but I need at least two because -- 11:41 | 4 A. Yes. We got fee waiver, like I said, because 11:43 |
| 5 guess what? -- they're going to pull me over every time 11:41 | 5 we don't make a lot of money. We give to the people. I 11:43 |
| 6 I drive. 11:41 | 6 don't want to tell you all the stuff we do because then 11:43 |
| 7 Q. Okay. 11:41 | 7 I lose credit with God. 11:43 |
| 8 A. If that guy's on the street, he's going to get 11:41 | 8 Q. I want to ask you -- 11:43 |
| 9 me. He's going to claim the same thing even though -- 11:41 | 9 A. I can tell you every criminal know us up there 11:43 |
| 10 think about it. This lawsuit shows how bad things are. 11:41 | 10 because we give -- they get out of jail and I say, 11:43 |
| 11 I already won the case, but I guarantee you if I drive 11:41 | 11 "Look, one excuse you shouldn't have is you should be 11:43 |
| 12 by that same cop, he's going to pull me over for the 11:41 | 12 able to get a job. I will give you a job." We give 11:43 |
| 13 same thing even though we already won in court. 11:41 | 13 them a chainsaw, a splitter. If they split it, we'll 11:43 |
| 14 Q. Okay. 11:41 | 14 pick it up, and we can give it to people. If you want 11:43 |
| 15 A. He's going to say, Well, that's just -- 11:41 | 15 to go clean something -- 11:43 |
| 16 whatever. He's never acknowledged he's wrong and he's 11:41 | 16 Q. I want to ask you some specific questions about 11:43 |
| 17 going to stop doing that. Until he does that, we've 11:41 | 17 the officer's and sergeant's behavior on the date of the 11:43 |
| 18 made no progress yet. The court can't force him to do 11:41 | 18 incident. Okay? 11:43 |
| 19 this. 11:42 | 19 A. You can see it in the video. 11:43 |
| 20 Q. Right. 11:42 | 20 Q. Okay. At any time did Officer Bates touch you, 11:43 |
| 21 And in this lawsuit you've been acting as your 11:42 | 21 physically touch you? 11:43 |
| 22 own attorney; right? 11:42 | 22 A. I doubt it. 11:43 |
| 23 A. Absolutely. And my kids know. It's a family 11:42 | 23 Q. Okay. At any time during the incident were you 11:43 |
| 24 thing because they have to protect themselves. When I'm 11:42 | 24 assaulted by Officer Bates? 11:43 |
| 25 gone, the government is going to come after them still. 11:42 | 25 A. There's a presence. When a cop tells you to 11:44 |
| Page 151 | Page 153 |

39 (Pages 150 - 153)

1  put a phone down, anybody that knows anything knows    11:44
2  that's not a good sign.    11:44
3    Q.  Okay.    11:44
4    A.  When they tell your kids to get out of the car,    11:44
5  usually you're being arrested.  They're getting    11:44
6  arrested.  I hope you know this stuff.  You don't say,    11:44
7  "Can you please get out of the car.  When they say that,    11:44
8  then they say, "Put your hands behind your back.  Let's    11:44
9  put some handcuffs on you."    11:44
10    Q.  I'm just -- the cell phone thing was with    11:44
11  Sergeant O'Brien.  I want you to focus --    11:44
12    A.  That's a big deal.    11:44
13    Q.  Okay.  I get it.    11:44
14    A.  It's not small.    11:44
15    Q.  I want to talk -- focus only on Officer Bates,    11:44
16  and then we'll talk about Sergeant O'Brien.  Okay?    11:44
17      So Officer O'Brien -- I'm sorry -- Officer    11:44
18  Bates did not touch you, did not assault you?    11:44
19    A.  He was scary.    11:44
20    Q.  Okay.  Did he threaten you physically in any    11:44
21  way?    11:44
22    A.  When you're being detained a long time, you're    11:44
23  going to jail.  There's a law.  You have 15 minutes.    11:44
24  And it's not supposed to be that.  So the answer is no,    11:44
25  he didn't physical -- it's coming.  If you don't know    11:44
Page 154

1  things, that's different.    11:45
2      If you know something for a fact, you know --    11:45
3  like I know Bible.  You say a word.  You know the last    11:45
4  word.  When all the signs are there -- he's held you for    11:45
5  a long time.  They're going to impound your car.  You're    11:45
6  going to jail.  If it's quick, then it's right.  Okay?    11:45
7  They go there -- even if they're wrong, they give you a    11:45
8  ticket and you go on your way because that's the law    11:45
9  requirement.  We were there for over an hour.    11:45
10    Q.  Did Officer Bates refuse to contact a    11:45
11  supervisor to come to the scene?    11:45
12    A.  No, he didn't refuse that.  He was difficult,    11:45
13  but he did.  He refused to give his identification when    11:45
14  I asked numerous times --    11:45
15    Q.  Okay.    11:45
16    A.  -- nicely.    11:45
17    Q.  At any --    11:45
18    A.  You see how calm I was in the video?    11:45
19    Q.  At any time --    11:45
20    A.  I was very calm.    11:45
21    Q.  At any time during the incident did Officer    11:45
22  Bates draw his service weapon?    11:45
23    A.  His hand -- no.  He had his hand on his gun.    11:45
24  That's enough for me to be concerned.  That's why I was    11:45
25  like this.    11:45
Page 155

1    Q.  At any time during the stop, did Officer --    11:45
2    A.  I felt I was in fear for my life.    11:45
3    Q.  At any time during the stop --    11:46
4    A.  No doubt.    11:46
5    Q.  At any time during the stop did Officer Bates    11:46
6  deploy any other method to subdue you, such as Mace or a    11:46
7  taser?    11:46
8    A.  No.  Or a club.    11:46
9    Q.  Okay.  At any time during the incident did    11:46
10  Officer Bates use profanity against you?    11:46
11    A.  I don't remember.  I don't think so.    11:46
12    Q.  Okay.    11:46
13    A.  I was too concerned with the badge not showing.    11:46
14  I already knew -- you don't -- I don't think you get    11:46
15  that.  I mean, I don't want to offend you like that.  I    11:46
16  should say I hope you comprehend that if you know where    11:46
17  I was at with the government already trying to shut us    11:46
18  down.  They cut our cables.    11:46
19      I got arrested -- I didn't tell you that -- by    11:46
20  the sheriffs for picking up trash on my religious    11:46
21  property factually.  And I won that case.  I've won    11:46
22  every case.  This is ongoing.  Over 300 County notices    11:46
23  of violations on my church property, we won every case.    11:46
24  I didn't finish that one.  We went to the county    11:47
25  hearing.  They had a hearing officer similar to you, a    11:47
Page 156

1  lawyer guy.  Right?  They had all those people on the    11:47
2  County against me.    11:47
3    Q.  Okay.  Let's talk about --    11:47
4    A.  Against me.  And I'm going, we did nothing    11:47
5  wrong.  And guess what?  We won.  In fact the County was    11:47
6  proven to have trespassed on our religious property and    11:47
7  had been harassing us.  We got all of our money back.    11:47
8  That case is ongoing.    11:47
9    Q.  At any time did Officer Bates impound any of    11:47
10  your property during this stop?    11:47
11    A.  Yeah.  He had my ID.  He wouldn't let it go    11:47
12  too.  I'm "when are you going to give that back?  He    11:47
13  didn't do things right.  That's all I can say.    11:47
14    Q.  Okay.    11:47
15    A.  You're supposed to give them a ticket.  Then    11:47
16  your sergeant shows up and discusses it, and he could    11:47
17  have let that guy go.  He could have said, "Hey, I took    11:47
18  over the stop.  I just want to let the guy know that we    11:47
19  believe you did this right."  That would have been the    11:47
20  normal way.    11:47
21    Q.  Okay.    11:47
22    A.  Then it would have been a shorter stop.    11:47
23    Q.  So then Officer Bates from your understanding    11:47
24  impounded your license, your registration, and your    11:48
25  insurance?    11:48
Page 157

40 (Pages 154 - 157)

**Page 158**

1    A.  There you go.  He had possession of them.  He
2  wouldn't give them back, completely give it back.  He
3  goes --
4    Q.  Did you --
5    A.  -- "It's right here."
6        What if he drove off with them.  We don't trust
7  them.
8    Q.  Did you receive them back at the end, by the
9  end of the stop?
10    A.  Yes.
11    Q.  Okay.  All right.  Let's talk about Sergeant
12  O'Brien's behavior.
13    A.  I need to add that, though.  You're asking a
14  question about behavior and stuff.  The sheriffs
15  illegally arrested me for picking up trash -- me picking
16  up trash -- it wasn't even me.  I took the blame so my
17  kids wouldn't get blamed -- for picking up trash on our
18  property.
19        You know what the officer said?  "Hey, if
20  someone puts a bike out on your property, would you just
21  throw it away?"  I was like, I mean, that's a good one.
22  I mean probably I could.  What am I supposed to do?
23    Q.  Okay.
24    A.  We're a trash company.  In fact the County are
25  the ones that have been dumping the trash.

**Page 159**

1    Q.  This incident --
2    A.  We're cleaning up this trash.  And guess what?
3  We won that case.
4    Q.  Okay.  Mr. Macy --
5    A.  It was an illegal arrest.  Do you think I had
6  trust with the highway patrol?  This had just happened
7  before this.
8    Q.  Okay.  So this incident with the trash you just
9  referred to --
10    A.  Uh-huh.
11    Q.  -- occurred prior to --
12    A.  Prior.
13    Q.  -- the stop?
14    A.  These are real things.  A normal jury I hope is
15  going to hear this.  Not like you and go (indicating).
16  So you didn't do anything wrong?  For what?  For picking
17  up -- for cleaning up trash.
18    Q.  And that was the County sheriff --
19    A.  For a 50 cent rusted up sign.  The County --
20  the same county, the same area.  They have the same
21  radio.  They can hear everybody on the radio.
22    Q.  So that was a sheriff; right?
23    A.  Yes.
24    Q.  Okay.  So it wasn't either Officer Bates or
25  Sergeant O'Brien; right?

**Page 160**

1    A.  They work together.  I don't know if you know
2  anything about police.  They're all friends.  They don't
3  have -- I feel bad for them.  I know a lot.  Most of
4  their friends are within themselves because people don't
5  like them or trust them.
6    Q.  Just to clarify something, though.  When you
7  were arrested --
8    A.  I answered.
9    Q.  -- by the sheriffs --
10    A.  Uh-huh.
11    Q.  -- the people or the sheriff officers that
12  arrived --
13    A.  Correct.
14    Q.  -- were not Officer Bates or Sergeant O'Brien;
15  right?
16    A.  What I'm saying it's relevant because they hear
17  the same stuff.  They're going after me.  They're going
18  after us.
19        You know what they said?  There's a case on
20  that too.  They go how -- another time they pulled me
21  over.  It might have been the highway patrol -- while I
22  was driving out to my religious property.  He goes, "You
23  didn't have a front license plate on."
24        And so I go, "Okay, whatever.  What do you want
25  to do?"

**Page 161**

1        And then he's like, "How much is your property
2  worth?"
3    A.  Okay.  Let's focus on Sergeant --
4    A.  It's very concerning.
5    Q.  Let's talk -- let's focus on Sergeant O'Brien.
6    A.  I never got a ticket on that one.
7    Q.  Let's focus on Sergeant O'Brien's behavior --
8    A.  Sure.
9    Q.  -- at the stop.
10        At any time did Sergeant O'Brien touch you?
11    A.  No.  He's on the other side over there.
12    Q.  At any time did Sergeant O'Brien assault you?
13    A.  The threat of being arrested.  So, no, he
14  didn't -- he didn't physically punch me, no.
15    Q.  Did Sergeant O'Brien at any time threaten
16  physical violence with you?
17    A.  It's implied.  When you say, "Put your phone
18  down."  When you tell people to bring their kids out of
19  their truck, these are issues.
20    Q.  Okay.  At any time did Sergeant O'Brien impound
21  any of your property?
22    A.  It would have been impounded.  By law if they
23  would have done it right -- I need to answer this.  No.
24  But I have to put the "but" in there.  If I wouldn't
25  have cooperated -- what if I would have said, "You guys

1 are wrong and I was right," he would have arrested me.    11:51
2 He would have impounded -- I believe he wanted to    11:51
3 impound my truck. I explained that they illegally    11:51
4 impounded my truck previously. Illegally.    11:51
5      The probability if somebody -- if they punched    11:51
6 you yesterday and they've got the same aggro behavior,    11:51
7 there's a good chance they're going to punch you the    11:51
8 next day. He takes my truck, impounds it illegally.    11:51
9 The supervisor looks into it -- someone. I don't    11:51
10 remember right now -- and finds out it was a completely    11:51
11 illegal towing. They did it within five minutes. That    11:51
12 means it was either tracked or a miracle that this guy    11:51
13 just happens to drive up and go, "Hey, get over here and    11:51
14 tow this guy's truck." It made no sense. It was on    11:51
15 private property.    11:51
16      If you knew the laws, the highway patrol only    11:51
17 patrols highways. This was a private street. Can they    11:52
18 do things in emergencies, yes. Not a normal behavior to    11:52
19 go on a private property and go, "Hey." And I had    11:52
20 permission from the neighbor. It was all straight. I    11:52
21 had a note on the car, "We're coming back with gas." I    11:52
22 couldn't believe it was gone. It had to have been    11:52
23 shady. I thought it was stolen at first. I couldn't    11:52
24 believe the highway patrol -- I didn't even believe the    11:52
25 highway patrol would tow it.    11:52

Page 162

1  Q.  At any time during the stop did Sergeant    11:52
2 O'Brien use any profanity towards you?    11:52
3  A.  I don't remember. I mean, I have to look it    11:52
4 up. I have to watch the video and ask people again to    11:52
5 make sure. I don't think he did.    11:52
6  Q.  Okay.    11:52
7  A.  I don't want to lie about nothing.    11:52
8  Q.  At any time during the stop did Sergeant    11:52
9 O'Brien refuse to answer any of your questions?    11:52
10  A.  Absolutely.    11:52
11  Q.  Which ones?    11:52
12  A.  Could go on forever. "Can I please have your    11:52
13 name?" He just -- he was cold as ice.    11:52
14  Q.  Not Officer Bates. I'm asking about Sergeant    11:52
15 O'Brien.    11:53
16  A.  Oh, O'Brien? Are we on the sergeant now?    11:53
17  Q.  Yes.    11:53
18  A.  Oh, the sergeant was way better. It was --    11:53
19 yeah. There was one. He's not as shady. I go, "You    11:53
20 would not have given us this ticket." He didn't answer    11:53
21 it.    11:53
22      Instead he goes, "Well, I believe that if I    11:53
23 would have done the same stop, I probably would have    11:53
24 done the same thing," which was a straight lie. I    11:53
25 explained to him that he had already stopped us for the    11:53

Page 163

1 exact same thing and you said we were fine. So he lied.    11:53
2 It was a straight lie. That's where he sold his soul, I    11:53
3 believe.    11:53
4      He went from -- I don't know his history. He    11:53
5 was a good customer. But I think when he realized it    11:53
6 was his friend, he had a choice. Either his friend made    11:53
7 an illegal stop. He would have had to discipline him, I    11:53
8 presume. Right? If you knew that it was -- he should    11:53
9 have corrected him in private. There's a way it all    11:53
10 works. Right?    11:53
11      When they had that discussion in the video,    11:53
12 they should have talked. "Hey, I pulled him over" -- he    11:53
13 should have been like this, "I pulled him over    11:53
14 previously. The seat belt was installed safe. He's    11:53
15 right. The federal law -- there's no law about how many    11:53
16 seats belts can be in a vehicle factually, and it was    11:54
17 safe and it was installed. And the guy knew what he was    11:54
18 talking about. And I made sure it was safe, and I let    11:54
19 him go."    11:54
20      And now his buddy is here. They shouldn't be    11:54
21 best friends. If they were best friends, they should    11:54
22 have brought a different sergeant, first of all. That's    11:54
23 the way to do it. Let's just say it happens. You    11:54
24 happen to work there. You're buddies. You have your    11:54
25 little private discussion and you go, "Just let him go    11:54

Page 164

1 and tell him, 'Hey, make sure you have your seat belt    11:54
2 on.'" It would have been squashed. We would all be    11:54
3 happy. You wouldn't be here.    11:54
4  Q.  All right. Mr. Macy, we've gone almost    11:54
5 two hours. Let's take a short break and we'll go off    11:54
6 the record.    11:54
7  THE VIDEOGRAPHER: The time is 11:53 a.m. We    11:54
8 are now off the record.    11:54
9  (Recess taken from 11:53 a.m. until 12:01 p.m.)    11:56
10  THE VIDEOGRAPHER: The time is 12:01 p.m. We    12:02
11 are now back on the record.    12:02
12 BY MR. HERNANDEZ:    12:02
13  Q.  All right. Mr. Macy, just remember that you    12:02
14 are under oath. Okay?    12:03
15  A.  Yes, sir.    12:03
16  Q.  All right. Can you look at Exhibit D.    12:03
17  A.  Yes.    12:03
18  Q.  These are requests for admissions. We ask you    12:03
19 to admit certain facts. I'm going to go over some of    12:03
20 these. Not all of them.    12:03
21      But the one thing that I do note -- and you    12:03
22 tell me if this is correct, if you agree -- that you    12:03
23 didn't admit to any of the admissions. Right?    12:03
24  A.  I don't think so. I think I have to look at    12:03
25 them. If that's what it says.    12:03

Page 165

42 (Pages 162 - 165)

| | |
|---|---|
| 1 | Q.  Take a few minutes to take a look if you'd    12:03 |
| 2 | like.  Just let me know when you're done.    12:03 |
| 3 | A.  I have to look where I answered, I guess.    12:03 |
| 4 | Q.  Yes.  It's got the question and then the    12:03 |
| 5 | answer.    12:03 |
| 6 | A.  Oh, the end's the answer?  You didn't say.    12:03 |
| 7 | Q.  No.  So you look -- so the first part --    12:03 |
| 8 | A.  I wasn't born a lawyer.    12:03 |
| 9 | Q.  So the first part is the request.    12:03 |
| 10 | A.  Where is the answer at?    12:03 |
| 11 | Q.  It should be on the next page.    12:03 |
| 12 | A.  Oh, okay.    12:04 |
| 13 | Q.  The top there.    12:04 |
| 14 | A.  Oh, "Plaintiff does not admit that the    12:04 |
| 15 | California" -- okay.    12:04 |
| 16 | Q.  It goes request, response, request, response.    12:04 |
| 17 | A.  Yeah.  He didn't.  I was asking him, "What's    12:04 |
| 18 | the charge?"    12:04 |
| 19 | Q.  We'll -- if you'd just go through it.    12:04 |
| 20 | A.  Just answer it your way.  Okay.    12:04 |
| 21 | Q.  Just confirm --    12:04 |
| 22 | A.  I was trying to get you to understand why I    12:04 |
| 23 | said it if you want.  "Admit that there was only" --    12:04 |
| 24 | Q.  Yeah.  You don't have to -- you can do it --    12:04 |
| 25 | A.  Don't say it out loud?    12:04 |

Page 166

| | |
|---|---|
| 1 | Q.  Once you're done reviewing it, just let me    12:04 |
| 2 | know.    12:04 |
| 3 | A.  It looks pretty straightforward.  Okay.  I    12:04 |
| 4 | looked at it.    12:07 |
| 5 | Q.  Okay.  Thank you for taking a look at it.    12:07 |
| 6 | And my understanding -- I'm correct, though,    12:07 |
| 7 | that you did not admit to any of these requests.  Right?    12:07 |
| 8 | A.  Well, I think No. 3 maybe, yes.  "Admit that    12:07 |
| 9 | the traffic was subject to an operative."  I might have    12:07 |
| 10 | got that one wrong.    12:07 |
| 11 | Q.  We're going to go through some of them and you    12:07 |
| 12 | tell me if you're changing your response.    12:07 |
| 13 | A.  Whatever you want.    12:07 |
| 14 | Q.  So we'll start with the first one.    12:07 |
| 15 | It says Request For Admission 1.  Exhibit D.    12:07 |
| 16 | So we're referencing Exhibit D.    12:07 |
| 17 | "Admit that the California Highway Patrol law    12:07 |
| 18 | enforcement officer who initiated the subject traffic    12:07 |
| 19 | stop explained to you the reason for the traffic stop."    12:07 |
| 20 | You started kind of talking about that a little    12:07 |
| 21 | earlier.  Explain to me why you don't agree with that.    12:07 |
| 22 | A.  He didn't give -- the normal procedure is you    12:07 |
| 23 | give someone a citation number.  In this case it was    12:07 |
| 24 | 13-something about a traffic thing.  He did not explain    12:07 |
| 25 | that to me.    12:07 |

Page 167

| | |
|---|---|
| 1 | Q.  He didn't explain it to you --    12:07 |
| 2 | A.  He would not even tell me when I asked him,    12:08 |
| 3 | "What is the charge?"  So your legal -- see, my    12:08 |
| 4 | definition is you have to tell someone the code.  You    12:08 |
| 5 | can't just say, "I pulled you over because I suspected    12:08 |
| 6 | it was a non-factory seat belt."  There has to be a    12:08 |
| 7 | charge to it.  I don't define it that way.  It's    12:08 |
| 8 | improper.  That was a violation of his duties.  He    12:08 |
| 9 | should be retrained.    12:08 |
| 10 | You need to tell someone, "According to    12:08 |
| 11 | California penal code or federal, whatever, this is what    12:08 |
| 12 | you're being charged of and this is the investigation,"    12:08 |
| 13 | whatever.  He didn't do that.    12:08 |
| 14 | Q.  Okay.    12:08 |
| 15 | A.  And I was greatly concerned, again, with his    12:08 |
| 16 | nametag not showing up.  This was -- this was bad    12:08 |
| 17 | because he didn't give me the charge and he didn't    12:08 |
| 18 | identify himself correctly.  This was a big problem.    12:08 |
| 19 | Q.  All right.  Fair enough.    12:08 |
| 20 | A.  If I was a cop, he would have been arrested.  I    12:08 |
| 21 | would have said, "Hey, why don't you have a badge?  If    12:08 |
| 22 | you're a cop, you need to be brought into internal    12:08 |
| 23 | affairs immediately."    12:08 |
| 24 | Q.  All right.  So let's go to request No. 2.  It    12:08 |
| 25 | says, "Admit that there were only two California Highway    12:08 |

Page 168

| | |
|---|---|
| 1 | Patrol law enforcement officers during the stop that is    12:08 |
| 2 | the subject of the operative complaint."    12:08 |
| 3 | A.  Their whole dispatch.  Everybody's involved.    12:09 |
| 4 | They've got to record it.  There's other people    12:09 |
| 5 | involved.  You call it in.  You ask for a supervisor, it    12:09 |
| 6 | goes on record.  It gets recorded so that if there's a    12:09 |
| 7 | problem, they know who's where.  There's other people    12:09 |
| 8 | involved.    12:09 |
| 9 | That's part of the proof of the timing.  That's    12:09 |
| 10 | why we want the timeline to show we were out there for    12:09 |
| 11 | over an hour.  So that gets called in.  You have a    12:09 |
| 12 | document.  Okay?  That's where you've got one point of    12:09 |
| 13 | reference.  Then you've got this.  He's supposed to --    12:09 |
| 14 | on his car camera, it should have shown when he first    12:09 |
| 15 | pulled us over.  And he edited that greatly.    12:09 |
| 16 | And I would hope you would be concerned about    12:09 |
| 17 | that as a schoolteacher or anybody who lives in the    12:09 |
| 18 | community.  Everything -- it's an illegal charge in    12:09 |
| 19 | fact.  MVARS -- they call them MVARS -- you're not    12:09 |
| 20 | allowed to turn off those cameras or edit them or    12:09 |
| 21 | destroy them.  They're only there by law to protect us,    12:09 |
| 22 | and that got edited.    12:09 |
| 23 | If you saw that video -- I hope you saw it.    12:09 |
| 24 | The one officer -- the better one is the sergeant.    12:09 |
| 25 | Right?  The normal guy, his is all chopped up.  You can    12:09 |

Page 169

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1  prove it. I can show you the timeline. You can see how    12:09
2  the officer is here and then he's over here. You don't    12:09
3  hear what he said. It's clearly edited. And you    12:10
4  could -- and then it's all "bizz, bizz, bizz."
5       The part you can hear is, like, "bizz." The    12:10
6  other guy is clear as a whistle, and he's a car back.    12:10
7  That's how bad this is. The close car is Bates, the    12:10
8  shady one; right? The more shady. The sergeant's back    12:10
9  here (indicating). You can hear his with people way    12:10
10 over here talking. But his close to us got all edited.    12:10
11 They don't want you to hear what I'm saying, "Can you    12:10
12 please show your identification. What is the charge?"    12:10
13 I'm being all calm. Just, "Hey, can you give me the    12:10
14 vehicle code so I can read it to you. I knew it by    12:10
15 heart, but laws can change.    12:10
16   Q.  Okay. So at the scene of the incident there    12:10
17 are only two officers that arrived, the sergeant --    12:10
18   A.  Correct.    12:10
19   Q.  -- and officer --    12:10
20      Next one says, "Admit that during the traffic    12:10
21 stop" -- admission -- let me set this up.    12:10
22      Request for Admission No. 3 says, "Admit that    12:10
23 during the traffic stop that is subject of the operative    12:10
24 complaint, you requested that supervisor of the    12:10
25 California Highway Patrol law enforcement officer who    12:11

Page 170

1  initiated the subject traffic stop come to the location    12:11
2  of the traffic stop."    12:11
3      That's correct; right?    12:11
4   A.  Not the right wording, but it would be that I    12:11
5  asked for a sergeant to show up, supervisor.    12:11
6   Q.  You asked that of Officer --    12:11
7   A.  However they want to do it. I thought we    12:11
8  should have pulled over to a safer place. It was a --    12:11
9  this is me thinking. I'm not the cop. But I wouldn't    12:11
10 have people on the high speed risking all of us getting    12:11
11 killed. That's why I got out of the car, if nothing    12:11
12 else. I'm watching stuff. If you're on a high speed    12:11
13 thing, you get rammed, you know. And then you have a    12:11
14 problem bigger than what's going on.    12:11
15   Q.  Okay.    12:11
16   A.  So I think he should pulled us over to the high    12:11
17 school, go to the next stop. This is normal stuff.    12:11
18 "Hey, can you pull over to the next safe location."    12:11
19 Safe out of traffic. Not have your kids stand out in    12:11
20 the street or you in the street or get out of the    12:11
21 truck and get hit. It's a high speed. It's a dangerous    12:11
22 place. I hope you go up and visit it, Highway 18. Go    12:11
23 look at the road he pulled us over.    12:11
24   Q.  But it's correct that you did request --    12:11
25   A.  Yes.    12:11

Page 171

1   Q.  -- Officer Bates to get a supervisor --    12:11
2   A.  Correct.    12:11
3   Q.  You've got to let me finish my question, sir.    12:11
4   A.  Oh, sorry.    12:11
5   Q.  And then you can answer.    12:11
6      So it's correct that you requested Officer    12:12
7  Bates to request a supervisor to come to the scene?    12:12
8  Yes?    12:12
9   A.  Yes.    12:12
10   Q.  Okay. Perfect.    12:12
11      All right. Let's skip over to No. 5, so I'm on    12:12
12 page 3. Request For Admission No. 5 states, "Admit that    12:12
13 you installed a seat belt to the cab of the vehicle you    12:12
14 were driving at the time of the traffic stop that is    12:12
15 subject of operative complaint."    12:12
16   A.  Can I respond?    12:12
17   Q.  Go ahead.    12:12
18   A.  So I did not install it. And the highway    12:12
19 patrol authorized this vehicle. This is a strong case.    12:12
20 So it was a salvaged truck. That's how we save money.    12:12
21 Right? We can't afford to buy a new truck. It costs    12:12
22 too much. We get a wrecked truck, and we personally fix    12:12
23 it ourselves to save money and give money to help the    12:12
24 community instead. Right?    12:12
25      So during that process you have to go to the    12:12

Page 172

1  highway patrol station. They inspect it for safety.    12:12
2  They checked the seat belts. They checked the lights,    12:12
3  the brakes. They said it is good, and they check it    12:12
4  off. And then you go back and do your paperwork and you    12:12
5  get it to become a street legal vehicle.    12:12
6      So it had already been inspected twice by the    12:13
7  highway patrol. This is how outrageous this case is.    12:13
8  First at the headquarters in Running Springs. The    12:13
9  speciality guy, that's what he does. He checks for    12:13
10 stolen parts, that type of stuff to make sure everything    12:13
11 is compliant. This is a safe vehicle. He checks the    12:13
12 seat belt. He goes -- pulls on it. He probably checks    12:13
13 the bolts, make sure it's actually bolted properly    12:13
14 because there's people that rig stuff. There is    12:13
15 something to all of this stuff. You have to have a    12:13
16 certain amount of space. Right?    12:13
17      We have all that. You can't have five people.    12:13
18 You can't put a thin strap and some people use one bolt    12:13
19 for a loop. And that's not safe and so on. They said    12:13
20 it was safe.    12:13
21   Q.  Did you have any paperwork of that in the    12:13
22 vehicle?    12:13
23   A.  It's part of the history of the truck. It's a    12:13
24 vehicle inspection. And then, as well, sergeant had    12:13
25 pulled us over previously and checked it (indicating).    12:13

Page 173

44 (Pages 170 - 173)

| | |
|---|---|
| 1 We got the sergeant's approval.  We got the head    12:13 | 1    A.   The only time they won't do it is if they're    12:15 |
| 2 inspector.  That's the strongest thing of the DMV.  This   12:13 | 2 overworked and lazy, to be honest.  Then they'll say,    12:15 |
| 3 is common stuff.  You can look it up online.  It's a    12:13 | 3 "Go down there."  They don't want them to go because    12:15 |
| 4 salvaged -- to get, you have to do a brake and lights    12:13 | 4 these guys are more expert.    12:15 |
| 5 inspection and a vehicle safety inspection.    12:13 | 5    Q.   All right.  Let's go to Request No. 8, which    12:15 |
| 6        If anything is wrong, they're going to say,    12:14 | 6 is --    12:15 |
| 7 "No.  You've got to take that seat belt out."  That's    12:14 | 7    A.   The CHP expert checked it.  They looked around.    12:15 |
| 8 what they would have done.    12:14 | 8 They opened the hood.  They look at your tires.  They    12:15 |
| 9    Q.   You didn't actually answer my question.    12:14 | 9 look at the brakes.  The lights have to all work    12:15 |
| 10    A.   I thought I answered it.    12:14 | 10 according to their standards and everything.  This just    12:15 |
| 11    Q.   No.  No, you didn't.    12:14 | 11 happened like not that long before.    12:15 |
| 12    A.   I stayed in the vehicle --    12:14 | 12    Q.   Wait.  Wait.    12:15 |
| 13    Q.   Did you have any proof that it had been    12:14 | 13        So when you're talking about an inspection, it    12:15 |
| 14 was inspected by the CHP inside the vehicle?    12:14 | 14 was inspected, the whole vehicle --    12:15 |
| 15    A.   Yes.    12:14 | 15    A.   The whole vehicle inside and out.    12:15 |
| 16    Q.   Inside the vehicle at the time?    12:14 | 16    Q.   It wasn't a specific inspection to --    12:15 |
| 17    A.   They go inside the vehicle.    12:14 | 17    A.   No, it wasn't.  It's for everything.    12:15 |
| 18    Q.   No.  No.  At the time of the incident --    12:14 | 18    Q.   You've got to let me finish.    12:15 |
| 19    A.   Oh, the incident?    12:14 | 19    A.   Sorry.    12:15 |
| 20    Q.   At the time you get pulled over --    12:14 | 20    Q.   It wasn't --    12:15 |
| 21    A.   I didn't need it.  It was such a strong case.    12:14 | 21    A.   I thought you were done.    12:15 |
| 22 I'm telling you it doesn't -- they already know this.    12:14 | 22    Q.   It wasn't a specific inspection to determine    12:16 |
| 23 They're supposed to know this in training.  You don't    12:14 | 23 whether the seat belt that was installed was okay?    12:16 |
| 24 have a vehicle on the road unless it's safe.    12:14 | 24    A.   They don't do that.    12:16 |
| 25    Q.   Let me stop.    12:14 | 25    Q.   Okay.    12:16 |
| Page 174 | Page 176 |

| | |
|---|---|
| 1    A.   You're saying did I have a form that said that    12:14 | 1    A.   There's not -- it's not -- I'm telling you this   12:16 |
| 2 the seat belt was legit because you inspected it, no.    12:14 | 2 is such a -- it's really weird.  I told the judge that    12:16 |
| 3    Q.   Yes.    12:14 | 3 too.  Seat belts, believe it or not, have the least    12:16 |
| 4    A.   Because no one would need that.    12:14 | 4 restrictions of anything.  Normally there's a law for,    12:16 |
| 5    Q.   Okay.  So you didn't --    12:14 | 5 like, everything.    12:16 |
| 6    A.   It's not normal.  It's not something you need    12:14 | 6        If you have a spot in the vehicle and there's a    12:16 |
| 7 to have.  It's like I fixed the car.  Here's proof of    12:14 | 7 seat, you can put a seat belt in and add another    12:16 |
| 8 the damage, no.  The DMV has that record.  I'm telling    12:14 | 8 passenger.  People don't know.  As long as there's    12:16 |
| 9 you.  This is easy.  You can talk to someone legit.    12:14 | 9 breathing, there's ventilation, there's different    12:16 |
| 10        You can call the highway patrol right now and    12:14 | 10 issues.  You can even put them in the back of a truck as   12:16 |
| 11 say, "Hey, was that truck salvaged?  Did you guys at    12:14 | 11 long as there's proper ventilation and a way to escape.    12:16 |
| 12 your shop inspect it.  Your inspector, what was his    12:14 | 12    Q.   Okay.  Let's go to No. 8.    12:16 |
| 13 name?  Okay.  Did he go in the vehicle?  Did he check    12:14 | 13    A.   It's unlimited.  Believe it or not, it's    12:16 |
| 14 the seat belts?  Did he check the lights?  Did he check    12:15 | 14 unlimited in federal law.  You could have 100 people as   12:16 |
| 15 the brakes and make you step on the thing?"  It has to    12:15 | 15 long as there was a slot, a seat belt, ventilation, and    12:16 |
| 16 pass.  If it doesn't pass, you can't drive the vehicle.    12:15 | 16 a way to escape.  It doesn't have to be -- well, this is   12:16 |
| 17    Q.   Okay.    12:15 | 17 how -- this is what they are brainwashed.  They thought,   12:16 |
| 18    A.   You get a temporary operating permit.  That's    12:15 | 18 well, the vehicle comes out of the factory.  It had two    12:16 |
| 19 what you do; right?    12:15 | 19 seats.  Now, it's not going to be forever.  They're    12:16 |
| 20    Q.   Did you tell Officer Bates --    12:15 | 20 misinformed.  They're uneducated.  They go, "We enforce   12:16 |
| 21    A.   I told them that.    12:15 | 21 California law."  Well, federal law is above, and this    12:16 |
| 22    Q.   -- this was a CHP --    12:15 | 22 is a federal case.    12:16 |
| 23    A.   Yes.  It's standard.  CHP is the only ones that   12:15 | 23    Q.   Let's go to Request No. 8, which is on page 4.    12:16 |
| 24 do it and the DMV.  The CHP is first.    12:15 | 24 It says Request For Admission No. 8.  It states: "Admit    12:17 |
| 25    Q.   So --    12:15 | 25 that you received a citation during the traffic stop    12:17 |
| Page 175 | Page 177 |

1 that is the subject of the operative complaint."    12:17
2    A.  And I explained how that wasn't accurate    12:17
3 because the ticket matched maybe one officer's thought,    12:17
4 but the sergeant took over the stop.  You're not a cop,    12:17
5 I thought, so I'll tell you how it works.  The sergeant    12:17
6 said he -- when a sergeant shows up on a scene, they    12:17
7 automatically take over a stop.  You may not know this.    12:17
8        Now he takes responsibility.  Now he can either    12:17
9 support the first guy, which he did at one point, but    12:17
10 then later he said, "That's not why you're getting a    12:17
11 ticket."  Like he had a heart.  He had a conscience.    12:17
12 And he's like, "Well, it's because there's four people.    12:17
13 It had nothing to do with the seat belt.    12:17
14        Instead of me arguing with him, which I could    12:17
15 have -- I knew all these things.  I didn't want to do    12:17
16 it.  So I go, "Well, I'm disappointed because you    12:17
17 personally have inspected this truck."  And I did inform    12:17
18 him, if I remember right, that the DMV salvaged vehicle    12:17
19 was inspected by the same -- same office.  The Running    12:18
20 Springs Highway Patrol is the same place that inspected    12:18
21 my truck, the whole truck, to make sure it's safe.    12:18
22        We don't want to be in trouble.  I'm a Bible    12:18
23 translator.  Obey the laws.  I don't know if you know    12:18
24 that part.  I have to obey the laws, but not necessarily    12:18
25 the law of California.  But the laws of federal and then    12:18

Page 178

1 California if they don't go against federal -- right?    12:18
2 That can happen.    12:18
3        But in this case the guy even said, "We only    12:18
4 use California laws.  California Highway Patrol.  We    12:18
5 don't use" -- it was disturbing when I talked to the    12:18
6 sergeant.  This is a private conversation, though.  I    12:18
7 don't want to say too much here.  Somebody told me they    12:18
8 don't have to know the federal laws.    12:18
9        I was like "The Constitution, guys."  If the    12:18
10 federal law -- there's a federal law.  If there wasn't a    12:18
11 federal law, then California can create them.  Right?    12:18
12 But when there's a federal law that says you only need a    12:18
13 two-point harness and there's no limit to where you put    12:18
14 it, how you put it.  It's just a space.  If there's room    12:18
15 and someone fits and it's bolted with two bolts, it    12:18
16 doesn't have to be this way (indicating).  It says it in    12:19
17 the federal law.  And it's in my suit.  I think you can    12:19
18 read it somewhere.  That's all that's required.    12:19
19        So now California can't come in and say, "Well,    12:19
20 we don't think you should have four passengers."  Based    12:19
21 on what law?  Does it say it in the federal law?    12:19
22        People -- when I was a kid -- I don't know how    12:19
23 old you are.  I'm old -- we didn't have seat belts.  I'm    12:19
24 proud of that.  My mom -- we had a Jeep.  We were poor.    12:19
25 We had six people and a seventh, plus my mom, eight    12:19

Page 179

1 people in a 4 x 4.  We literally did sit on other    12:19
2 people's laps.  I used to stand up in the back of the    12:19
3 truck, and the cops (indicating) were okay with it.    12:19
4        And most -- and a lot of states don't even have    12:19
5 a seat belt requirement.  And the law says in most    12:19
6 states it's not a first -- not a first -- whatever you    12:19
7 call it.  Meaning they can't pull you over even for a    12:19
8 seat belt violation.  Even if they saw it.  You drove    12:19
9 right by them.  "That guy does not have a seat belt on."    12:19
10 They must first have another charge that you were    12:19
11 speeding and then go, "Oh, you didn't have a seat    12:19
12 belt on."    12:19
13        But in California they're allowing you to just    12:19
14 -- it's for money.  Clearly it's to get money.  I mean,    12:19
15 in my case it's harassment.  They're trying to lock me    12:19
16 up.  We had a camera on.  We had a sergeant show up.  I    12:20
17 was about to call other people because they were    12:20
18 going to get -- they were going to --    12:20
19    Q.  Who were you going to call?    12:20
20    A.  Sheriffs next.  I would have told the sheriffs.    12:20
21 There's good people in the sheriffs.  Every system has    12:20
22 good people.  I just don't know why people in the    12:20
23 highway patrol -- I was hoping it would have been that    12:20
24 sergeant.  The sergeant sold his soul, in my opinion.    12:20
25 It's really sad.  I knew exactly what happened.  He's    12:20

Page 180

1 filming me.  I won't say any more.  The camera's right    12:20
2 there.  If he didn't have that guy for a friend, he    12:20
3 would have reprimanded him in private.  He would have    12:20
4 said, "Yes, you're right.  You need to follow the    12:20
5 federal Constitution first."  In fact you have to swear    12:20
6 an oath to the federal.  You don't have to swear an oath    12:20
7 to California.  It's really jacked up if you think about    12:20
8 it.  They enforce California law, but you don't have to    12:20
9 swear an oath to us.  You can be a little shady.    12:20
10        You have to swear an oath to God and the    12:20
11 Constitution, though, which is interesting.  I'm a Bible    12:20
12 translator.  Right?  You're arresting a Bible    12:20
13 translator.  It's an arrest.  Did you know that that    12:20
14 stop was an arrest?  Every traffic stop is a minimum of    12:21
15 a misdemeanor or an arrest.  They have to have probable    12:21
16 cause and you have to be an immediate threat to the    12:21
17 community somehow.  And that on its own would be another    12:21
18 winning point.    12:21
19        And the court would be, How was someone having    12:21
20 a seat belt that he admitted was on that he didn't    12:21
21 believe was a factory one and a danger to who?  Who's    12:21
22 going to get hurt?  It's not going to come off.  In fact    12:21
23 it's safer than the ones that they installed.  Safer.    12:21
24 It's thicker.  It's bolted better.  I could prove it.    12:21
25 You could prove it with hydraulics and show you how    12:21

Page 181

46 (Pages 178 - 181)

1 these ones work.                           12:21
2      These ones cut your neck off. People don't   12:21
3 tell you this stuff. I used to do salvage cars. This   12:21
4 one here is so dangerous. And it's not required. No   12:21
5 one seems to know this, you know. You don't have to   12:21
6 have this. Even if it's installed, you can just -- you   12:21
7 have to this one (indicating).           12:21
8      There are excuses that we only do in   12:21
9 California, which is California's got stuff that goes --   12:21
10 you can't go against the federal Constitution. The   12:21
11 federal law is over the EPA, Environment -- you know,   12:21
12 DMV, Department of Motor Vehicles, federal agency said   12:21
13 you only have to have a two-point.         12:22
14      THE WITNESS: I'm talking way too fast. I do   12:22
15 feel sorry. I'm sorry about that. It's a lot of   12:22
16 information so if you go fast, but it's not fun to be   12:22
17 you.                                      12:22
18      I totally told them this was -- he needs to let   12:22
19 us go. I explained these things.          12:22
20 BY MR. HERNANDEZ:                        12:22
21      Q. So you don't believe you received a citation,   12:22
22 or is it --                              12:22
23      A. It's a wording issue. If you would have said,   12:22
24 "Did you get a citation," I would have said "Yes." But   12:22
25 you said if you read it carefully No. 8 -- do you want   12:22

                                          Page 182

1 me to read it out loud or not? It's up to you. "That   12:22
2 is subject of operative complaint."       12:22
3      Remember, the sergeant said the ticket -- so he   12:22
4 didn't give you the proper ticket. The sergeant said   12:22
5 this ticket was wrong. He said, "You're getting a   12:22
6 ticket for four people." The ticket said for non --   12:22
7 what he claimed was a non-factory seat belt. But the   12:22
8 charge was -- so remember -- so the wording was the   12:22
9 ticket was given to me. The ticket should have been   12:23
10 given -- if there was any validity -- would have been to   12:23
11 my daughter. That's the law of California. California   12:23
12 law. Federal law says two-point. He should have given   12:23
13 her a ticket.                            12:23
14      Q. So just to clarify, I understand that you   12:23
15 believe the citation was wrong and that's what --   12:23
16      A. If it's wrong, then it's not subject --   12:23
17      Q. And you went to the court --      12:23
18      A. There's two different officers. And the court   12:23
19 said I was correct.                      12:23
20      Q. Okay. Right.                     12:23
21      A. I didn't get to my whole case.    12:23
22      Q. My question is very simple.       12:23
23      A. Okay.                           12:23
24      Q. During the stop did you --        12:23
25      A. I got an invalid ticket not matching the   12:23

                                          Page 183

1 sergeant who took over the ticket. So he should have   12:23
2 given the ticket. This guy gave the ticket.   12:23
3      Q. Let me finish my question.        12:23
4      A. Sorry.                          12:23
5      Q. So during the stop you did receive a citation.   12:23
6 However, you believe the citation was unlawful; would   12:23
7 that be --                               12:23
8      A. That's not a belief. The judge ruled on it   12:23
9 honestly.                                12:23
10      Q. At the time --                   12:23
11      A. Well, I believed it was unlawful then too,   12:23
12 especially when the sergeant -- I don't know if you know   12:24
13 the legal thing. When a sergeant shows up, he has to   12:24
14 give me the ticket now. He took over the traffic stop.   12:24
15 This guy gave the ticket. So if you just want me to   12:24
16 answer and make it easy for you, Bates gave me a ticket   12:24
17 even though the sergeant said it was a different charge.   12:24
18 That makes it a null. I was given the wrong ticket.   12:24
19      The sergeant should have given me the ticket,   12:24
20 said, "Okay. I'm here. I've investigated this, and I   12:24
21 believe this shouldn't have four people on the thing   12:24
22 based on" -- they can't find a code. There's no code   12:24
23 for it. There's no limit on how many people in a   12:24
24 vehicle.                                 12:24
25      The only law, like I said, is the most open law   12:24

                                          Page 184

1 of all of them. I do DMV stuff. You only have to have   12:24
2 a seat belt on. It doesn't have to be a certain seat.   12:24
3 It doesn't have to be a certain shape. It's really   12:24
4 interesting. As long as that seat belt doesn't rip out   12:24
5 and you're within the box inside the vehicle --   12:24
6      Q. Okay.                          12:24
7      A. -- that's the law --             12:24
8      Q. All right.                      12:24
9      A. -- factual.                     12:24
10      Q. So I just want to kind of condense --   12:24
11      A. You need an answer to help you.   12:24
12      Q. I just want to condense this.     12:24
13      So you received a citation that was ultimately   12:25
14 deemed not valid; right?                 12:25
15      A. God is great. They have -- they have a free   12:25
16 lawyer. Officer of the law who got a badge and a gun.   12:25
17 I'm outnumbered. They got this great lawyer. I'm down   12:25
18 here a victim being interrogated as if I'd done   12:25
19 something wrong when I already won the case. If I was   12:25
20 here and I lost the case, I wouldn't be here, though.   12:25
21 Right? I wouldn't be here if the judge said, "Sir, you   12:25
22 guys did something wrong. There is a law that says the   12:25
23 seat belt, da, da, da and it doesn't have to be   12:25
24 factory."                                12:25
25      If he would have said, "Look, here's -- we   12:25

                                          Page 185

47 (Pages 182 - 185)

**Page 186**

1 looked it up. We took our time. It says you can't have 12:25
2 a non-factory seat belt, sir. Did you know?" That's -- 12:25
3 and this is the penal code or the civil code. 12:25
4      I would have been like, "I'm so sorry. I'll 12:25
5 pay the fine, and we'll never do it again, sir." I'm a 12:25
6 Bible translator. I follow the law if the law says it. 12:26
7 I looked up every law there was. DMV -- I had a stack 12:26
8 this thick (indicating) in my defense. We have five 12:26
9 ways we were innocent. You never see that. You only 12:26
10 need one. Right? Five different things that all said, 12:26
11 "You're a trash company. You're not responsible for the 12:26
12 passenger." And as a driver of a commercial truck, 12:26
13 it's -- people don't know this. A commercial truck is 12:26
14 even like a Chevy. They're not even that serious. 12:26
15 People don't know it. 12:26
16      If a person in their car -- the reason was too 12:26
17 because the idea was you're in a big truck or you're 12:26
18 working. You've got serious payload. You're doing 12:26
19 serious stuff. We want you to focus on the road. If 12:26
20 this passenger gets aggro and they go, "I don't want to 12:26
21 wear this seat belt anymore," they don't want you or 12:26
22 there fighting with them, "Hey, put your seat belt on. 12:26
23 I'm going to get a ticket from the cops." 12:26
24      So they went, "Okay. You just drive." If they 12:26
25 pull them over for something -- it's supposed to be for 12:26

**Page 187**

1 something else. But let's just say they pull them over, 12:26
2 "Hey, you" -- now the cop deals with them and says, 12:26
3 "Okay. You're getting a citation because you didn't 12:26
4 have" -- like I said, the lap belt thing makes it so you 12:26
5 can almost not pull anyone over. People don't know the 12:26
6 laws. Because if they knew that, they could say, "I 12:27
7 didn't have my thing on." But we were legit. We don't 12:27
8 drive around without seat belts. I have to follow the 12:27
9 law. This is crazy. 12:27
10   Q. Okay. 12:27
11   A. There's no chance I'm going to say, "Sir, I 12:27
12 don't believe in the law." I'm a Bible law translator, 12:27
13 word-for-word Bible translator. I give you the only 12:27
14 free one in the world. It's literally word-for-word. 12:27
15 There's no one Bible like it. You cross t's. You don't 12:27
16 even know about it, like things that are going on. We 12:27
17 give all this for free. We're just trying to help people. 12:27
18 We don't force it on you. We don't brainwash you. You 12:27
19 don't have to be a member. You come if you want. You 12:27
20 go if you want. We love people. What can we do to help 12:27
21 you? That's all we do. 12:27
22   Q. Okay. So I just want to -- 12:27
23   A. We won the case. I hope you focus on that the 12:27
24 most. The judge was on our side. 12:27
25   Q. I understand. 12:27

**Page 188**

1   A. I thought he was against us. He was aggro the 12:27
2 first day. The second day he was ready to roll. It's 12:27
3 like he had a vision. I prayed. Right? He gets there 12:27
4 in the morning. And I had this big stack of all these 12:27
5 laws. We're going to win, I think, but he still can go 12:27
6 against us. Right? 12:27
7      The genius judge -- don't doubt the system. 12:28
8 This is why I'm still going to teach positives. The 12:28
9 paperwork works. Right? He looks it up, and he goes, 12:28
10 "Sir, I just noticed this. You filled in the box" -- I 12:28
11 think it was A or something. "And it says the 12:28
12 passenger. You gave a ticket to Jeff Macy, a famous 12:28
13 Bible translator who loves people who's well liked by 12:28
14 everybody, who's friends with the people in power up 12:28
15 there who doesn't want to make a big deal out of this. 12:28
16 You should have given the ticket to her at least but you 12:28
17 didn't. What do you want to do? Do you want to let 12:28
18 this case go?" 12:28
19      He's like, "Well, yeah." 12:28
20      And then the judge lectures him. He goes -- I 12:28
21 remember this. This is a beautiful moment. Do you 12:28
22 realize that? We're getting totally hammered. There's 12:28
23 no hope. And then the judge goes, "Why did you fill in 12:28
24 the wrong box?" 12:28
25      And he goes, "Well, this is how we were 12:28

**Page 189**

1 trained." 12:28
2      I was like, "Isn't that an admission of, like, 12:28
3 incompetence and whatever else you want to call it?" 12:28
4   Q. Okay. Mr. Macy -- 12:28
5   A. And he goes, "Do you want to let the case go, 12:28
6 or do you want to still fight it?" 12:29
7   I go, "Well, I really wanted to fight it, to be 12:29
8 honest. I had a really good case, but I had to be 12:29
9 reasonable." 12:29
10   Q. Mr. Macy, we're not -- we don't dispute -- 12:29
11   A. We won. 12:29
12   Q. -- that your citation was dismissed. 12:29
13   A. I love the system. 12:29
14   Q. Okay. 12:29
15   A. It's not perfect, but eventually someone 12:29
16 gets -- 12:29
17   Q. I just want to summarize a couple issues that 12:29
18 we talked about because there's been a lot of testimony 12:29
19 that you provided today. 12:29
20   A. Oh, yeah. 12:29
21   Q. So I want to clarify two things, and we'll be 12:29
22 done. 12:29
23   A. God and Jesus loves all of you (indicating). 12:29
24   Q. So is it -- would it be accurate to state 12:29
25 that -- that you believed the stop was prolonged? 12:29

48 (Pages 186 - 189)

**Page 190**

| | | |
|---|---|---|
| 1 | A. It's a fact. | 12:29 |
| 2 | Q. Okay. | 12:29 |
| 3 | A. And I'd already known the law. | 12:29 |
| 4 | Q. What facts -- | 12:29 |
| 5 | A. He sat us in the truck. It was already past it | 12:29 |
| 6 | before I even went back. | 12:29 |
| 7 | Q. I'm just talking about the length of the stop. | 12:29 |
| 8 | A. It was over an hour. I can show you in | 12:29 |
| 9 | documents. | 12:29 |
| 10 | Q. Okay. | 12:29 |
| 11 | A. It shows up on the ticket. It shows up on the | 12:29 |
| 12 | MVARS cameras with the highway patrol. | 12:29 |
| 13 | Q. Right. We're not -- | 12:30 |
| 14 | A. It shows up on their video when we leave. It's | 12:30 |
| 15 | over an hour. It's really easy. | 12:30 |
| 16 | Q. So my question is to you. Can you just state | 12:30 |
| 17 | me the facts that you believe the stop was too long or | 12:30 |
| 18 | prolonged? | 12:30 |
| 19 | A. Well, the law -- the most -- the best case | 12:30 |
| 20 | scenario is 15 minutes. They've got to have a training | 12:30 |
| 21 | procedure. You can't hold them for more than | 12:30 |
| 22 | 15 minutes. The reasonable is five minutes, but the | 12:30 |
| 23 | 15, they kind of let it go. | 12:30 |
| 24 | And then they start bringing people in saying, | 12:30 |
| 25 | "Why is all your stops" -- for a lot of reasons. They | 12:30 |

**Page 191**

| | | |
|---|---|---|
| 1 | have other things to do, especially on a seat belt, you | 12:30 |
| 2 | know. It is -- if it's not criminal -- so the law -- I | 12:30 |
| 3 | looked. It's 15 minutes. That's with weird things. | 12:30 |
| 4 | The supervisor shows up. It should be quick. | 12:30 |
| 5 | The supervisor shows up, and he should have | 12:30 |
| 6 | known immediately that he'd already been there. He | 12:30 |
| 7 | should have read the code. Okay. The code says, "No | 12:30 |
| 8 | one in the state of California shall drive without a | 12:30 |
| 9 | seat belt securely fastened." Okay. The ticket that he | 12:30 |
| 10 | filled in said -- he wrote in -- he wrote in. Right? | 12:31 |
| 11 | He put the wrong box on who was getting charged. But | 12:31 |
| 12 | then when he wrote it, it was secured. This is not -- | 12:31 |
| 13 | you don't have to be a genius to go you have to be | 12:31 |
| 14 | unsecured. He wrote in his own writing "secured by a | 12:31 |
| 15 | non-factory seat belt." He didn't put in, "I felt it | 12:31 |
| 16 | was unsafe. It wasn't mounted properly. I didn't -- I | 12:31 |
| 17 | thought something could happen. Maybe someone -- I | 12:31 |
| 18 | thought it would break. I pulled it. It was loose." | 12:31 |
| 19 | There's no credibility to saying that you did | 12:31 |
| 20 | nothing wrong. This is why this is so hard on me when I | 12:31 |
| 21 | was in court. I was like, "Your Honor" -- he didn't | 12:31 |
| 22 | want to keep hearing -- "please read this out loud one | 12:31 |
| 23 | time." He finally did. I think that's when God -- and | 12:31 |
| 24 | then he prayed -- in the morning he gets there. He | 12:31 |
| 25 | defended me for free. The judge threw it out. He was | 12:31 |

**Page 192**

| | | |
|---|---|---|
| 1 | lecturing. | 12:31 |
| 2 | He said, "You need to know your job. This | 12:31 |
| 3 | bringing people" -- you know, that was a criminal | 12:31 |
| 4 | charge. If I didn't pay the fine, I would have gone to | 12:31 |
| 5 | jail. If I didn't show up, I would have gotten a | 12:31 |
| 6 | warrant to go to jail. And here I am winning the case. | 12:32 |
| 7 | So this is why he should really be in trouble. | 12:32 |
| 8 | He drug us through the court for two days. Even after | 12:32 |
| 9 | begging him -- I talked to him nicely. He would never | 12:32 |
| 10 | smile. I said, "Look, all you had to do was say sorry." | 12:32 |
| 11 | I even told his sergeant, "Look, people make mistakes. | 12:32 |
| 12 | After reading all this stuff, could you please -- the | 12:32 |
| 13 | judge is going to rule in our favor. In the meantime | 12:32 |
| 14 | it's going to look bad on your whole department. We're | 12:32 |
| 15 | going to lose all trust with you guys. | 12:32 |
| 16 | And now my kids are being told factually by | 12:32 |
| 17 | their dad, who's pretty good at what I do, "Do not trust | 12:32 |
| 18 | the highway patrol whatsoever. You need to film until | 12:32 |
| 19 | the day you die anybody with the highway patrol car up | 12:32 |
| 20 | in our area. Not everywhere. You need to be filming. | 12:32 |
| 21 | You need to call witnesses immediately and don't drive | 12:32 |
| 22 | anywhere by yourself." | 12:32 |
| 23 | All my kids do not drive anywhere without a | 12:32 |
| 24 | witness. If we -- if I didn't have my kids with me, I | 12:32 |
| 25 | would be locked up and my truck would be impounded and | 12:32 |

**Page 193**

| | | |
|---|---|---|
| 1 | there was no way I was going to win that case. What | 12:32 |
| 2 | would I have in my defense? | 12:32 |
| 3 | Q. Okay. | 12:32 |
| 4 | A. If he did an investigation, that's what they | 12:32 |
| 5 | try to get you for, like this. You say I'm not | 12:32 |
| 6 | interrupting you. That's their scam. | 12:33 |
| 7 | Q. All right. So in your complaint you state the | 12:33 |
| 8 | following: It says, "Officer entered truck without | 12:33 |
| 9 | permission and seized private property without consent." | 12:33 |
| 10 | We watched the videos -- | 12:33 |
| 11 | A. Video is taking of private property. I have to | 12:33 |
| 12 | make it clear because you might think, well, it's a | 12:33 |
| 13 | physical thing. | 12:33 |
| 14 | Q. Can you please let me finish the question. | 12:33 |
| 15 | A. All right. I didn't know if you understood | 12:33 |
| 16 | that. That's all. | 12:33 |
| 17 | Q. What I was going to say was that we watched the | 12:33 |
| 18 | video -- | 12:33 |
| 19 | A. Uh-huh. | 12:33 |
| 20 | Q. -- where you have those two instances where -- | 12:33 |
| 21 | A. You see him in the truck. | 12:33 |
| 22 | Q. Right. | 12:33 |
| 23 | You see Officer -- first you see Officer -- | 12:33 |
| 24 | A. Someone taking the pictures. There's two | 12:33 |
| 25 | instances. I'm sorry. I'll try not to say a single | 12:33 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    thing.                                    12:33
2      Q.  The video demonstrates Officer Bates one time    12:33
3    and then a second time accompanied with Sergeant    12:33
4    O'Brien; correct?                          12:33
5      A.  Uh-huh.                             12:33
6      Q.  Right?  Yes?  Correct?              12:33
7      A.  Yes.  I'm trying not to interrupt.  I'm trying    12:33
8    to be -- you know, don't get me going.  Right?    12:33
9      Q.  That's okay.                         12:34
10        Then the video also demonstrates that Officer    12:34
11    Bates appears to be taking a photograph with a cell    12:34
12    phone.                                    12:34
13        Would you agree to that?              12:34
14      A.  Leaning in the truck (indicating) --    12:34
15      Q.  Right.                             12:34
16      A.  -- inside the vehicle.              12:34
17        He's leaning in the vehicle taking the picture.    12:34
18    I mean, it's super solid.                 12:34
19      Q.  So when your complaint references, "Seized    12:34
20    private property images without consent," you're talking    12:34
21    about the photographs?                    12:34
22      A.  Yes.                              12:34
23      Q.  Okay.                             12:34
24      A.  Let me know when to say something so I don't    12:34
25    interrupt.  Sometimes I think you're done, but you're    12:34
                                          Page 194

1    still going.  You have little gaps sometimes.    12:34
2      Q.  All right.  Mr. Macy, is there any other    12:34
3    reasons why at this point you believe you are entitled    12:34
4    to compensation that we haven't discussed yet?    12:34
5      A.  The legal stuff is a big deal.  You went to    12:34
6    four years and you had expert teachers.    12:34
7      Q.  I'm asking you, other than what we've already    12:34
8    discussed, do you believe there's any other factors?    12:34
9      A.  Emotional distress for my whole family is    12:34
10    pretty serious.  They won't tow vehicles too.  There's a    12:35
11    whole history that accumulated to this event.  This    12:35
12    event is when I filed the paperwork.  Before, I was    12:35
13    letting them go, forgiving them, turning the other    12:35
14    cheek.  I don't want any drama.  I teach -- I deal with    12:35
15    almost every criminal up there.  Right?  I help them    12:35
16    out.  Not in a bad way.  I don't do drugs.  I tell them    12:35
17    to get off drugs.  I tell them to obey the cops,    12:35
18    cooperate.  Right?  "Eventually if you're right, do the    12:35
19    paperwork and all that."                  12:35
20        So they've done a lot of bad stuff.  They won't    12:35
21    tow vehicles.  To this day I have illegal vehicles that    12:35
22    show up.  They don't tow them anywhere else.  We're    12:35
23    being harassed continually.  Since I did the paperwork,    12:35
24    now they stopped.  So this is a big deal.  This is real.    12:35
25    You have to do paperwork.                 12:35
                                          Page 195

1    Out of this I tried the complaint.  I talked to    12:35
2    people on the phone.  I asked to please say you're    12:35
3    sorry.  For years they've been doing illegal activity    12:35
4    against our religious development for years.  Pulling me    12:35
5    over for a license plate and then saying, "How much is    12:35
6    your property worth?  How many millions is it worth?"    12:35
7        And I'm like trying to play dumb.  Right?  I    12:36
8    don't let them know.  I'm like, "why are you curious?"    12:36
9    You know, I'm playing like I have no idea.  And then all    12:36
10    of a sudden they leave.  In the meantime I get pulled    12:36
11    over on the side of the road.  It's not a good -- not a    12:36
12    safe place.  If you don't know the forest, there's a    12:36
13    forest road.  There's no houses in sight.  I'm here    12:36
14    luckily with my family.  You don't -- you don't do what    12:36
15    I do.  You don't understand -- the what -- you have to    12:36
16    look at all the cases and see what's going on.  They're    12:36
17    after me.  Factually over 300.  We won a case against    12:36
18    the Board of Supervisors.             12:36
19      Q.  Right.                           12:36
20        So you --                         12:36
21      A.  They are trespassing.  They're arresting me.    12:36
22    And they pulled me over and detained me forever.  If    12:36
23    they don't do -- if something doesn't happen, it's    12:36
24    going -- it's going -- I'm going to be dead.  You guys    12:36
25    remember me, I hope.                    12:36
                                          Page 196

1      Q.  That's why I'm trying to understand the scope    12:36
2    of your emotional distress claim because frankly --    12:36
3      A.  You wouldn't want to be me.  You wouldn't do    12:36
4    what I do.  You would not risk your life to tell people    12:36
5    the truth.  I don't believe that.  I know so many people    12:36
6    say --                                12:36
7        I do a suicide hotline.  Guess what?  When you    12:36
8    ask someone, "Do you want to volunteer to do the suicide    12:36
9    hotline," they're always like, "Yeah, yeah, yeah."  As    12:37
10    soon as they get a call, they quit.  I do suicide    12:37
11    hotline sadly, help out police and fire department.    12:37
12    They don't even --                    12:37
13        Free Bible is the biggest thing by far because    12:37
14    when you have a legal document, you can defend yourself.    12:37
15    You can have knowledge.  When you don't have access to a    12:37
16    proper Bible -- you don't even know about tithing.  You    12:37
17    don't know how brainwashed you are.  I hope on your own    12:37
18    personally you look at my website.  It's 1611bible.us.    12:37
19    Take the brainwashing test and see -- not my opinion.    12:37
20    I'm not a druggy.                     12:37
21        It says, "This is what they're doing.  This    12:37
22    is" -- then you get the answer wrong.  Then it tells you    12:37
23    the Bible verse.  Now, who gave you that?  I did.    12:37
24    Without me no one's given it to you.  I don't know if    12:37
25    you get that.  No one else is exposing the churches and    12:37
                                          Page 197

50 (Pages 194 - 197)

Page 198

```
 1   the government.                        12:37
 2        You don't know how much money they got paid.   12:37
 3   Burrtec got paid -- think about this if you want to --   12:37
 4   here's the connection with your case:  Why would the   12:37
 5   highway patrol want to get me?  That's a question.   12:37
 6   Right?  Motive.  You don't have to prove motive.  But   12:37
 7   why would they really want to get me?  What did I   12:38
 8   allege -- when I started finding out what was going on   12:38
 9   with the other thing, it all -- different things started   12:38
10   coming together.  Right?                 12:38
11        Burrtec makes a lot of money.  In our area   12:38
12   where we live, you weren't even allowed to have a trash   12:38
13   service before.  You had to do your own trash or you   12:38
14   could pay a small local company to dump your trash.   12:38
15   Sorry I didn't say it right.  Okay?          12:38
16        In fact the government up there said no.  The   12:38
17   reason they didn't want it, they didn't want trash cans   12:38
18   in front of everyone's house.  Right?  And the sound,   12:38
19   smog.  So Burrtec started forcing us to pay for a   12:38
20   service we didn't need.  I'm already a trash company.   12:38
21        So I started investigating, is this legal?   12:38
22   Then there was all this persecution.  I finally started   12:38
23   filing paperwork.  Right?  I didn't want to do that, but   12:38
24   God said I could do it.  It's peaceful.  It's not   12:38
25   harassing or any kind of negativity.      12:38
```

Page 199

```
 1        So I found out that's illegal.  You can't -- so   12:38
 2   the government of where I'm at --           12:38
 3        You're not from here probably.  Are you from   12:38
 4   San Bernardino?  If you're not, you're not going to   12:38
 5   care.  This is a bummer.  So you're not going to really   12:39
 6   care about this story to understand it.       12:39
 7        But if you're in San Bernardino now, you're   12:39
 8   forced to buy a trash.  When I mean "forced," I'm going   12:39
 9   to explain it.  If you don't pay for that trash service,   12:39
10   the County will give out your private information, which   12:39
11   is illegal.  You're a federal lawyer.  You know this.   12:39
12   It's illegal.  They're giving it out.         12:39
13        You got -- where we live is rich people.  You   12:39
14   got P.O. Boxes.  They don't want to know where people   12:39
15   live.  And this is the worst part.  The County of   12:39
16   San Bernardino will collect the money on behalf of a   12:39
17   private company called Burrtec.             12:39
18        Now, why would they want to do that?  Why would   12:39
19   they want to hire people from down here to come up there   12:39
20   with these smog trucks, so why -- how do they both   12:39
21   benefit?  So Burrtec -- I'm going to say it slowly and   12:39
22   quick -- they do not have to get smog tests on their   12:39
23   trucks.  That's a big financial savings for them.   12:39
24        So what they do is they gave them a place to   12:39
25   park on County property up there in San Bernardino.  No   12:39
```

Page 200

```
 1   one knows this stuff, but I know this through my   12:39
 2   investigation.  Right?  They're parking up there, so   12:40
 3   they're not getting inspected.  It's a law.  We all have   12:40
 4   to get our vehicles smogged.  I have a truck.  They're   12:40
 5   getting me -- I have to pay fees for stuff they don't   12:40
 6   even inspect.                           12:40
 7        They're up, so they're gaining.  Now they're   12:40
 8   giving the right to trespass, the County.  Part of their   12:40
 9   ordinance.  Right?  You can go through streets that   12:40
10   normally you couldn't go on with heavier trucks than you   12:40
11   should be, which is damaging the roads.  Interesting;   12:40
12   right?  So they're gaining.  They don't have to repair   12:40
13   the roads.  They don't have to get smogs, brakes.   12:40
14   They're not checking our drivers.  We're making money.   12:40
15   And now everybody has to buy trash.  That's enriching   12:40
16   them greatly because normally people -- not everybody   12:40
17   wants to buy trash.  So why would the County do this?   12:40
18   Q.  Mr. Macy --                         12:40
19   A.  Money.                             12:40
20   Q.  Mr. Macy, I'm going to stop you there   12:40
21   because --                             12:40
22   A.  Okay.                              12:40
23   Q.  -- I'm -- I don't understand --       12:40
24   A.  So the highway patrol is defending them by   12:40
25   shutting me down.                       12:40
```

Page 201

```
 1   Q.  I don't understand how the emotional distress   12:40
 2   claim resulted from this.                12:40
 3   A.  It's proof of what I've alleged.      12:40
 4   Q.  Okay.  So are you suggesting then that you had   12:40
 5   emotional distress prior to this incident?   12:41
 6   A.  But not as great.                   12:41
 7   Q.  And then this incident happened causing   12:41
 8   emotional distress --                   12:41
 9   A.  Well, now it's -- finish.            12:41
10   Q.  -- exacerbated -- --                12:41
11   A.  Let me know when I can --            12:41
12   Q.  -- exacerbated your emotional distress.   12:41
13        And my question, then, is explain to me what   12:41
14   those effects of your emotional distress -- how those   12:41
15   have impacted your life.  But just talk about the   12:41
16   emotional distress.                     12:41
17   A.  Well, I'm a religious leader and I teach,   12:41
18   number one, to obey the government.  How sad is this?   12:41
19   And now I'm in a conflict of obey the government but   12:41
20   file the paperwork.  It changes -- it's changing my   12:41
21   stuff.  Right?  I have to push this now.  I have to tell   12:41
22   people because you never want to lie to people.  Right?   12:41
23        So the Bible says obey the government, do --   12:41
24   there was an intent and purpose, for example, pay the   12:41
25   taxes and the government won't be after you.  But if the   12:41
```

51 (Pages 198 - 201)

Page 202

```
 1   gov- -- if people get corrupt and they do come after    12:41
 2   you, what should you do?  It just happens to be the    12:41
 3   authorities.  Well, don't be violent.  You know, don't    12:42
 4   fight them back, I mean, unless you really can get away.    12:42
 5   I mean, they're probably going to win.  They're going to    12:42
 6   shoot you or something so don't resist, you know.    12:42
 7        But then what's the solution?  I'm a leader.  I    12:42
 8   have to tell people, "Let's not get violent."  Why do    12:42
 9   people get violent?  They get their feelings hurt.  They    12:42
10   don't know how to resolve things.  So you guys need to    12:42
11   be educated.  You almost all have to be lawyers.    12:42
12        So I tell them, "I'll help you out for free if    12:42
13   I can.  You need to educate yourself."  Now I've changed    12:42
14   my whole doctrine, if that's what you want to call it.    12:42
15   My doctrine.  It sounds shady.  But a teaching.  That    12:42
16   you need to be educated with paperwork because without    12:42
17   this my truck would be gone, my business would be gone.    12:42
18   We would leave the area without a doubt immediately if I    12:42
19   had no paperwork.  We're in danger.    12:42
20        If you -- if you take the time to look at all    12:42
21   of our cases, it won't be believable.  You won't believe    12:42
22   it unless you try to take the -- figure out that there's    12:42
23   a lot of money the County is getting paid to let Burrtec    12:42
24   violate all of our federal rights.  And if no one stands    12:43
25   up, people don't know how much trouble they're in.    12:43
```

Page 203

```
 1        This -- this act, if it doesn't get stood up    12:43
 2   to, you're done.  If they can stay a monopoly and    12:43
 3   enforce it -- I don't know if you understand it --    12:43
 4   Burrtec, for example -- I'm trying to give you one you    12:43
 5   can understand.  You have to buy their trash.  The    12:43
 6   County is going to put a lien on your property and take    12:43
 7   everything you own, the threat of your house.  You know,    12:43
 8   these are all liens against your house, against your    12:43
 9   vehicle.    12:43
10        Highway patrol is against your vehicle.  Right?    12:43
11   Then it can go into collections.  But highway patrol    12:43
12   puts you in jail.  It's no joke.  I have to teach now    12:43
13   everybody, you need to know the laws.  Right?  You need    12:43
14   to take the Fifth Amendment anytime you can if they let    12:43
15   you.  And if you can't sue -- the reality is I have to    12:43
16   teach if the highway patrol abuses you.  They threaten    12:43
17   you.  They're clearly oppressing you.  You know this is    12:43
18   legit.  You're not fake.  You're not making stuff up.    12:43
19   You're not just paranoid.    12:43
20        If you file a complaint with the sergeant,    12:44
21   they're going to come after you harder.  That's what    12:44
22   happened to us.  You may not.  There is good    12:44
23   departments.  It's a 50/50, I would say.  They're all    12:44
24   friends.  You need to be educated.  Cops don't have a    12:44
25   lot of friends.  I don't want to sound shady.  There's    12:44
```

Page 204

```
 1   reasons.  Right?    12:44
 2        They don't trust them.  These people hate cops    12:44
 3   because there's bad cops out there.  And that one bad    12:44
 4   cop makes everybody hate them, for example.  I try to    12:44
 5   teach to love the police and love the authority.    12:44
 6   Q.   You don't get paid from your --    12:44
 7   A.   No, I don't.    12:44
 8   Q.   -- religious organization; right?    12:44
 9   A.   No.    12:44
10   Q.   It's all volunteer; right?    12:44
11   A.   Absolutely.  I'm clean as a whistle.  Not one    12:44
12   penny.  And yet people go, "How do you have so much?"    12:44
13   Well, we love people.  Try it.  Try doing it right, see    12:44
14   where you end up.  It may not be cash, but it's a place.    12:44
15   It's a truck that runs.    12:44
16   Q.   Have you lost any business as a result of --    12:44
17   A.   Yeah.    12:44
18   Q.   -- this stop?    12:44
19   A.   A lot of police people.  They've heard about    12:44
20   the case.  We had a lot of -- sadly it was one of our    12:44
21   biggest clients was the police.  The sergeant was one of    12:44
22   our customers.  Lots of police.    12:45
23   Q.   So do you have --    12:45
24   A.   Because they like our family.  They don't want    12:45
25   criminals showing up on their property.    12:45
```

Page 205

```
 1   Q.   Do you have any documentation demonstrating --    12:45
 2   A.   I don't want to expose all people like that.    12:45
 3   There's good police.  They just -- they're friends and    12:45
 4   now they're freaked out because, look, I sued -- this is    12:45
 5   so bad to sue the highway patrol to tell people to obey    12:45
 6   the authorities.    12:45
 7   Q.   You need to let --    12:45
 8   A.   It's conflictive.    12:45
 9   Q.   You need to let me finish my question.    12:45
10   A.   Sorry.    12:45
11   Q.   Do you have any documentation demonstrating or    12:45
12   reflecting that you have lost business from law    12:45
13   enforcement personnel?    12:45
14   A.   We wouldn't do that.  We're Godly.  I have tons    12:45
15   of customers.  Right?  And now they're not calling.    12:45
16   They -- they all know.  This is Running Springs.  They    12:45
17   all know.  The sheriffs know because of that case that    12:45
18   got dismissed against the thing.  They know what's going    12:45
19   on.  I have lawsuits against the police.    12:45
20   Q.   So --    12:45
21   A.   They know.    12:45
22   Q.   So my question is, do you have the    12:45
23   documentation demonstrating --    12:45
24   A.   No.  I mean, I could if I had -- if there was a    12:45
25   good way that was safe.  I'm not going to give out    12:46
```

52 (Pages 202 - 205)

1  police -- I still do things right. I'm not going to        12:46
2  give out, "Here's the police officer's address. Here's     12:46
3  his name." Big guys that are retired.                      12:46
4        They love our family. We've been all over            12:46
5  their property because they don't want druggies on their   12:46
6  property. They want people that respect the police. We     12:46
7  respect the police. I told you my friend's on the board    12:46
8  of directors. We like police. I still like them. I am      12:46
9  not going to let this blow off my whole -- but I have to   12:46
10 modify my teaching. You need to be able to file a          12:46
11 lawsuit because if you do internal affairs, you end up     12:46
12 in jail.                                                   12:46
13       If you do a lawsuit -- look, you showed up.          12:46
14 There's a chance that things are going to get right.       12:46
15 It's your only chance. There is no other -- there's        12:46
16 nothing else left in America.                              12:46
17    Q.  So then you think you've lost law                   12:46
18 enforcement --                                             12:46
19    A.  A lot of law enforcement. And they know a lot       12:46
20 of people. Sorry.                                          12:46
21    Q.  Let me finish the question, sir.                    12:46
22       You believe that you have lost law enforcement       12:46
23 personnel business because of this lawsuit?                12:46
24    A.  Absolutely. For sure. For sure. It shouldn't        12:46
25 have been necessary. I tried to talk them out of it.       12:46

Page 206

1  You can ask. In private I made calls. I'm not going to    12:47
2  say what they said. "Please let's get this resolved."     12:47
3        Even after the case was over, they refused, and     12:47
4  I'm still getting dragged through trial. I'm going to     12:47
5  win this case. I can't wait for a jury. Can you           12:47
6  imagine real people hearing what the sheriffs have been   12:47
7  doing and the highway patrol? They're going to go stick   12:47
8  them. That's what I think. I don't mean stick them        12:47
9  physically. Sorry. No violence.                           12:47
10    Q.  Mr. Macy, I don't have any other questions. I       12:47
11 know that you wanted the videographer's information.       12:47
12    A.  In case something gets shady, we need proof.        12:47
13    Q.  I'll --                                             12:47
14    A.  It's all about how it turns out.                    12:47
15    Q.  I'm going to let -- have him give it to you         12:47
16 after we go off the record. Okay?                         12:47
17    A.  Thank you.                                          12:47
18    THE VIDEOGRAPHER: This concludes today's               12:47
19 deposition of Jeff Macy. The time is 12:46 p.m. We are    12:47
20 now off the record.                                       12:47
21       (The deposition concluded at 12:46 p.m.)
22              --oOo--
23
24
25

Page 207

1        (Signature page to the deposition
2        of Jeff Macy)
3
4               --oOo--
5
6        I hereby certify under penalty of perjury that
7  I have read the foregoing transcript. Corrections, if
8  any, were noted by me, and the same is now a true and
9  correct transcript of my testimony.
10       Executed this_____ day of_____,
11 2024, at_____, California.
12
13
14       _____
         JEFF MACY
15
16
17
18
19
20
21
22
23
24
25

Page 208

1
2
3        REPORTER'S CERTIFICATE
4
5        I, STACY M. WILSON, C.S.R. No. 9530, do hereby
6  certify:
7        That prior to being examined, the witness named
8  in the foregoing deposition, JEFF MACY, was by me
9  administered an oath to testify to the truth, the whole
10 truth, and nothing but the truth;
11       That said deposition was taken before me at the
12 time and place therein set forth and was taken down by
13 me in shorthand and thereafter was transcribed into
14 typewriting under my direction and supervision, and I
15 hereby certify the foregoing deposition is a full, true,
16 and correct transcript of my shorthand notes so taken.
17       I further certify that I am neither counsel for
18 nor related to any party to said action, nor in any way
19 interested in the outcome thereof.
20       Witness my hand this 14th day of October, 2024.
21
22
23
24       _Stacy M. Wilson_____
         STACY M. WILSON, CSR NO. 9530
25

Page 209

53 (Pages 206 - 209)

1  JULIO A. HERNANDEZ, ESQ.

2  julio.hernandez@doj.ca.gov

3                           OCTOBER 14, 2024

4  RE: Jeff Macy, Et Al. v. California Highway Patrol Et Al

5  10/1/2024, Jeff Macy, (#6884847).

6  The above-referenced transcript has been

7  completed by Veritext Legal Solutions and

8  review of the transcript is being handled as follows:

9  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

10    to schedule a time to review the original transcript at

11    a Veritext office.

12  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

13    Transcript - The witness should review the transcript and

14    make any necessary corrections on the errata pages included

15    below, notating the page and line number of the corrections.

16    The witness should then sign and date the errata and penalty

17    of perjury pages and return the completed pages to all

18    appearing counsel within the period of time determined at

19    the deposition or provided by the Code of Civil Procedure.

20    Contact Veritext when the sealed original is required.

21  __ Waiving the CA Code of Civil Procedure per Stipulation of

22    Counsel - Original transcript to be released for signature

23    as determined at the deposition.

24  __ Signature Waived – Reading & Signature was waived at the

25    time of the deposition.

                                                    Page 210

1  __ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF

2    Transcript - The witness should review the transcript and

3    make any necessary corrections on the errata pages included

4    below, notating the page and line number of the corrections.

5    The witness should then sign and date the errata and penalty

6    of perjury pages and return the completed pages to all

7    appearing counsel within the period of time determined at

8    the deposition or provided by the Federal Rules.

9  _X_ Federal R&S Not Requested - Reading & Signature was not

10    requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    Page 211

54 (Pages 210 - 211)

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT B

# Excerpt of the Deposition of Jeff Macy

**Case Name:** Macy v. Bates
**Transcript:** [10/1/2024 9:00 AM] Jeff Macy

### Pg: 65 Ln: 25 - Pg: 73 Ln: 5

65:25        Q.   I just want to get some quick background.

66: 1             What kind of cell phone was this video taken

   2        on?

   3        A.   Right here.  My phone.

   4        Q.   Do you know what type of phone that is?

   5        A.   Samsung Galaxy Note 10, I think.  It's not a

   6        weapon.

   7        Q.   Okay.

   8        A.   That's the reason they said I -- the sergeant

   9        said I couldn't record.  He thought this was a weapon.

  10        Q.   Sir --

  11        A.   It's a battery on top of the phone.  It's            0

  12        relevant.

  13        Q.   So my understanding is that you initially

  14        started to record and then during the time that you were

  15        recording, at one point you gave the cell phone to one

  16        of your children; right?

  17        A.   Yeah.  I was forced to.  I was ordered to.

  18        Q.   Okay.

  19        A.   It was lawful command.  He's a sergeant.  Not

  20        just an officer.  He's a sergeant.  Very expected to be

  21        professional and know the laws of the state of

  22        California and federal law.  You are allowed -- in fact

  23        to video-record an officer is why the law exists.  It's

  24        not for any other reason.  I bet you already know it by

  25        heart, I'm sure.

67: 1             Every citizen has a right involving officers

   2        and the public to record an officer.  So I was doing

   3        that peacefully.  Held it like this (indicating).

   4        Didn't hold it -- I wasn't acting -- I like police.  My

# Excerpt of the Deposition of Jeff Macy

**Case Name:** Macy v. Bates
**Transcript:** [10/1/2024 9:00 AM] Jeff Macy

5      board of directors is a sheriff.  You know, we believe

6      in law and order.

7          Q.   Okay.

8          A.   We tried to get him to not harass us.  Right?

9      So we're just filming peacefully.  I'm filming.

10         Q.   Just so I have it on the record, you had

11     indicated just now you were holding your phone kind of

12     like breast, about the size of your chest?

13         A.   That's how the police do it.

14         Q.   -- in --

15         A.   The exact same way.

16         Q.   -- in what we would call portrait mode up and

17     down; right?

18         A.   This is not -- this is not a weapon style.

19     It's some type of -- he knew us.  The sergeant knew we

20     were good.  He even told this guy, "These are good

21     family people."

22         Q.   Okay.

23         A.   We didn't come across as threatening.

24         Q.   I had asked you earlier and you agreed that

25     you -- at one point you provided the phone to one of

68: 1  your children to continue the videotape?

2          A.   That's not the right wording.  That's not

3      proper.

4          Q.   You indicated you were ordered?

5          A.   The sergeant said, "You cannot film because

6      why" -- or he goes, "Could you set" -- this is why it

7      was another red flag.  This is really bad.  The first

8      guy is shady.  Not the second guy, which I thought was a     3

9      good guy.  Right?

10              He goes, "You guys, can you please set your

# Excerpt of the Deposition of Jeff Macy

**Case Name:** Macy v. Bates
**Transcript:** [10/1/2024 9:00 AM] Jeff Macy

```
11   phone down."  Now, what does that normally mean in law

12   enforcement?  You're getting arrested.  You got to put

13   all your stuff down.  They're arresting you.  Right?

14   That's why you put it down.  There's no logical reason.

15   This is not -- so later I was smart, while I was

16   backing, to hand it to my son.  Right?

17        Q.   Okay.

18        A.   I go, "Can I give it to my son?"

19             He goes, "Yeah."

20        Q.   Okay.  So --

21        A.   I was smart.  On the way walking over to my

22   son, I turned around and said, "Why -- why can't I

23   record you?"

24             He goes, "Because that could be a weapon."

25   This cell phone with the battery on it.

69: 1     Q.   Okay.

2         A.   It's not a taser.  It's not anything dangerous.

3    I'm not a dangerous person.  I have no violence in my

4    background.  I don't have a threat towards any police.

5    I love everybody.  Even shady people still change.  I

6    deal with dangerous people all the time.  That's what we

7    do.  We still believe in forgiveness and change.

8         Q.   Mr. Macy --

9         A.   So I handed it to him.  I said, "Please record

10   for me, Josiah."

11        Q.   What's the name of the son you gave the --

12        A.   Josiah Macy.  Who I'm blessed to have -- if I

13   didn't have him there, I would have no film, guys.  We

14   would have no proof that the officer had identification

15   folded over, refused to give me his name.

16        Q.   So then --
```

# Excerpt of the Deposition of Jeff Macy

**Case Name:** Macy v. Bates
**Transcript:** [10/1/2024 9:00 AM] Jeff Macy

17      A.   We would have no evidence.

18      Q.   So at that point --

19      A.   We would have lost our case.

20      Q.   At that point, then, you gave it to your son,

21  and he continued recording until the end of the video?

22      A.   I told him.  He knows.  I said, "You need to

23  record."  He knew my life was in jeopardy.

24      Q.   Okay.  I'm trying to establish who recorded

25  when.  Okay?

70: 1        Initially you started recording.  You were

2  asked by the officer to provide it to your son.

3      A.   Sergeant.

4      Q.   Or the sergeant.  I'm sorry.

5           The sergeant --

6      A.   He didn't ask.  He commanded.  Officers don't      4

7  ask, "Hey --

8      Q.   Sir --

9      A.   -- you like the weather?"                           4

10          No.  They go, "Put the phone down."

11      Q.   So I might have used the wrong word.  So let

12  me restart --

13      A.   And then they handcuff you.  That's the normal

14  thing.  Do you think I was concerned?

15      Q.   Mr. Macy --

16      A.   For my daughter having a seat belt on they

17  didn't think was sufficient.

18          This is out of control.  I hope you would

19  investigate this.

20      Q.   Mr. Macy, you initially were videotaping.

21          The sergeant then commanded you to give it to

22  your son?

# Excerpt of the Deposition of Jeff Macy

**Case Name:** Macy v. Bates
**Transcript:** [10/1/2024 9:00 AM] Jeff Macy

23    A.   Commanded.  Gave an order -- a lawful order is

24    the proper wording.  It's a called a lawful -- he

25    believed it was lawful.  I believed it was unlawful.

71: 1    Q.   Okay.  So then at that point, then, you gave it

2    to your son Josiah?

3    A.   Yes.  I was smart, intelligent.  I'm not

4    going -- if I were to obey his command completely, we

5    would not have a case.  You guys would have got away

6    with harassing me and my family for over an hour that

7    we won in court.

8    You made us go all the way down the hill, go

9    through a two-day trial, and the judge -- I didn't even

10    have to finish it off.  Didn't even get to the rest of

11    my evidence -- said, "This" -- he told the officer, "Was

12    this an illegal ticket?  Did you fill in the wrong box?"

13    And he goes, "Yeah."

14    Well, then he explained it to him, "This box --

15    this box that you filled in on the ticket is for a

16    passenger.  You got Jeff Macy in court, a famous Bible

17    translator who gives people his life for free.  And

18    guess what?  Do you want to dismiss this ticket?"

19    Q.   Mr. Macy, I was asking who was videotaping.  I

20    didn't finish my question.

21    A.   Okay.

22    Q.   So Josiah, then, once he took the cell phone,

23    videotaped it until the end of the stop; right?

24    A.   Until the end.  They said, "Get in your car."

25    Q.   Okay.  Once you got in the vehicle --

72: 1    A.   They said it very intimidating.  He said, "Get

2    in your car."  What are you supposed to do?  Get in your

3    car.  That's what we do.  We obey the law.

# Excerpt of the Deposition of Jeff Macy

**Case Name:** Macy v. Bates
**Transcript:** [10/1/2024 9:00 AM] Jeff Macy

> 4       Q.   Okay.
>
> 5       A.   "Get in your truck."  Sorry.
>
> 6       Q.   So then you videotaped it first and then your
>
> 7    son and no one else; right?
>
> 8       A.   That's correct.
>
> 9       Q.   Okay.  Thank you.
>
> 10      A.   The cars were supposed to have cameras on them.
>
> 11   You asked a question.  I have the right to answer it.
>
> 12   You said no one else.  Well, the cars were supposed to
>
> 13   have cameras on them.
>
> 14      Q.   No one else used your phone to videotape;
>
> 15   right?
>
> 16      A.   The main officer who pulled me over illegally,
>
> 17   his got edited and deleted.  There's sections deleted
>
> 18   out of the time.  You can see it.  We've checked it many
>
> 19   times over on the video.  Why would he delete what was
>
> 20   said out there?
>
> 21      Q.   Okay.  Once again, I just want to establish who
>
> 22   used your cell phone.                                     7
>
> 23      A.   I need to answer -- you said did anyone else
>
> 24   film.  I need to answer that.  At the end of the traffic
>
> 25   stop --
>
> 73: 1      Q.   Mr. Macy, you need to stop.
>
> 2       A.   Okay.
>
> 3       Q.   Okay.  I've never raised my voice in a
>
> 4    deposition before, but I need you to stop so I can ask
>
> 5    the question, please.

[DAG Hernandez then attempts to go off the record; Upon return on the record, DAG Hernandez continued as follows below.]

# Excerpt of the Deposition of Jeff Macy

**Case Name:** Macy v. Bates
**Transcript:** [10/1/2024 9:00 AM] Jeff Macy

**Pg: 75 Ln: 5 - 16**

```
75: 5    BY MR. HERNANDEZ:
     6        Q.   Sir, this is my deposition, and I asked you a
     7    question about who continued videotaping with your
     8    cellphone.  All right?
     9            So let me ask you again.  The only individuals
    10    who used your cell phone to videotape this -- the
    11    incident was yourself and your son Josiah; is that
    12    correct?
    13        A.   My phone, yes.  Correct.
    14        Q.   Thank you.
    15            And, Mr. Macy, I understand that I did raise my
    16    voice and I apologize.
```